FILED

Daniel L. Germain (Bar No. 143334)
**ROSMAN & GERMAIN LLP**
16311 Ventura Boulevard
Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
E-Mail: germain@lalawyer.com

2011 DEC -9 PH 3: 29

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

*Attorneys for Plaintiffs and the Proposed Class*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

WAYNE SAMP, ROBERTA SAMP,
DANIEL KOMARCHUK, SUSAN
KOMARCHUK, and ANNETTA
WHITAKER, individually and on behalf
of all others similarly situated,

          Plaintiffs,

          v.

JPMORGAN CHASE BANK, N.A.,
CHASE BANK USA, N.A., JPMORGAN
CHASE & CO., CROSS COUNTRY
INSURANCE COMPANY, UNITED
GUARANTY RESIDENTIAL
INSURANCE CO., PMI MORTGAGE
INSURANCE CO., MORTGAGE
GUARANTY INSURANCE CORP.,
GENWORTH  MORTGAGE
INSURANCE CORP., REPUBLIC
MORTGAGE INSURANCE CO.,
RADIAN GUARANTY INC., and TRIAD
GUARANTY INSURANCE CORP.

          Defendants.

Case No. EDCV11 - 01950 VAP SPx

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

CLASS ACTION COMPLAINT

## INTRODUCTION

1.      Defendants JPMorgan Chase Bank, N.A., Chase Bank USA, N.A. and JPMorgan Chase & Co., together with their affiliated reinsurer, Defendant Cross Country Insurance Co. ("Cross Country") (collectively, "JPMorgan"), have acted in concert with Defendants United Guaranty Residential Insurance Co., PMI Mortgage Insurance Co., Mortgage Guaranty Insurance Corp., Genworth Mortgage Insurance Corp., Republic Mortgage Insurance Co., Radian Guaranty Inc., and Triad Guaranty Insurance Corp. (collectively, the "Private Mortgage Insurers") (together with JPMorgan, "Defendants") to effectuate a captive reinsurance scheme whereby, in violation of the Real Estate Settlement Procedures Act of 1974 ("RESPA"): (a) illegal referral payments in the form of purported reinsurance premiums were paid by the Private Mortgage Insurers to Cross Country; and (b) Cross Country received an unlawful split of private mortgage insurance premiums paid by JPMorgan's customers.

2.      This is a proposed nationwide action brought by Plaintiffs Wayne Samp, Roberta Samp, Daniel Komarchuk, Susan Komarchuk and Annetta Whitaker (collectively, "Plaintiffs") on behalf of themselves and a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by JPMorgan or any of its subsidiaries and/or affiliates between January 1, 2004 and the present (the "Class Period") and, in connection therewith, purchased private mortgage insurance and whose residential mortgage loans were included within JPMorgan's captive mortgage reinsurance arrangements (hereinafter, the "Class").

3.      Captive reinsurance schemes such as that involving Defendants is widespread throughout the mortgage lending marketplace.  As *American Banker* magazine recently reported in connection with an investigation by the Inspector General of the Department of Housing and Urban Development ("HUD"), "beginning in the late 1990s major U.S. banks began coercing [private mortgage] insurers into cutting them in on what would ultimately amount to $6 billion of insurance premiums in exchange for assuming little or no risk." *See* Jeff Horowitz, *Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction,*

American Banker (Sept. 16, 2011, 7:45 PM), http://www.americanbanker.com/issues/ 176_181/mortgages-reinsurance-deals-kickbacks-HUD-1042277-1.html, attached as Exhibit A hereto (hereinafter referred to as "Mortgage Kickback Scheme"); *see also* Jeff Horowitz, *Banks Took $6B in Reinsurance Kickbacks, Investigators Say,* American Banker (Sept. 6, 2011, 4:55 PM), http://www.americanbanker.com/.../176_173/mortgage-reinsurance-respa-kickbacks-hud-investigation-doj-1041928-1.html, attached as Exhibit B hereto (hereinafter referred to as "Reinsurance Kickbacks").[1]

4.      As described in greater detail below, this was accomplished through a secretive "pay-to-play scheme"[2] that utilized carefully crafted excess-of-loss or "purported" quota-share reinsurance contracts that minimized risk exposure to bands of losses unlikely to be pierced.  Further, as described below, even with regard to the purported band of exposure, certain lenders, including JPMorgan, insulated themselves from providing any real reinsurance by: (a) making their captive reinsurance arrangements "self-capitalizing," in that they were required to put only "nominal initial capital" into the trusts supporting the reinsurance contracts and (b) providing no recourse for the failure to adequately fund the trusts.  *See* Mortgage Kickback Scheme.

5.      As *American Banker* described such arrangements:

> The banks were supposedly providing catastrophic reinsurance, but the policies appeared to render it impossible that they'd ever suffer significant losses.  In the event of catastrophic losses, a bank could simply walk away from its nominal initial investment and leave the insurer to bear the other costs . . . .

*Id.*

6.      In other words, these lenders—including JPMorgan—were "playing with the

---

[1]      In fact, "Bank of America recently spent $34 million to settle a RESPA class action suit accusing Countrywide of taking the same mortgage insurance kickbacks alleged by HUD investigators."  *See* Reinsurance Kickbacks.  *See also* Final Approval Order in *Alston v. Countrywide Fin. Corp.*, No. 07-cv-03508 (E.D. Pa. July 29, 2011) at ECF No. 149.

[2]      *Id.*

house's money" with no risk of meaningful losses.  As *American Banker* aptly explained:

> If defaults remained low, banks would pocket large premiums without paying any claims; if defaults were high, banks' losses would be capped at the amount of their small initial investments, plus the premiums paid by homeowners and passed along to them by their mortgage insurance partners.  In other words, it appeared to be a no-lose proposition for the banks.

*Id.*

7.    In this action, Plaintiffs challenge Defendants' hidden scheme to circumvent RESPA's strict prohibition against kickbacks, referral payments and unearned fee splits and seek statutory damages and/or restitution for Defendants' unjust enrichment.    Each Defendant was a member of the scheme.

8.    Homeowners who buy a home with less than a 20% down payment are typically required to pay for private mortgage insurance.  *See* http://www.privatemi.com.  Private mortgage insurance protects the lender in the event of a default by the borrower.  *Id. See also* Proposed EITF Issue titled "Risk Transfer in Mortgage Reinsurance Captive Arrangements" at 1, attached hereto as Exhibit C, discussing the purpose of private mortgage insurance.  Although the premium is paid by the borrower (either directly or indirectly, as further described below), borrowers typically have no opportunity to comparison-shop or select the provider of the private mortgage insurance.  *See* Reinsurance Kickbacks ("Banks typically choose the insurance carrier . . . .).

9.    Section 2607(a) of RESPA prohibits lenders from accepting kickbacks or referral fees from any person providing a real estate settlement service, including providers of private mortgage insurance.  Thus, a lender cannot legally accept a referral fee from the insurer issuing the private mortgage insurance policy on the borrower's home.  Similarly, Section 2607(a) of RESPA prohibits providers of private mortgage insurance from giving kickbacks or referrals fees to providers of real estate settlement services, including lenders and their affiliates.  Accordingly, it is unlawful for providers of private mortgage insurance to pay referral fees to lenders and their affiliates.

3

10.     Section 2607(b) of RESPA prohibits lenders from accepting any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance—from any person providing a real estate settlement service, including providers of private mortgage insurance, other than for services actually performed.  Thus, a lender cannot legally accept an unearned fee split from the insurer issuing the private mortgage insurance policy on the borrower's home.  Similarly, Section 2607(b) of RESPA prohibits providers of private mortgage insurance from giving any portion of a settlement service fee—including amounts paid by borrowers for private mortgage insurance—to providers of real estate settlement services, including lenders and their affiliates, other than for services actually performed.  Accordingly, it is unlawful for providers of private mortgage insurance to pay unearned fee splits to lenders and their affiliates.

11.     Defendants have engaged in a scheme designed to circumvent RESPA's prohibition against kickbacks, referral payments and unearned fee splits.  Pursuant to the scheme, each Private Mortgage Insurer pays a portion of borrowers' private mortgage insurance premiums to Cross Country in the form of purported "reinsurance" premiums.

12.     While these payments to Cross Country are purportedly for "reinsurance" services, Cross Country receives these payments while assuming very little or no actual risk under its contracts with the Private Mortgage Insurers.  From the beginning of 2004 through the end of 2008, Cross Country collected from private mortgage insurers at least **$428 million** as its "share" of borrower's private mortgage insurance premiums.  In contrast, Cross Country's "share" of paid claims during this time period was only approximately $7 million.[3]  *See* Schedule F – Part 3 from the 2004-2008 Annual Statements filed with the National Association of Insurance Commissioners ("NAIC") by each of the Defendant Private Mortgage Insurers (showing the reinsurance premiums ceded to and the "losses"

---

[3]      As further described below, although Cross Country paid additional "claims" during 2009 and 2010, the payment of such claims does not mean that it suffered a true reinsurance "loss."  Rather, it is the structure and missing essential terms of the reinsurance contracts themselves that renders the arrangements a sham in violation of RESPA.

4

paid by Cross Country).

13.    In this action, Plaintiffs contend that, due to the **structure** of Defendants' captive reinsurance arrangements, and the essential terms missing therein, such arrangements were a sham and in violation of RESPA.

14.    This scheme constitutes disguised, unlawful referral fees in violation of RESPA's anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.

### JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

16.    Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because the real property involved in one or more of Plaintiffs' mortgage loan transactions is located in this district, certain Defendants reside in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

### PARTIES

**Plaintiffs**

17.    Plaintiffs Wayne Samp and Roberta Samp, husband and wife, obtained a mortgage loan from Defendant JPMorgan Chase Bank, N.A. on or about June 6, 2008, for the purchase of their home located in Hemet, CA.  In connection with their loan, Plaintiffs Wayne Samp and Roberta Samp were required to pay for private mortgage insurance in the amount of $66.38 per month.   Their Private Mortgage Insurer, Genworth Mortgage Insurance Corp., was selected by their lender and was a provider with whom JPMorgan had a captive reinsurance arrangement.

18.    Plaintiffs Daniel Komarchuk and Susan Komarchuk, husband and wife, obtained a mortgage loan from Chase Manhattan Mortgage Corporation on or about January 27, 2005, for the purchase of their home located in Antioch, IL.[4]   In connection with their

---

[4]    As explained herein, Chase Home Finance, LLC is the successor by merger to Chase Manhattan Mortgage Corporation.  Upon information and belief, Chase Home Finance,

loan, Plaintiffs Daniel Komarchuk and Susan Komarchuk were required to pay for private mortgage insurance in the amount of $172.47 per month. Their Private Mortgage Insurer, Republic Mortgage Insurance Co., was selected by their lender and was a provider with whom JPMorgan had a captive reinsurance arrangement.

19. Plaintiff Annetta Whitaker obtained a mortgage loan from Defendant JPMorgan Chase Bank, N.A. on or about April 28, 2005, for the purchase of her home located in Harrisburg, PA. In connection with her loan, Plaintiff Annetta Whitaker was required to pay for private mortgage insurance in the amount of $94.76 per month. Her Private Mortgage Insurer, United Guaranty Residential Insurance Co., was selected by her lender and was a provider with whom JPMorgan had a captive reinsurance arrangement.

**Defendants**

JPMorgan Defendants

20. Defendant JPMorgan Chase Bank, N.A., a subsidiary of JPMorgan Chase & Co., is a national banking association that conducts business in California and other states throughout the United States. *See* Exhibit D hereto (shareholder information sheet from JPMorgan Chase & Co.'s 2010 Annual Report, listing JPMorgan Chase Bank, N.A. as a principal subsidiary of JPMorgan Chase & Co.).

21. Defendant Chase Bank USA, N.A., also a subsidiary of JPMorgan Chase & Co., is a national banking association that conducts business in California and other states throughout the United States. *Id.* (listing Chase Bank USA, N.A. as a principal subsidiary of JPMorgan Chase & Co.).

22. Defendant JPMorgan Chase & Co. is a financial holding company incorporated in Delaware and headquartered in New York, NY. *Id.* (listing the location of JPMorgan Chase & Co.'s corporate headquarters).

23. Defendant Cross Country Insurance Company is a Vermont corporation. Cross

LLC merged with and into Defendant JPMorgan Chase Bank, N.A. on or about May 1, 2011 with JPMorgan Chase Bank, N.A. as the surviving entity. Prior to the merger, Chase Home Finance, LLC was a subsidiary of JPMorgan Chase Bank, N.A. & JPMorgan Chase & Co.

6

Country is a subsidiary of JPMorgan Chase Bank, N.A. and JPMorgan Chase & Co. and an affiliate of Chase Bank USA, N.A.  *See* Exhibit E attached hereto (Exhibit 21.1 to JPMorgan Chase & Co.'s 2010 Form 10-K, dated February 28, 2011, listing Cross Country as a subsidiary of both JPMorgan Chase Bank, N.A. and JPMorgan Chase & Co.); Exhibit F attached hereto (Comptroller of the Currency Corporate Decision #97-06, dated January 1997, regarding Chase Manhattan Bank USA, N.A.'s [5] intent to establish Cross Country as an operating subsidiary to reinsure mortgage insurance); Exhibit G attached hereto (*OCC approves Chase mortgage insurance application; First bank given reinsurance powers,* allBusiness.com (Jan. 23, 1997), http://www.allbusiness.com/banking-finance/banking-lending-credit-services/7027383-1.html, noting that Chase Manhattan Bank USA, N.A.'s application to establish Cross Country as an operating subsidiary to reinsure mortgage insurance had been approved); Exhibit H attached hereto (2004 application disclosure provided to Plaintiff Daniel Komarchuk noting that Cross Country is an affiliate of Chase Manhattan Mortgage Corporation).[6]

The Private Mortgage Insurer Defendants

24.    Defendant United Guaranty Residential Insurance Co. is a North Carolina corporation headquartered in Greensboro, NC, and, during the Class Period, conducted business throughout the United States, including in California.

25.    Defendant PMI Mortgage Insurance Co. is an Arizona corporation headquartered in Walnut Creek, CA, and, during the Class Period, conducted business

---

[5]    Chase Bank USA, N.A. was formerly known as Chase Manhattan Bank USA, N.A. Chase Manhattan Bank USA, N.A. was a principal bank subsidiary of The Chase Manhattan Corporation.  In 2000, The Chase Manhattan Corporation merged with J.P. Morgan & Co. Inc. to form JPMorgan Chase & Co.

[6]    Chase Home Finance, LLC is the successor by merger to Chase Manhattan Mortgage Corporation.  Upon information and belief, Chase Home Finance, LLC merged with and into Defendant JPMorgan Chase Bank, N.A. on or about May 1, 2011 with JPMorgan Chase Bank, N.A. as the surviving entity.

7

throughout the United States, including in California.[7]

26.    Defendant Mortgage Guaranty Insurance Corp. is a Wisconsin corporation headquartered in Milwaukee, WI, and, during the Class Period, conducted business throughout the United States, including in California.

27.    Defendant Genworth Mortgage Insurance Corp. is a North Carolina corporation headquartered in Raleigh, NC, and, during the Class Period, conducted business throughout the United States, including in California.

28.    Defendant Republic Mortgage Insurance Co. is a North Carolina corporation headquartered in Winston-Salem, NC, and, during the Class Period, conducted business throughout the United States, including in California.

29.    Defendant Radian Guaranty Inc. is a Pennsylvania corporation headquartered in Philadelphia, PA, and, during the Class Period, conducted business throughout the United States, including in California.

30.    Defendant Triad Guaranty Insurance Corp. is an Illinois corporation headquartered in Winston-Salem, NC, and, during the Class Period, conducted business

---

[7]    On August 19, 2011, the Director of the Arizona Department of Insurance issued an order placing PMI Mortgage Insurance Co. under supervision pursuant to § 20-169 of the Arizona Revised Statutes and requiring PMI Mortgage Insurance Co. to cease writing new commitments for insurance effective as of the close of business on August 19, 2011.  *See* http://phx.corporate-ir.net/phoenix.zhtml?c=63356&p=irol-news&nyo=0 (August 19, 2011 Press Release).  On October 20, 2011, the Director of the Arizona Department of Insurance obtained an interim "Order Directing Full and Exclusive Possession and Control of Insurer" with respect to PMI Mortgage Insurance Co. pursuant to § 20-172 of the Arizona Revised Statutes and, under the order, now has full possession, management and control of PMI Mortgage Insurance Co.  *See* http://www.id.state.az.us/announcements.html (October 20, 2011 Announcement).  The hearing on the Director's Application for Appointment of Receiver and Order to Show Cause has been set for January 10, 2012.  *See In re: The PMI Group, Inc.*, No. 11-13730 (D. Del. Nov. 23, 2011) Declaration of L. Stephen Smith in Support of Chapter 11 Petition and Requests for First Day Relief at ¶ 13.  In the wake of this recent seizure, PMI Group Inc., the parent company of PMI Mortgage Insurance Co., filed for Chapter 11 bankruptcy protection in Delaware on November 23, 2011. *See* http://phx.corporate-ir.net/phoenix.zhtml?c=63356&p=irol-news&nyo=0  (November 23, 2011 Press Release).

throughout the United States, including in California.  Defendant Triad Insurance Corp. purportedly ceased issuing commitments for new business on July 15, 2008 and entered into voluntary run-off.  *See* http://www.tgic.com/.

31.    Each Defendant is a proper party to this action as, upon information and belief, each Defendant participated in the scheme alleged herein and was a provider or recipient of the unlawful kickbacks and unearned fees described herein.  Under RESPA Sections 8(a) and 8(b), 12 U.S.C. §§ 2607(a) and (b), it is unlawful for any person to give or accept any fee, kickback, or thing of value for the referral of private mortgage insurance or any portion of an unearned fee and, further, Section 8(d) of RESPA, 12 U.S.C. § 2607(d), provides that a violator is jointly and severally liable for three times the amount paid for the settlement service.

## FACTUAL ALLEGATIONS

### JPMorgan's Mortgage Operations

32.    JPMorgan Chase & Co. is one of the world's largest global financial services firm and one of the largest banking institutions in the U.S., with $2.1 trillion in assets as of December 31, 2010.  *See* JPMorgan Chase & Co., Annual Report (Form 10-K), at 1 (February 28, 2011).

33.    JPMorgan Chase & Co.'s principal bank subsidiaries are JPMorgan Chase Bank, N.A., a national bank with branches in 23 states in the U.S., and Chase Bank USA, N.A.  *Id.* at 54.

34.    According to its latest annual report, JPMorgan's mortgage-related origination and revenue production channels are comprised of the following:

**Retail** – Borrowers who are buying or refinancing a home through direct contact with a mortgage banker employed by [JPMorgan] using a branch office, the Internet or by phone. Borrowers are frequently referred to a mortgage banker by a banker in a Chase branch, real estate brokers, home builders or other third parties.

**Wholesale** – A third-party mortgage broker refers loan applications to a mortgage banker at the [JPMorgan].  Brokers are independent loan originators that specialize in finding and counseling borrowers but do not provide funding for loans.  [JPMorgan] exited the broker channel during 2008.

9

**Correspondent** – Banks, thrifts, other mortgage banks and other financial institutions that sell closed loans to [JPMorgan].

**Correspondent negotiated transactions ("CNTs")** – These transactions occur when mid- to large-sized mortgage lenders, banks and bank-owned mortgage companies sell servicing to [JPMorgan], on an as-originated basis, and exclude purchased bulk servicing transactions. These transactions supplement traditional production channels and provide growth opportunities in the servicing portfolio in stable and periods of rising interest rates.

**Net production revenue** – Includes net gains or losses on originations and sales of prime and subprime mortgage loans, other production-related fees and losses related to the repurchase of previously-sold loans.

*Id.* at 76.

### Private Mortgage Insurance Industry

35. Each of the Defendant Private Mortgage Insurers provides or provided mortgage insurance for the protection of residential mortgage lenders such as JPMorgan and was a party to a captive reinsurance agreement with JPMorgan.

36. The private mortgage insurance industry began with the founding of Defendant Mortgage Guaranty Insurance Corp. ("MGIC") in 1957 and grew to become dominated by MGIC and the other Defendant Private Mortgage Insurers, including United Guaranty Residential Insurance Co., PMI Mortgage Insurance Co., Genworth Mortgage Insurance Corp, Republic Mortgage Insurance Co., Radian Guaranty Inc., and Triad Guaranty Insurance Corp. Generally, the industry is represented by a trade association known as Mortgage Insurance Companies of America ("MICA"). *See* http://www.privatemi.com/news/index.cfm. According to its website, MICA's members include each of the foregoing insurers, with the exception of Triad Guaranty Insurance Corp. and United Guaranty Residential Insurance Co. *See* http://www.privatemi.com/about.cfm.

37. According to MICA, new private mortgage insurance contracts for its member firms consistently exceeded $200 billion between 1998 and 2006 and topped $300 billion in 2007. *Id.*

38. In order to lessen the risk of default, lenders typically prefer to finance no more than eighty percent (80%) of the value of a home, with the remaining twenty percent (20%)

being paid as a down payment by the borrower.  In the event of a default, the lender is then more likely to completely recover its investment.

39.     Many potential homebuyers cannot afford to pay 20% of the purchase price as a down payment on a home.  Private mortgage insurance allows the lender to make loans in excess of 80% of the home's value by providing a guarantee from a dependable third party—the provider of private mortgage insurance—to protect the lender in the event of a default by the borrower.   *See* http://www.privatemi.com/news/factsheets/20 10-2011.pdf. *See also* Exhibit C at 1-2, discussing the purpose of mortgage insurance.

40.     Providers of private mortgage insurance are typically unaffiliated third-party companies who agree to cover the first 20% to thirty percent (30%) of the amount of the potential claim for private mortgage insurance coverage, including unpaid principal, interest and certain expenses.  *Id.*

41.     The amount of private mortgage insurance coverage required varies according to the perceived risk of default.  The lower the percentage of the borrower's down payment, the greater the amount of mortgage insurance required.   *See* http://www. privatemi.com/ toolsresources/faqs.cfm.  For example, more private mortgage insurance is required with a five percent (5%) down payment than with a fifteen percent (15%) down payment.

42.     While the lender is the beneficiary of the private mortgage insurance, the borrower pays for the insurance, either (a) directly through the addition of monthly premiums to the borrower's monthly mortgage payment, or (b) indirectly through a higher interest rate on the loan (the lender pays the initial private mortgage insurance premium as a lump sum and then passes this cost on the borrower in the form of a higher interest rate for the life of the loan).

43.     Borrowers generally have no opportunity to comparison-shop for private mortgage insurance, as the private mortgage insurance is arranged by the lender.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the lender and the provider of private mortgage insurance, rather than negotiated between the borrower and the provider of private mortgage insurance.   *See, e.g.,*

11

http://www.privatemi.com/toolsresources/faqs.cfm.   *See also* Reinsurance Kickbacks ("Banks typically choose the insurance carrier . . . .).

44.    Private mortgage insurance is limited to the conventional home loan market. Mortgage loans directly insured by the federal government via mortgage guaranty programs, such as those maintained by the Federal Housing Administration, the Department of Veterans Affairs and the Department of Agriculture maintain their own form of mortgage default insurance.  *See* http://www.privatemi.com/news/factsheets/2010-2011.pdf.

## RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related to Private Mortgage Insurance Policies

45.    RESPA is the primary federal law regulating residential mortgage settlement services.  The United States Department of Housing and Urban Development ("HUD") is charged with enforcing RESPA.  HUD has promulgated the implementing rules for RESPA. *See* Regulation X, 24 C.F.R. § 3500.

46.    RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers.  "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b).

47.    A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

48.    RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any contract or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

49.    RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or

12

received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

50.    Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

51.    The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> [W]ithout limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity . . . . The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

52.    Private mortgage insurance business referred to private mortgage insurers by a lender constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a).  The term "settlement service" is liberally defined in RESPA and Regulation X and includes the "provision of services involving mortgage insurance." 24 C.F.R. § 3500.2(b).

53.    Under RESPA, therefore: (a) JPMorgan is prohibited from accepting referral fees from a Private Mortgage Insurer or from splitting private mortgage insurance premiums with the Private Mortgage Insurer other than for services actually performed by the captive reinsurer; and (b) the Private Mortgage Insurers are prohibited from paying referral fees to JPMorgan or from paying to JPMorgan any split of private mortgage insurance premiums other than for services actually performed by the captive reinsurer.

13

### Mortgage Reinsurance

54.     Beginning in the mid to late 1990s, mortgage companies began looking for ways to capitalize on the booming profitability of the private mortgage insurance market. *See* Exhibit I attached hereto (Timothy J. Cremin, *Using a Bank Captive Subsidiary to Reinsure Mortgage Insurance,* (Mar. 23, 1998), http://www.captive.com/service/milliman/article3_mortgage.shtml).

55.     In order to "share in these profits," lenders typically create reinsurance subsidiaries to enter into contracts with providers of private mortgage insurance, whereby the reinsurer typically agrees to assume a portion of the private mortgage insurer's risk with respect to a given pool of loans. *Id.* In return for guaranteeing a steady stream of business, the private mortgage insurer cedes to the reinsurer a portion of the premiums it receives from borrowers with respect to the loans involved.

56.     Mortgage reinsurance arrangements can generally take one of two forms: (a) "quota share" or (b) "excess-of-loss."

57.     In a typical quota share reinsurance arrangement, the reinsurer agrees to assume a fixed percentage of all the private mortgage insurer's insured losses. Thus, if the private mortgage insurer experiences losses, the reinsurer is expected to experience losses in the percentage agreed upon in the reinsurance contract. However, quota share arrangements do not constitute real or commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers, and the Private Mortgage Insurers have no recourse against the reinsurer.[8]

---

[8]     As noted by the American Academy of Actuaries:

> Straight quota share contracts are typically exempted from risk transfer requirements under the paragraph 11 exception of FAS 113. However, the ***introduction of risk limiting features to a quota share contract, such as a loss ratio cap*** . . . a loss retention

14

58.    In contrast to the typical quota share arrangement, where the private mortgage insurer and reinsurer are *expected* to share losses beginning with the first dollar of loss paid, in an excess-of-loss arrangement, the reinsurer is liable only for a specified corridor or "band" of loss, with the losses below and above the band being covered by the private mortgage insurer.   In other words, the reinsurer is liable only for claims, or a percentage thereof, above a particular point, commonly known as an attachment or entry point, and subject to a ceiling, commonly known as a detachment or exit point.   Under this structure, then, the reinsurer's liability begins, if ever, only when the private mortgage insurer's incurred losses reach the attachment point and ends when such losses reach the detachment point.

59.    An excess-of-loss arrangement does not, however, necessarily result in any actual "losses" being shifted to the reinsurer, even if the reinsurer begins paying claims. Paid claims, as discussed herein, do not establish that the reinsurance agreements provide for true, and commensurately priced, risk transfer as required by RESPA. Risk/liability/recourse limiting features such as those described herein make any claim of "loss" illusory and purposefully inaccurate.

60.    Under accepted accounting principles, and actuarial principles, for a contract to be treated as "real," risk-transferring reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss."   *See* CAS Research Working Party on Risk Transfer Testing, Risk Transfer Testing of Reinsurance Contracts: Analysis and Recommendations, Casualty Actuarial Society *Forum,* Winter 2006, at 282-283, attached hereto as Exhibit K; *see generally* Statement of Financial Accounting Standards No. 113, "Accounting and Reporting for Reinsurance of Short-

---

corridor, or a sliding scale commission, often prevents the contract from qualifying for the exception.

*See* Exhibit J attached hereto, January 2007 Reinsurance Attestation Supplement 20-1, at 14 (emphasis added).   Upon information and belief, any quota share reinsurance arrangement between JPMorgan and the Private Mortgage Insurers during the Class Period included a "cap" and other risk/liability/recourse limiting features.

15

Duration and Long-Duration Contracts," (December 1992) at 7, attached hereto as Exhibit L.

61.    The likelihood of the reinsurer experiencing any real losses (as opposed to merely paying claims) under the arrangement depends not only on the amount of losses paid by the private mortgage insurer (i.e. whether the amount of claims paid by the insurer ever reaches the band where the reinsurer's responsibility to pay claims attaches) but also on whether the reinsurance agreement between the reinsurer and the private mortgage insurer exposes the reinsurer to any real possibility that it may be *required* to contribute its *own* money when called upon by the primary private mortgage insurer to pay for its share of losses.  The absence of any likelihood that the reinsurer will experience any real losses, in turn, reveals the reinsurance agreement between the reinsurer and primary private mortgage insurer to be a sham.  Such an arrangement does not constitute real, risk-transferring or commensurately priced reinsurance.

### Captive Mortgage Reinsurance Arrangements

62.    Lenders produce customers for private mortgage insurers.  In the early years of the private mortgage insurance industry, there were no financial ties between lenders and the private mortgage insurers.  *See* Reinsurance Kickbacks.

63.    However, mortgage lenders such as JPMorgan, seeking to capitalize on the hundreds of millions of dollars its borrowers pay to private mortgage insurers in premiums each year, entered into a scheme with the Defendant Private Mortgage Insurers to establish its own affiliated or "captive" reinsurer and, "[i]n exchange for steering home buyers to the [Defendant Private Mortgage] [I]nsurers, [] demand[ed] unjustifiably lucrative [captive] reinsurance deals" with such Private Mortgage Insurers (whose business was dependent upon referrals from the lenders and who initially used reinsurance deals as marketing tools). *See* Mortgage Kickback Scheme*; see also* Michael C. Schmitz, *Investigating Captive Mortgage Reinsurance,* Mortgage Banking, February 1, 1998, attached as Exhibit M hereto.

64.    Upon information and belief, lender captive reinsurers provide reinsurance primarily or exclusively for loans the lender originates that include private mortgage

insurance.   Under captive reinsurance arrangements, the lender refers its borrowers to a private mortgage insurer who agrees to reinsure with the lender's captive reinsurer.  These arrangements require the private mortgage insurer to cede a percentage of the borrowers' premiums to the lender's captive reinsurer for the "reinsurance" purportedly provided.

65.   Notably,   after   investigating   mortgage   lenders'   captive   reinsurance arrangements with private mortgage insurers, the Office of the Inspector General of HUD concluded that "banks and insurance companies had created elaborate financial structures that had the appearance of reinsurance but failed to transfer significant amounts of risk to their bank underwriters."  *See* Reinsurance Kickbacks.

66.   This is because some lenders, including JPMorgan, collaborated with private mortgage insurers to create lucrative excess-of-loss and quota share reinsurance deals and purposefully designed their reinsurance contracts in such a manner as to receive hundreds of millions of dollars in purported reinsurance premiums, while assuming little or no actual risk.  As *American Banker* reported, "[w]hile designed to look like reinsurance, the deals weren't built to perform like it.  The problem was how they split up the risks and rewards of insuring homeowners' mortgages."  *Id*.

67.   Typically, pursuant to the terms of the reinsurance contracts, the premiums ceded by the private mortgage insurers are deposited directly into trust accounts supporting the reinsurance contracts—that is, accounts which hold the funds that are to be used under the reinsurance contracts to pay claims.  *See, e.g.,* Exhibit C at 4, discussing the use of a trust fund.

68.   Premiums are ceded into the supporting trusts on a "book year" basis, as described by an American Institute of CPAs ("AICPA") Task Force addressing issues regarding risk transfer in mortgage reinsurance captive arrangements.

> A contract functions at the book year level and is typically for a 10 year term. For example, 1999 is a book year and all mortgage insurance policies written during 1999 would be considered "book year 1" and reinsurance premium and reinsurance losses related to that book year would be ceded to the captive reinsurer for 10 years . . . . Trust funds

17

for all book years for the particular MI cross-collateralize
the entire reinsured obligation to the MI.

*Id.* at 3.

69.    Thus, all claims under a reinsurance contract with a particular private mortgage insurer can be satisfied from all the funds in the trust created to support that reinsurance contract, rather than only from premiums ceded for a given book year.  *Id.*  Moreover, upon information and belief, when certain trust reserve requirements are met, the funds in the trust can also typically be released as dividends to the captive reinsurer.  Thus, the ceded premiums which are deposited into the trusts remain there until they are paid out to cover claims, paid out to cover administrative expenses incurred by the captive reinsurer, or released as a dividend to the captive reinsurer.

70.    Typically, by design, lenders' captive reinsurance contracts with private mortgage insurers, such as JPMorgan's contracts with the Private Mortgage Insurers, limit the lenders' liability/payment responsibilities under the contracts through provisions that permit the captive reinsurer to effectively opt out of the contracts at will by simply failing to adequately capitalize the trust supporting the reinsurance contract.  *See* Reinsurance Kickbacks.

71.    While the captive reinsurer is facially required to maintain the trust fund's net assets at a level required by state law (typically, upon information and belief, 10% of the current cumulative loss exposure for all book years or 100% of loss reserves, including a contingency reserve) through, *inter alia*, capital infusions, this requirement is a chimera as the private mortgage insurers have no monetary recourse against the captive reinsurer or the lender to ensure that the trusts are sufficiently funded on an ongoing basis in order to cover actual or expected losses under the reinsurance contract.  *Id*.

72.    Thus, the captive reinsurer's potential exposure for payment of reinsurance claims is commonly limited to the amount held in the trust account established for the mortgage insurer—no matter what state law or regulation, or even other portions of the reinsurance contracts, require.  This is accomplished either through concurrent contractual provisions expressly providing that the captive reinsurer and its affiliates have no exposure

18

for the failure to adequately fund the trusts or through an unwritten understanding of the parties.[9]

73.     As *American Banker* aptly described such arrangements:

> And the deals were "self-capitalizing," meaning that a bank could fund its stake with incoming premiums.  If the deal went bad, the bank could walk away and leave the insurer to cover its losses.   Conceptually, such arrangements are analogous to letting a gambler with $10 in casino chips place a $100 bet at a blackjack table on the assumption that he'll win.

*See* Reinsurance Kickbacks.

74.     In other words, should the captive reinsurer choose not to maintain the required funds in the trust (which it commonly does), once the trust is depleted, the captive reinsurer bears no further risk and the mortgage insurer assumes any remaining obligations—no matter if the funds available in the trusts were not enough to cover the amount of risk or "losses" the captive reinsurer contracted and paid to cover.  The absence of such recourse distinguishes the challenged captive reinsurance contracts from true mortgage reinsurance contracts.

75.     Typically, lenders' captive reinsurance arrangements provide yet another layer of protection from true reinsurance losses, in that:

> Each of a bank's reinsurance vehicles was legally separate not only from the bank's main reinsurance subsidiary but also from all the other funds.  If a reinsurance deal didn't have enough money to pay its obligations, the bank could abandon it and leave the mortgage insurer with the unpaid bill.
>
> To carry on the casino analogy above, it would be as if the gambler with $10 in chips were allowed to make that same $100 bet at ten different blackjack tables, collecting on the

---

[9]     *See* Exhibit F at 3 (noting that under the terms of its reinsurance agreement, Chase Manhattan Bank USA, N.A.'s "potential liability for [Cross Country's] reinsurance obligation will not exceed [its] investment in [Cross Country.").

winning bets and renouncing the losers.

*Id.*

76.     Lenders have aggressively pursued such arrangements with private mortgage insurers.   As *American Banker* recently reported, "[e]ven as insurers complained they couldn't afford the escalating cost of the reinsurance payments, banks threatened or punished companies that balked at providing them."  *Id.*

77.     Captive mortgage reinsurance arrangements such as JPMorgan's arrangements with the Private Mortgage Insurers raise obvious RESPA kickback problems.   Private mortgage insurers are dependent on the lender to obtain business, while the lender is collaborating with the insurer to obtain a share of the premium revenue generated by referral of its borrowers to the private mortgage insurers.   The private mortgage insurer stimulates/guarantees its business by providing a lucrative stream of revenue for the lender via the lender's captive reinsurer.

78.     As opposed to receiving direct payments for referring its customers to a certain private mortgage insurer, lenders have utilized carefully crafted reinsurance contracts, as described above, to funnel such unlawful kickbacks from private mortgage insurers to the lenders' captive reinsurance subsidiaries.

79.     As actuarial firm Milliman, Inc. acknowledged, if everything went as planned, the scheme would operate as a perfect kickback: "[i]f actual losses develop to the expected level, the above arrangement, from the lender's perspective, is financially equivalent to *receiving a commission or profit sharing equal to a percentage of premium*."  *See* Exhibit I (emphasis added).

### HUD's Concern About  RESPA Anti-kickback Violations Under Captive Reinsurance Arrangements

80.     Concerned that captive reinsurance arrangements would be designed to disguise a funneling of referral fees back to the lender who arranged for the private mortgage insurer to obtain the business, HUD issued a letter dated August 6, 1997 ("HUD letter") addressing the problem of captive reinsurers and RESPA's anti-kickback violations.  *See* HUD Letter,

20

attached as Exhibit N hereto.

81.    The HUD letter concluded that captive reinsurance arrangements were permissible under RESPA only "if the payments to the affiliated reinsurer: (1) are for reinsurance services 'actually furnished or for services performed' and (2) are bona fide compensation that does not exceed the value of such services" (emphasis in original).  *Id.* at 3.

82.    The HUD letter focuses the RESPA anti-kickback analysis on whether the arrangement between the lender's captive reinsurer and the private mortgage insurer represents "a real transfer of risk."  In determining whether there is a real transfer of risk, HUD warned that "The reinsurance transaction cannot be a sham under which premium payments . . . are given to the reinsurer even though there is no reasonable expectation that the reinsurer will ever have to pay claims."  *Id.* at 6.

83.    The HUD letter also states that "[t]his requirement for a real transfer of risk would clearly be satisfied by a quota share arrangement, under which the reinsurer is bound to participate pro rata in every claim" (emphasis in original).  *Id.*[10]

84.    The HUD letter contrasts the excess-of-loss method of captive mortgage reinsurance, stating that excess-of-loss reinsurance contracts can escape characterization as an unlawful referral fee or fee-split only:

> [I]f the band of the reinsurer's potential exposure is such that a reasonable business justification would motivate a decision to reinsure that band.  Unless there is a real transfer of risk, no real reinsurance services are actually being provided.  In either case, the premiums paid . . . must be commensurate with the risk.

*Id.*  In other words, even if there is some transfer of risk, the reinsurance arrangement will

---

[10]    As noted above, even quota share arrangements do not constitute real or commensurately priced reinsurance if provisions in the reinsurance contract limit the reinsurer's liability to pay claims to the assets held in the trust accounts established for each mortgage insurer into which the mortgage insurer deposits the contractually-determined ceded portion of the premiums that it collects from borrowers, and the Private Mortgage Insurers have no recourse against the reinsurer.

still violate RESPA unless the amount paid (*e.g.,* the premiums ceded) is commensurate with the risk transferred.

### JPMorgan's Captive Reinsurance Arrangements with the Defendant Private Mortgage Insurers

85.     During the Class Period, in connection with the hundreds of millions of dollars in home loans originated, funded and/or originated through correspondent lending by JPMorgan, many of its borrowers paid for private mortgage insurance.

86.     Also during the Class Period, Defendant Cross Country was a party to captive reinsurance arrangements with each of the Defendant Private Mortgage Insurers.  Pursuant to these arrangements, JPMorgan Chase Bank, N.A. and Chase Bank USA, N.A., referred their borrowers to, and, upon information and belief, allocated referrals on a rotating or other systematic basis having nothing to do with quality of service, price, reputation, performance or other appropriate metric among, the Defendant Private Mortgage Insurers who, for their part, agreed to reinsure with Cross Country under carefully crafted reinsurance contracts that provided for no true transfer of risk of reinsurance losses to Cross Country.

87.     Upon information and belief, Cross Country entered into reinsurance contracts solely with respect to loans originated, funded, and/or originated through correspondent lending by JPMorgan during the Class Period.  Further, upon information and belief, such agreements were in the form of aggregate excess-of-loss reinsurance contracts or "purported" quota share reinsurance contracts.[11]

88.     Upon information and belief, under each of JPMorgan's excess-of-loss and quota share captive reinsurance arrangements, the Defendant Private Mortgage Insurer pays Cross Country a percentage of the premiums paid by borrowers on a particular pool of

---

[11]     Upon information and belief, JPMorgan entered into at least one quota share reinsurance arrangement with Defendant Mortgage Guaranty Insurance Corp.  *See* http://phx.corporate-ir.net/phoenix.zhtml?c=117240&p=irol-reportsAnnual, 2010 Annual Report at 20 (noting that, effective January 1, 2009, Mortgage Guaranty Insurance Corp. no longer cedes new business under excess-of-loss reinsurance treaties with lender captive reinsurers and that all new business will continue to be ceded under quota share reinsurance arrangements).

22

loans; in return, Cross Country purportedly agrees to assume a portion of the insurer's risk of loss with respect to the loans involved.

89.    In fact, each of Defendants' carefully-crafted reinsurance contracts does not provide for "real transfer of risk" and, under any analysis, are not "commensurately" priced.

90.    Upon information and belief, under its reinsurance contracts, Cross Country established a separate trust fund for each Private Mortgage Insurer into which the Private Mortgage Insurer deposited the contractually-determined ceded portions of the premiums that it collected from borrowers.  Upon information and belief, Cross Country is facially required, pursuant to its contracts with the Private Mortgage Insurers, to maintain through, *inter alia,* capital infusions and ceded premiums, each trust fund's net assets at a level required by state law to fund claims made under the reinsurance contracts.

91.    Upon information and belief, for the reasons described above, Cross Country's potential exposure for payment of reinsurance claims is limited to the amount held in the trust account established for the mortgage insurer—effectively insulating Defendants from liability for failing to maintain the trusts adequately to pay claims and leaving the Private Mortgage Insurers with no recourse.[12]

92.    Consequently, JPMorgan's captive reinsurance arrangements do not constitute real, risk-transferring reinsurance between Cross Country and the Defendant Private Mortgage Insurers.

93.    As HUD noted during testimony by Deputy Assistant Secretary for Regulatory

---

[12]    *See* Exhibit O attached hereto (Comptroller of the Currency Corporate Decision #99-32, dated October 1999, regarding Chase Manhattan Bank USA, N.A.'s application to expand the activities of its mortgage reinsurance operating subsidiary to include reinsuring mortgage insurance on serviced mortgage loans and noting that "[n]either Chase Manhattan Corporation nor any of its subsidiaries, including [Chase Manhattan Bank USA, N.A.], will guarantee the activities or obligations of [Cross Country] or provide [Cross Country] with any other credit enhancement.  [Chase Manhattan Bank USA, N.A.'s] total exposure to the mortgage reinsurance activities will be limited, therefore, to the amount of its capital investment.  [Chase Manhattan Bank USA, N.A.] will ensure that the mortgage insurance companies with which [it] or [Cross Country] may negotiate are advised that none of these credit enhancements will be provided."

23

Affairs and Manufactured Housing, Gary M. Cunningham, before the United States Congress (referring to analogous captive reinsurance arrangements in the title insurance industry):

> [W]hen there is a history of little or no claims being paid, or the premium payments to the captive reinsurer far exceed the risk borne by the reinsurer, there is strong evidence that there is an arrangement constructed for the purpose of payment of referral fees or other things of value in violation of Section 8 of RESPA.

*See* Exhibit P attached hereto (April 26, 2006 testimony of Gary M. Cunningham).

94.    Such is the case with JPMorgan.  As reflected in the table below, from the beginning of 2004 through the end of 2010, Cross Country collected from private mortgage insurers at least $584 million as its "share" of borrower's private mortgage insurance premiums.  In contrast, its "share" of paid claims from the trust accounts supporting its captive reinsurance arrangements during this time period was only approximately $106 million, as depicted below:[13]

---

[13]    These figures were obtained from a review of the Schedule F – Part 3 of the Annual Statements for the Private Mortgage Insurers filed with the NAIC for the years 2004 through 2010.  These figures do not include ceded premiums and paid claims with respect to United Guaranty Residential Insurance Company for the year 2009.  Plaintiffs' investigation is ongoing.



95.     As *American Banker* observed with respect to lenders' captive reinsurance arrangements, "[s]ome of the deals were designed to return a 400% profit on a  bank's investment during good years and remain profitable even in the event of a real estate collapse."  *See* Reinsurance Kickbacks.

96.     Beginning in 2007, the United States experienced one of the worst mortgage meltdowns in recent history.  *See, e.g.,* Katalina M. Bianco, *The Subprime Lending Crisis: Causes and Effects of the Mortgage Meltdown,* CCH Mortgage Compliance Guide and Bank Digest (2008), attached as Exhibit Q hereto.  Thus, it is not at all surprising that slightly more claims were paid from the trusts during 2009 and 2010.

97.     Further, paid claims, as discussed herein, do not establish that the reinsurance contracts at issue constitute real, risk-transferring and commensurately priced reinsurance as required by RESPA.  Upon information and belief, even after paying some additional claims during 2009 and 2010, due to the *structure* of the reimsurance agreements, Defendants continued to carry no true risk of loss and the premiums received by Cross Country far exceeded any risk that Cross Country purportedly assumed.

98.     Payments from the reinsurance trusts to the Private Mortgage Insurers do not constitute "losses" to the reinsurer.  The reinsurer will either: (1) receive more in premiums from the Private Mortgage Insurers than the trusts will ever transfer to the Private Mortgage Insurers in "reinsurance claims" or (2) have the option to "walk-away" from its reinsurance

25

obligations if it is called upon to pay more in reinsurance claims than is available in the trust accounts.  The premiums received and deposited into the trust accounts effectively cover all "losses" or reinsurance claims payments.

99.     Under accepted accounting and actuarial principles, in order for a contract to be treated as real reinsurance, the reinsurer must assume significant insurance risk and it must be "reasonably possible that the reinsurer may realize a significant loss."  *See* Exhibit K at 282-83; *see generally* Exhibit L at 7.

100.     Insurers and reinsurers are subject to two sets of accounting standards in the United States: "(1) statutory accounting principles (SAP) and (2) generally accepted accounting principles (GAAP)."  *See* Exhibit R attached hereto (Robert W. Klein & Shaun Wang, *Catastrophe Risk Financing in the US and the EU:A Comparative Analysis of Alternative Regulatory Approaches,* The Journal of Risk and Insurance, 2009, Vol. 76, No. 3, 609).  SAP rules are determined by state insurance regulators through the NAIC, and insurers are required to file detailed financial statements and other reports in accordance with SAP.  *Id.*  GAAP rules are "determined by the Financial Accounting Standards Board (FASB), and insurers are required to follow GAAP in their non-regulatory financial statements and Securities and Exchange Commission (SEC) reports."  *Id.*

101.     FASB 113 or "FAS 113" was "implemented in 1993 to prevent, among other things, abuses in GAAP accounting for contracts (such as the ones at issue in this litigation) that have the formal appearance of reinsurance but do not transfer significant insurance risk and this should not be eligible for reinsurance accounting.  SSAP 62 [or SAP 62, now SAP 62R], which largely incorporates the same language as FAS 113, was implemented shortly thereafter to address the same issues with respect to statutory accounting."  *See* Exhibit K at 282-83.

102.     Under FAS 113, "in order for a contract to qualify for reinsurance accounting treatment [as real, risk-transferring reinsurance] . . . it must transfer insurance risk from an insurer to a reinsurer.  To meet the risk transfer requirement, a reinsurance contract must satisfy one of two conditions:

1.   It must be evident that 'the reinsurer has assumed substantially all of the insurance risk relating to the reinsured portion of the underlying insurance contracts' (paragraph 11), or

2.   The reinsurer must 'assume significant insurancr risk under the reinsured portions of the underlying insurance contracts' (paragraph 9a) and it must be 'reasonably possible that the reinsurer may realize a significant loss from the transaction' (paragraph 9b)."

*Id*. at 283; *see generally* Exhibit L at 7.   Given the trust cap limitation and other risk/liability/recourse limiting features in each of Defendants' reinsurance contracts, only the second test identified by FAS 113 is relevant here.   Indeed, the first test is viewed as an exception to the second.   *See* Exhibit K at 283.   The "primary" test can be more fully and formally stated as mandating that real transfer of insurance risk is passed to a reinsurer only if:

a.   The reinsurer assumes ***significant*** insurance risk under the reinsured portions of the underlying reinsurance contracts, and

b.   It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

*See* Exhibit L at 7.

103.   Further, FAS 113 provides the blueprint for how to structure a "real risk transfer" analysis:

The ceding enterprises' evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming enterprises under reasonably possible outcomes, without regard to how the individual cash flows are characterized. The same interest rate shall be used to compute the present value of cash flows for each reasonably possible outcome tested.

Significance of loss shall be evaluated by comparing the present value of all cash flows . . . with the present value

27

of the amounts paid . . . to the reinsurer.

*Id.* at 7.

104.    SSAP 62R's test for whether real risk transfer is found in a reinsurance contract is substantively identical:[14]

> 1.    The reinsurer assumes significant insurance risk under the reinsured portions of the underlying insurance agreements; and
>
> 2.    It is reasonably possible that the reinsurer may realize a significant loss from the transaction.

*See* Exhibit S attached hereto at paragraph 13, SAP 62R-6 (NAIC Accounting Practices & Procedures Manual, March 2010, Statement of Statutory Accounting Principles No. 62R, Property and Casualty Reinsurance, Exhibit A "Implementation Questions and Answers).[15]

105.    Reinsurance "[c]ontracts that do not result in the reasonable possibility that the reinsurer may realize a significant loss from the insurance risk assumed generally do not meet the conditions for reinsurance accounting and are to be accounted for as deposits." *See* Exhibit L at 4; *see generally* Exhibit T attached hereto (Section AICPA Technical Practice Aids, Section 10,760, Statement of Position 98-7 Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer Insurance Risk, October 19, 1998).

106.    In a deposit accounting/no risk transfer arrangement, loss to the Private Mortgage Insurer is not equivalent to loss to the reinsurer—payment from a reinsurance

---

[14]    "The above provisions of SSAP 62 are essentially the same as those in FAS 113." *See* American Academy of Actuaries, Committee on Property and Liability Financial Reporting, Risk Transfer in P&C Reinsurance: Report to the Casualty Actuarial Task Force of the National Association of Insurance Commissioners, August 2005 at 6, available at http://www.actuary.org/pdf/casualty/risk_transfer.pdf.

[15]    *See also id.* at paragraph 15, 62R-6 ("The ceding entity's evaluation of whether it is reasonably possible for a reinsurer to realize a significant loss from the transaction shall be based on the present value of all cash flows between the ceding and assuming companies under reasonably possible outcomes . . . . An outcome is reasonably possible if its probability is more than remote.").

trust to a Private Mortgage Insurer under a deposit accounting/no risk transfer arrangement is a "loss" to the Private Mortgage Insurer, not the reinsurer.  Risk transfer does not equate "loss" to the reinsurer with "loss" to the Private Mortgage Insurers in a deposit/no risk transfer arrangement—payment from a reinsurance trust to a Private Mortgage Insurer under a deposit/no risk transfer arrangement is a "loss" to the Private Mortgage Insurer, not the reinsurer.  Payment of "claims" under a "deposit accounting"/reinsurance contract is not an infrequent or unusual event.  Rather, it is specifically anticipated, and accounting of such payments (versus payments made under "real," risk-transferring reinsurance contracts) is subject to a different set of rules.  *See* Exhibit S at paragraph 35, SAP 62R-11 at b (referencing "disbursements"), e (referencing "settlement of losses"), and f (referencing loss and loss adjustment expense in these types of "non" risk transfer contracts); *see also* Exhibit U (superseding SSAP No. 75, amending SSAP No. 62R, paragraph 3, at 75-3 (paragraph b, referencing "disbursements," paragraph d, referencing "settlement of losses," and paragraph e, referencing loss and loss adjustment expense)).

107.   As set forth above, the risk transfer evaluation does not end at the first "claim" payment from each reinsurance trust to a Private Mortgage Insurer.  The HUD Letter phrase that "there is no reasonable expectation that the ***reinsurer*** will ever have to pay claims" does not mean that when the ***first claim*** is paid out of a reinsurance trust, real risk is transferred.  *See* HUD letter, Exhibit L at 6 (emphasis added).  That ***first claim***, by definition, would be paid out of the premiums placed into the trust by the ceding Private Mortgage Insurer.  The ***reinsurer*** only pays after ceded premiums are exhausted.  The "reinsurer" does not pay "claims," or suffer "losses" under a reinsurance arrangement in a risk transfer sense, until its own capital is utilized, and not "repaid" through dividends or otherwise.  Until then, the reinsurance trusts are just returning ceded premiums paid by the Private Mortgage Insurers.

108.   To the extent, then, that claims have been made from the reinsurance trusts under Cross Country's arrangements with the Private Mortgage Insurers, the payment of such claims does not establish a *bona fide* risk-transferring reinsurance arrangement nor does it establish that Defendants have suffered a true reinsurance "loss."  In fact, the

structure and missing essential terms of the reinsurance contracts themselves negate any exposure to reinsurance losses rendering the arrangements a sham.

109.   Indeed, at least one state regulator explicitly concluded, that no real transfer of risk exists where reinsurance agreements include liability limiting provisions or lack sufficient recourse pursuant to the contract to ensure that the reinsurer lives up to its commitments.   The State of Arizona Department of Insurance, in a statement (E-MG.CEDE–Rev. 12/09) discussing the filing by mortgage insurers of certain schedules with the state, made clear its view that mortgage reinsurance arrangements:

- that had unusual termination provisions, such as provisions for automatic termination and recapture by the ceding mortgage insurer with no further liability to the reinsurer, in the event the reinsurer fails to adequately fund the reinsurance treaty trust account;

- where the reinsurer shall have no liability to the ceding insurer in the event the assets in the trust account are insufficient to pay any amounts then due and payable by the reinsurer; and

- where the ceding company shall have no recourse against the reinsurer or its assets other than the trust funds,

result in "insufficient risk transfer" and should be accounted for under "deposit accounting guidelines."   *See* Exhibit V attached hereto (Department of Insurance, State of Arizona, Supplemental Schedule F-5 for Mortgage Guaranty Insurers that Cede to Captive and/or Unauthorized Reinsurers).

110.   As *American Banker* observed, "the fact that captive reinsurers paid claims does not mean the structures were unprofitable for the banks."   *See* Reinsurance Kickbacks.

111.   The hundreds of millions of dollars paid by the Defendant Private Mortgage Insurers and collected by JPMorgan through its captive reinsurer have clearly not been commensurate to its actual risk exposure.   The Defendant Private Mortgage Insurers have paid, and JPMorgan has received, hundreds of millions of dollars in ceded premiums, while JPMorgan has borne little or no risk of loss.

112.   In reality, Defendants' captive reinsurance arrangements were and are sham transactions providing for the transfer of kickbacks and unearned fees in violation of

30

RESPA.

113.   The money JPMorgan collected from the Defendant Private Mortgage Insurers through Cross Country far exceeded the value of the services, if any, it performed.  There was no real transfer of risk or, at least, not a commensurate transfer of risk given the "price paid" by, or the sheer amount of premium ceded to, the reinsurer.  The amounts paid were simply disguised kickbacks to JPMorgan for the referral of borrowers to the Defendant Private Mortgage Insurers.

114.   These arrangements tend to keep premiums for private mortgage insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks to lenders.  In other words, because the money collected by a lender through its captive reinsurer comes from borrowers' mortgage insurance premiums, borrowers are essentially required to pay for *both* actual private mortgage insurance coverage and private mortgage insurers' unlawful kickbacks to lenders.[16]

115.   Amounts paid to lenders as unlawful kickbacks have become a part of the cost of doing business for private mortgage insurers.  As a result, private mortgage insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers and in contravention of the stated purpose of RESPA.

## CLASS ACTION ALLEGATIONS

116.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and/or (b)(3) on behalf of themselves and a class of all other similarly situated persons who obtained residential mortgage loans originated, funded and/or originated through correspondent lending by JPMorgan or any of its subsidiaries and/or affiliates between January 1, 2004 and the present and, in connection therewith, purchased private

---

[16]   Indeed, the Reinsurance Kickbacks article by *American Banker* states that according to the Office of the Inspector General of HUD's presentation to the Department of Justice, banks forced borrowers to buy more expensive policies than they needed.  "Nearly all loan files reviewed show borrowers with excessive coverage placed on their loan," the presentation concluded.  *See* Reinsurance Kickbacks.

mortgage insurance and whose residential mortgage loans were included within JPMorgan's captive mortgage reinsurance arrangements (the "Class").

117. The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

118. The Class is so numerous that joinder of all members is impracticable.

119. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

120. Plaintiffs' claims are typical of the claims of the Class.

121. There are questions of law and fact common to the Class, including but not limited to:

(a) Whether Defendants' captive reinsurance arrangements involved sufficient transfer of risk;

(b) Whether payments to JPMorgan's captive reinsurer were *bona fide* compensation and solely for services actually performed;

(c) Whether payments to JPMorgan's captive reinsurer exceeded the value of any services actually performed;

(d) Whether JPMorgan's captive reinsurance arrangements constituted unlawful kickbacks from the Private Mortgage Insurers;

(e) Whether JPMorgan accepted referral fees from the Private Mortgage Insurers or a portion, split or percentage of borrowers' private mortgage insurance premiums from the Private Mortgage Insurers other than for services actually performed;

(f) Whether the Private Mortgage Insurers paid or gave referral fees to JPMorgan or a portion, split or percentage of borrowers' private mortgage insurance premiums to JPMorgan other than for services actually performed; and

(g) Whether Defendants are liable to Plaintiffs and the Class for statutory damages pursuant to RESPA § 2607(d)(2).

122. These and other questions of law and/or fact are common to the Class and

32

predominate over any questions affecting only individual Class members.  The basic terms and contours of Defendants' challenged captive reinsurance arrangements are not tied to any specific, individual consumer loan.  Rather, the captive reinsurance arrangements apply to groups or pools of loans.  Further, each and every Class member that Plaintiffs seek to represent was required, as part and parcel of obtaining their JPMorgan mortgage loan, to pay for private mortgage insurance.  Each and every Class member was directed to obtain private mortgage insurance from one of the Defendant Private Mortgage Insurers—each of whom had reinsurance contracts with Cross Country, structured as challenged here, to purchase "reinsurance" on that private mortgage insurance.  The essential and basic terms of each of those "reinsurance" contracts between Cross Country and the Defendant Private Mortgage Insurers were, for all intents and purposes, materially the same—and each of the Class members, no matter the Private Mortgage Insurer to whom they were referred, suffered the same harm, entitling them to demand the same statutory damages.  Accordingly, this is the quintessential consumer class action lawsuit.

123.   The same common issues predominate with respect to all members of the Class, regardless of whether their loans were originated or funded by JPMorgan or originated through correspondent lending.  Regardless of whether JPMorgan or a third-party lender made the initial referral to the Private Mortgage Insurer, Defendants' conduct violates Sections 8(a) and (b) of RESPA, as described herein.

124.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have no claims antagonistic to those of the Class.  Plaintiffs have retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

125.   Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

33

126.   Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

127.   Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### TOLLING OF STATUTE OF LIMITATIONS

128.   Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule.   For Plaintiffs and putative Class members whose claims accrued prior to one year preceding the commencement of this action, equitable tolling is available under RESPA and should apply. Plaintiffs and members of the putative Class could not, despite the exercise of due diligence, have discovered the underlying basis for their claims.  Further, Defendants knowingly and actively concealed the basis for Plaintiffs' claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing.   For these reasons, any delay by the members of the putative Class whose claims accrued prior to one year preceding the commencement of this action was excusable.

129.   Due to the complex, undisclosed and self-concealing nature of Defendants' scheme to provide for the payment of illegal kickbacks from the Private Mortgage Insurers to JPMorgan, Plaintiffs and putative Class members whose claims accrued prior to one year preceding the commencement of this action did not possess sufficient information or possess the requisite expertise in order to enable them to discover the true nature of Defendants' captive reinsurance arrangements.

130.   As *American Banker* reported, "making matters worse, banks allegedly forced unknowing consumers to buy more insurance than they needed *and failed to properly*

34

*disclose the reinsurance contracts*, another RESPA violation." *See* Reinsurance Kickbacks (emphasis added). In fact, HUD investigators reported to the DOJ that "[m]ost of the time, lenders did not tell borrowers in advance that their captives were reinsuring the deals . . . [i]n some cases, banks allegedly told customers that the charge for the reinsurance was 'none.'" *Id*.

131. This complex action is dissimilar to a simple type of RESPA case where, for example, an attentive borrower may determine—from a careful examination of his HUD-1 settlement statement—that he or she was overcharged for a settlement service or that too much money is being paid to his or her lender, real estate agent, title insurer or other settlement service provider. Rather, the conduct described herein occurs behind closed doors, with a wispy trail virtually impossible for the average homeowner to follow.

132. Plaintiffs were able to discover the underlying basis for the claims alleged herein only with the assistance of counsel. Plaintiffs and the putative Class members had no basis upon which to investigate the validity of the undisclosed payments from the Defendant Private Mortgage Insurers to Cross Country for purported reinsurance. Plaintiffs' and the putative Class members' delay was excusable because they did not discover, and reasonably could not have discovered, Defendants' conduct as alleged herein absent specialized knowledge and/or assistance of counsel.

133. Once Plaintiffs discovered the underlying basis for the claims alleged herein with the assistance of counsel, each contacted Defendants in an effort to obtain further information about the reinsurance of their private mortgage insurance and to ask that their loans be removed from Defendants' captive reinsurance program. None of the employees with whom Plaintiffs spoke had any knowledge of Defendants' reinsurance program, and, instead, discussed Plaintiffs' options in connection with removing private mortgage insurance from their loans. For example, after Plaintiffs Susan Komarchuk and Daniel Komarchuk contacted Defendants to discuss removing their loan from Defendants' captive reinsurance program, the individuals with whom they spoke did not understand their request, as further evidenced by a letter that they received shortly thereafter indicating that their

request to remove the private mortgage insurance from their loan had been denied.  *See*
Exhibit W attached hereto (November 15, 2011 Letter from Chase).  Additionally, when
Plaintiffs sought to speak with someone with knowledge of the reinsurance of their private
mortgage insurance or Defendants' captive reinsurance program in general, they were
unable to obtain any information.

134.  Further, Defendants engaged in affirmative acts to conceal the facts and
circumstances giving rise to the claims asserted herein and made false representations about
the nature of its reinsurance arrangements.  Such acts are separate and distinct from the
conduct violative of RESPA.

135.  JPMorgan used its form mortgage documents, disclosures of affiliated business
arrangements, and the entire artifice of a seemingly legitimate business arrangement, to
affirmatively mislead Class members about the relationship between the reinsurer, Cross
Country, and the lender, JPMorgan, and to represent that, rather than a kickback or unearned
fee, any payments exchanged between the affiliated businesses, or given to them from the
Private Mortgage Insurer Defendants through referral, were for actual services rendered.

136.  Even when some industry analyst and ratings agencies questioned the captive
reinsurance deals, banks *and* insurers publicly maintained that they met the standards set
forth in the HUD letter.  *See* Reinsurance Kickbacks.

137.  Upon information and belief, Defendants also actively concealed their conduct
by providing incomplete and/or inaccurate information to state regulators.  As *American
Banker* reported:

> All the same, banks persuaded state insurance regulators to
> sign off on the structures.   To judge whether the
> reinsurance agreements were fair, state officials relied in
> part on actuarial analyses submitted by the banks and
> insurers.
>
> Review of these opinions has found them to frequently
> contain significant defects and omissions which render
> them inapplicable to the actual reinsurance agreements
> executed," HUD investigators later concluded.

36

*Id.*

138.   Putative Class members thus did not, and could not, possess sufficient information to even put them on notice of the true nature of JPMorgan's captive reinsurance arrangements.   The average homebuyer is neither an insurance expert nor a reinsurance expert.   Simply being told that JPMorgan may enter into captive reinsurance relationships is insufficient to put the average homebuyer on notice that anything improper or actionable may have occurred with respect to that reinsurance or that his rights under RESPA may be violated.   *See, e.g.,* Reinsurance Kickbacks (noting that even HUD's investigation "may have stagnated because demonstrating that the captive reinsurance amounted to kickbacks would require accounting expertise that the Department does not possess").   This is especially true where affirmative misrepresentations as to transfer of risk are included in the lender's statements/disclosures concerning captive reinsurance.

139.   Similarly, it is beyond unrealistic to expect members of the putative Class to be as diligent as state regulatory agencies such as the Minnesota Department of Commerce whose investigation of certain captive mortgage reinsurance transactions involving several of the Private Mortgage Insurer Defendants did not begin until around 2007, years after the transactions came into existence.   *See* Reinsurance Kickbacks (noting that the Minnesota Department of Commerce began to review the insurance on home loans around 2007 and presented its findings to the Department of Justice in the summer of 2009).

140.   JPMorgan intentionally designed any disclosure that it provided to its borrowers in such a manner as to conceal from them information sufficient to put them on notice of the underlying basis for their claims and affirmatively misrepresent the nature of Defendants' conduct.   The putative class members were not put on notice of JPMorgan's wrongdoing.   For instance, JPMorgan did not disclose to borrowers that its captive reinsurance arrangements were lawful only if they involved adequate assumption of risk by Cross Country.   The form disclosures provided to Plaintiffs note only that if mortgage guaranty insurance coverage is required, the provider of the insurance "may ask another insurance company to assume some or all of the risk under the insurance policy in exchange

37

for a portion of the insurance premium."  The disclosures further note that the reinsurer may obtain a "financial gain" from the reinsurance, that Cross Country, a JPMorgan affiliate, provides such reinsurance, and that the reinsurance arrangement will not "change" the borrower's mortgage guaranty insurance premiums.  *See, e.g.,* Exhibits H and X attached hereto (disclosure forms provided to Plaintiffs).

141.  Defendants' alleged and ubiquitous misrepresentations about the legitimacy of their captive reinsurance arrangements as *bona fide* in various standardized mortgage and closing documents are separate and distinct acts of concealment that misled Plaintiffs and members of the putative Class.

142.  Further, upon information and belief, Cross Country and other captive reinsurance companies incorporated in "captive-friendly" states are not required to file with the NAIC the type of detailed annual reports usually required of commercial insurance companies.  *See* Janis Mara, *Wells Fargo, Citibank Under Investigation in Alleged Kickback Schemes*, Inman News (Mar. 7, 2005), attached hereto as Exhibit Y ("The annual reports and actuarial reports of Vermont captives are protected by the state's confidentiality laws and cannot be accessed without a court order by anyone other than a regulator."); *see also* Mortgage Kickback Scheme (noting that Vermont ranks among the world's top three domiciles along with Bermuda and the Cayman Islands).  Even the most sophisticated borrower could not, for example, simply contact the NAIC to obtain information on JPMorgan's captive reinsurer.  One would need a subpoena to obtain such information; and to obtain a subpoena, one would have to file a lawsuit.

143.  For instance, HUD investigators have alleged that "Vermont insurance regulators went a step further in enabling the mortgage reinsurance business to flourish," finding that:

> Vermont regulators signed off on actuarial opinions from
> banks and insurers that failed to accurately describe the
> terms of the reinsurance deals in question, overpaid banks
> for the risk they were taking and allowed banks to claim
> insurance trust accounts were capitalized with money that
> had been explicitly deemed off-limits for claims-paying

38

purposes.

*See* Mortgage Kickback Scheme (also noting that, when "[f]aced with the prospect of either tacitly admitting that it was not taking on actual risk or filing financial statements that did not conform to accounting guidelines, [Countrywide Financial Corporation's captive reinsurer] Balboa was rescued by Vermont insurance officials.").

144.   Putative Class members exercised due diligence by fully participating in their loan transactions.   Because of Defendants' actions and because of the nature of the reinsurance scheme, the absent putative Class members were not put on notice of Defendants' wrongdoing despite exercising due diligence.

145.   JPMorgan provided misleading and false information to Plaintiffs and the Class, thus affirmatively acting to conceal its unlawful kickback scheme.   By funneling kickbacks through Cross Country and representing that such payments were for services actually performed, rather than referral fees, JPMorgan acted to conceal and prevent Plaintiffs from discovering the underlying basis for this action.   Any delay by the absent putative Class members is excusable and, accordingly, Plaintiffs and the Class contend that it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claim of any Class member.

## CLAIMS FOR RELIEF

### COUNT ONE

### (Violation of RESPA, 12 U.S.C. § 2607)

146.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

147.   Throughout the Class Period, Defendants provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

148.   Plaintiffs and the Class obtained federally-related residential mortgage loans through JPMorgan and collectively paid hundreds of millions of dollars for private mortgage

insurance premiums in connection with their real estate closings.

149.   The amounts paid by the Defendant Private Mortgage Insurers and accepted by JPMorgan through its captive reinsurance arrangements constituted "things of value" within the meaning of RESPA § 2602(2).

150.   Defendants arranged for an unlawfully excessive split of borrowers' premiums to be ceded to Cross Country under carefully crafted excess-of-loss and purported quota share reinsurance contracts.

151.   These ceded premiums: (a) were not for services actually furnished or performed and/or (b) exceeded the value of such services.

152.   The millions of dollars paid by the Defendant Private Mortgage Insurers and accepted by JPMorgan through its captive reinsurance arrangements constituted fees, kickbacks or things of value pursuant to agreements between JPMorgan and the Defendant Private Mortgage Insurers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers.  Such practice violated RESPA, 12 U.S.C. 2607(a).

153.   In connection with transactions involving federally-related mortgage loans, the Defendant Private Mortgage Insurers gave and JPMorgan accepted a portion, split or percentage of charges received by the Private Mortgage Insurers for the rendering of real estate settlement services other than for services actually performed, in violation of RESPA, 12 U.S.C. 2607(b).  The money paid by the Defendant Private Mortgage Insurers and accepted by JPMorgan through its captive reinsurer was a portion, split or percentage of the private mortgage insurance premiums paid by JPMorgan's customers.  Cross Country participated in the scheme and served as the direct party to which the split was paid.  Cross Country agreed to provide purported "reinsurance" services involving private mortgage insurance paid by Plaintiffs and the Class.

154.   Plaintiffs and the Class were subjected to settlement services tainted by naked kickbacks or referrals of business inherently biased by Defendants' unlawful kickback scheme, which involved each and every major provider of private mortgage insurance in the

40

country.   Defendants' reinsurance arrangements with the Defendant Private Mortgage Insurers over time affected the price, quality or other characteristics of the "referred" private mortgage insurance through, among other things, inherent limits on settlement service choice and competition.

155.   First, Plaintiffs and the Class were harmed in that, as a matter of law, they were entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes.   Congress bestowed upon Plaintiffs and the Class a right to a real estate settlement free from unlawful kickbacks and unearned fees and has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties without proof of an overcharge.   *See* 12 U.S.C. §§ 2601, 2607(d)(2).   Plaintiffs allege that the Defendant Private Mortgage Insurers have given, and JPMorgan has accepted, unlawful kickback payments and/or an unearned portion of settlement service charges—private mortgage insurance premiums—in violation of RESPA.   Defendants' scheme resulted in a limitation on both settlement service choice and competition.    JPMorgan eliminated competition among providers of private mortgage insurance by requiring its borrowers to purchase private mortgage insurance from one of the Defendant Private Mortgage Insurers with whom it had an arrangement.   Referred borrowers were allocated to one of the private mortgage insurers on a rotating or other systematic basis, which unlawfully guaranteed business for each private mortgage insurer in return for a referral fee.   The referral fee included no evaluation of price, quality, service provided, reputation, performance or any other aspect of the product provided by any of the private mortgage insurers receiving the referrals.   Further, as set forth above, Defendants did not disclose the true nature of the reinsurance arrangements to Plaintiffs.    Congress has already determined that an unlawful kickback/referral arrangement, such as the sham captive mortgage reinsurance arrangement at issue here, may reduce competition among settlement service providers.   *See Carter v. Welles-Bowen Realty, Inc.,* 553 F.3d 979, 987 (6th Cir. 2009) (explaining that the 1983 amendment to the RESPA statute was necessary to address "practices [that] could result in harm to consumers beyond

41

an increase in the cost of settlement services," including the reduction of healthy competition) (citing H.R. Rep. No. 97-532, at 52 (1982)).

156.    Second, though not necessary to prevail on their claims, Plaintiffs and the Class were harmed in that their private mortgage insurance premiums were artificially inflated as a result of Defendants' conduct.[17]  Congress has already determined that the *aggregate* effect of an unlawful kickback/referral arrangement, such as a sham captive mortgage reinsurance arrangement, is to unnecessarily inflate the costs consumers pay for real estate settlement services.  *See* 12 U.S.C. § 2601(b) ("It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . (2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services.").   Thus, kickbacks and unearned fees unnecessarily and artificially inflate the price of settlement service charges, including private mortgage insurance premiums.  Under Defendants' scheme, the mortgage insurance premiums paid by Plaintiffs and the Class necessarily and wrongly included payments for both: (a) actual mortgage insurance services; and (b) payments unlawfully kicked back to JPMorgan's captive reinsurer that far exceeded the value of any services performed (indeed, there were no services performed in return for this payment) and, were also, in fact, illegal referral fees.

157.    The specific harms identified above have been recognized as widespread in the mortgage lending marketplace.  *See generally* Mortgage Kickback Scheme; Reinsurance Kickbacks.

158.    For the reasons set forth above, Defendants have violated RESPA, 12 U.S.C. 2607(a) and (b).   Pursuant to RESPA, 12 U.S.C. 2607(d), Defendants are jointly and severally liable to Plaintiffs and the Class in an amount equal to three times the amounts they have paid or will have paid for private mortgage insurance as of the date of judgment.

159.    In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiffs also seek attorneys'

---

[17]    The Third Circuit, in a directly analogous action, held that, although the plaintiffs contended that they were overcharged for mortgage insurance, "[t]he plain language of RESPA section 8 does not require plaintiffs to allege an overcharge."  *See Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 759 (3d Cir. 2009).

fees and costs of suit.

**COUNT TWO**

**(COMMON-LAW RESTITUTION/UNJUST ENRICHMENT)**

160.  Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

161.  Plaintiffs have conferred a substantial benefit upon Defendants which has been appreciated by Defendants.  During the Class Period, the Defendant Private Mortgage Insurers collected and wrongfully paid to JPMorgan hundreds of millions of dollars as JPMorgan's unlawful split or share of the private mortgage insurance premiums paid by Plaintiffs and the putative Class members.

162.  The amounts collected and ceded to Cross Country as purported reinsurance premiums were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiffs and the Class.

163.  As a result of Defendants' unjust enrichment, Plaintiffs and the respective Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

164.  Further, Plaintiffs and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.  Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and Plaintiffs' counsel as counsel for the Class;

B.  Declaring, adjudging and decreeing the conduct alleged herein as unlawful;

C.    Awarding Plaintiffs and the Class statutory damages pursuant to RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2);

D.    Granting Plaintiffs and the Class costs of suit, including reasonable attorneys' fees and expenses;

E.    Granting Plaintiffs and the Class restitution of all improperly collected reinsurance premiums and/or disgorgement of Defendants' ill-gotten gains, and imposing an equitable constructive trust over all such amounts for the benefit of the Class; and

F.    Granting Plaintiffs and the Class such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

Respectfully submitted,

**ROSMAN & GERMAIN LLP**

Dated: December 9, 2011          By: _____

Daniel L. Germain (Bar No. 143334)
16311 Ventura Boulevard, Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Edward W. Ciolko
Terence S. Ziegler
Michelle A. Coccagna
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

44

**BRAMSON PLUTZIK MAHLER &
BIRKHAEUSER LLP**
Alan R. Plutzik
2125 Oak Grove Boulevard, Ste. 120
Walnut Creek, California 94598
Telephone: (925) 945-0200

**BERKE, BERKE & BERKE**
Andrew L. Berke
420 Frazier Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 266-5171

*Attorneys for Plaintiffs and the Proposed Class*

45

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

**ROSMAN & GERMAIN LLP**

Dated: December 9, 2011          By: _____

Daniel L. Germain (Bar No. 143334)
16311 Ventura Boulevard, Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Edward W. Ciolko
Terence S. Ziegler
Michelle A. Coccagna
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**BRAMSON PLUTZIK MAHLER &**
**BIRKHAEUSER LLP**
Alan R. Plutzik
2125 Oak Grove Boulevard, Ste. 120
Walnut Creek, California 94598
Telephone: (925) 945-0200

**BERKE, BERKE & BERKE**
Andrew L. Berke
420 Frazier Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 266-5171

*Attorneys for Plaintiffs and the Proposed Class*

46

# EXHIBIT A

# AMERICAN BANKER.

## Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction

**By** Jeff Horwitz

SEP 16, 2011 7:46pm ET

*Second of two-part series*

Eight years ago a Bear Stearns research report on the mortgage insurance industry warned of a grave threat: In exchange for steering home buyers to the insurers, mortgage lenders were demanding unjustifiably lucrative reinsurance deals.

"We find it difficult to understand how some of these arrangements conform" with legal prohibitions on mortgage kickbacks, Bear analysts wrote.

Six years later in 2009, amid the wreckage of the biggest housing bust in history, federal investigators concluded that what Bear had opined were sweetheart deals were in fact just that. Beginning in the late 1990s major U.S. banks began coercing insurers into cutting them in on what would ultimately amount to $6 billion of insurance premiums in exchange for assuming little or no risk, alleged investigators in the inspector general's office at the Department of Housing and Urban Development. Inspired by the over-sized profits, bankers further were found to have sold unwary home buyers more mortgage insurance than they required.

As reported by *American Banker* on Sept. 9, the HUD inspectors presented their findings to the Department of Justice a year and a half ago in a bid to spark a case against many of the nation's largest banks. The DOJ has taken no public action to date and declines comment. It is one of several entities that appears to have failed to address the apparent wrongdoing, despite ample warning signs. They include the HUD officials who oversaw home lending for two decades, state regulators, mortgage insurers and class action attorneys.

While their institutions reaped large short-term profits from the captive reinsurance arrangements, in the end the bankers may have outsmarted even themselves by foisting insurance risk onto others.

"It gave the banks a false sense of confidence that they didn't need to pay attention to underwriting standards," says Joshua Rosner, managing director of Graham Fisher & Co., an independent research boutique.

### COUNTRYWIDE LEADS

Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction - American Banker Article

The alleged reinsurance kickbacks evolved from what was originally prudent practice. Bankers wanted to share in the profitable business of insuring mortgages against default. Insurers welcomed them to ensure careful underwriting. Early reinsurance agreements fulfilled both objectives by granting banks the premium revenue equal to the risk they incurred.

That began to change in the late 1990's at the behest of Angelo Mozilo, the pugnacious chief executive who built Countrywide Financial Corp. into the nation's largest home lender. Under Mozilo, Countrywide pushed into non-traditional areas such as low-doc lending, property appraisals and title insurance. In mortgage insurance, Countrywide became the first lender to forge a risk-sharing arrangement known as "excess-of-loss."

Under a 1996 deal with Amerin Guaranty, a mortgage insurer absorbed in 1999 by Radian Group Inc., Countrywide's captive insurance subsidiary split risks unevenly. The agreement put the insurer in the first-loss position, meaning that Countrywide would only pay claims if they rose to a high level. Goodbye to proportional loss-splitting.

HUD's assistant secretary for housing declared in a 1997 opinion letter that such deals were acceptable, as long as they were not the result of coercion and transferred risk. "The reinsurance transaction cannot be a sham," the HUD letter stated.

With the pattern in place and the mortgage market heating up, home lenders pressed for increasingly favorable terms. That included so-called "4-10-40" deals in which the mortgage originators received 40% of premiums in exchange for reimbursing insurers for no more than 10% of claims-and even then only after the most likely 4% of losses were incurred.

Within a few years, excess-of-loss deals had become outright shams, the HUD inspector general's office later concluded. In addition to the 4-10-40 structures, investigators found terms were altered in numerous ways to benefit lenders, including SunTrust, GMAC, CitiMortgage and Countrywide. The biggest tweak was to make policies "self-capitalizing." Banks were required to put only "nominal initial capital" into the trusts that backstopped the reinsurance policies, according to a 2000 presentation to CitiMortgage by a predecessor of Genworth Financial. Banks' stakes were largely funded only as premiums came in from home buyers.

The extent to which this occurred and the degree to which it advantaged the banks struck the HUD inspector general's office as highly unusual. The banks were supposedly providing catastrophic reinsurance, but the policies appeared to render it impossible that they'd ever suffer significant losses. In the event of catastrophic losses, a bank could simply walk away from its nominal initial investment and leave the insurer to bear the other costs.

Actuaries hired by the insurers signed off on such deals as meeting the narrow requirements for risk transfer. However, the policies were a bad deal for insurers in almost every circumstance, HUD investigators concluded. If defaults remained low, banks would pocket large premiums without paying any claims; if defaults were high, banks' losses would be capped at the amount of their small initial investments, plus the premiums paid by homeowners and passed along to them by their mortgage insurance partners. In other words, it appeared to be a no-lose proposition for the banks.

Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction - American Banker Article

## INSURER COMPLICITY

How banks allegedly got away with demanding kickbacks through sure-bet reinsurance deals harks back in part to the actions of the insurers themselves. As the excess-of-loss arrangements became more favorable to the banks, mortgage insurers complained regularly that they were bad business for them. Standard & Poor's agreed. The worst deals were slashing insurers' profit margins without reducing their risk, it declared in a 2003 report.

Finally, MGIC Chief Executive Curt Culver stood up. He was a longtime industry hand who arrived at the company in 1982 and took over as its leader in 2000. Two years later Culver announced MGIC would cap at 25% the share of total premium revenue shared with banks' captive reinsurance units.

"Frankly, the returns are unacceptable," Culver told analysts during a 2003 earnings call. "How can you run a company where you lose money on each policy that you write and justify that business?"

Revolting against the deals was certain to cost MGIC short term market share, Culver admitted. But the pain would be limited if other insurers followed suit. "I would think the whole industry would like to see this happen," said Culver, who still runs MGIC.

Analysts and ratings agencies applauded. MGIC's step "could constitute a critical mass that emboldens most or all of the industry to discontinue the 4-10-40 product as well," S&P wrote in 2003.

The faith that Culver and the ratings agency put in the industry proved misplaced. Countrywide started yanking business from MGIC even before its prohibition of 4-10-40 deals went into effect, internal company email obtained by HUD shows. Meanwhile, MGIC rivals rushed to take away customers. Culver ultimately abandoned MGIC's hard line.

"We tried to stem the tide, and that was unsuccessful," says Michael Zimmerman, MGIC's head of investor relations.

The episode has left MGIC in an awkward position. It concedes the captive reinsurance deals were terrible business propositions while insisting it willingly entered into them. Doing deals in exchange for business referrals "would be a violation of Respa," Zimmerman says, referring to the 1974 Real Estate Settlement and Procedures Act that prohibits payment of unearned fees. Rather it was unspecified "market forces" that prompted MGIC to enter into the deals, Zimmerman says.

## "A KICKBACK SCHEME"

Individual homeowners proved equally impotent in opposing the banks. Fannie Mae, Freddie Mac, and private investors required borrowers with low down-payments to purchase mortgage insurance, which protects them against default. Home buyers pay for the policy; lenders are the beneficiaries.

Bank Mortgage Kickback Scheme Thrived Amid Regulatory Inaction - American Banker Article

Few homeowners were ever told about the excess-of-loss arrangements, HUD's inspector general alleges. Even if they were, it would have been of no practical benefit since mortgage insurers charge standard rates.

Class action attorneys likewise did little to alter industry practice. Respa recognizes private litigation as form or redress against kickbacks in the housing market. Under Respa, plaintiffs lawyers filed a series of class actions in 2000 on behalf of homeowners against industry leaders including PMI Mortgage Insurance Co., Triad Guaranty and GE Mortgage Insurance Co (later spun off as Genworth).

A "concerted kickback scheme" is how attorneys described the arrangements in a suit brought in the U.S. District Court for the Southern District of Georgia against GE. The reinsurance fee that GE was paying to captive reinsurers "far exceeds the value of the risk assumed by the captive company and on terms more favorable than that provided to other reinsurers," attorneys for Milberg, Weiss, Bershad, Hynes & Lerach LLP and other firms wrote in wrote in *Douglas V. General Electric Mortgage Insurance Co*. Ten years later the HUD inspector general's report used virtually identical language.

Courts dismissed some suits, but banks paid millions of dollars to settle others. It did little to alter their behavior. In *Douglas V. General Electric*, for example, thousands of homeowners received $35.47 each; their law firms received around $2 million. The four other settlements had similar terms.

Banks did agree in the settlements to have actuaries sign off on the validity of future reinsurance deals. Even so, they do not appear to have foreseen a significant change in their practices. GE Mortgage Insurance warned in a Securities and Exchange Commission filing of the possibility that it would be sued again within a few years for similar behavior.

"Any future claims made against us could allege … that we violated the terms of the injunction," the company warned.

That class action attorneys failed to reform the industry is perhaps not surprising. If their financial incentive to do so was limited, so was their leverage: the court in the Douglas case noted that the plaintiffs' case faced procedural weaknesses. Attorneys involved in the 2000 case did not respond to interview requests.

"Litigation is a rough tool to try to reform industry practice," says Diane Thompson, an attorney for the National Consumer Law Center. Even so, "there's a general principle that you don't just do coupon settlements, that you want to get injunctive relief," she adds.

## HUD INACTION

One entity that faced fewer obstacles in enforcing Respa was HUD, which can address alleged violations through administrative actions or referrals to prosecutors. However, during the formative years of the housing bubble, the agency largely limited itself to pursuing misconduct by individual companies.

"I haven't seen them do much that went to systemic lending practices," says Thompson of HUD's

early efforts.

A spokesman for the department disagrees, arguing that HUD never signed off on the terms of specific captive reinsurance deals. Conversely, there is no record that HUD ever looked into whether the deals violated Respa, even as banks' rapidly expanded their captive mortgage reinsurance operations in ways that raised red flags at Bear Stearns, S&P and among the plaintiffs' bar.

In its 2009 presentation on captive mortgage reinsurance to the Department of Justice, officials from its inspector general's office concluded that HUD had missed opportunities to act. If DOJ prosecutors took the case, as the investigators argued they should, they needed to be aware of the "perception that the Department [HUD] allowed captive mortgage insurance arrangements" and then opposed them "after the fact," the investigators wrote.

HUD officials may have failed to intercede during the housing boom, but Vermont insurance regulators went a step further in enabling the mortgage reinsurance business to flourish, the inspector general's office concluded.

Insurance is regulated by the states, and Vermont has long promoted itself as a captive insurance haven as a way to capture industry tax dollars. The state's insurance division boasts on its web site of the "friendly" approach to captive insurance taken by Vermont, which ranks as among the world's top three domiciles along with Bermuda and the Cayman Islands. Among the captive reinsurance units set up in Vermont were those of Countrywide, GMAC and Citigroup.

Documents from the investigation show that the Captive Insurance Division of Vermont's Department of Banking, Insurance, Securities and Health Care approved insurance structures and accounting maneuvers that the HUD investigators would later conclude violated both the law and basic principles of insurance. Vermont regulators signed off on actuarial opinions from banks and insurers that failed to accurately describe the terms of the reinsurance deals in question, overpaid banks for the risk they were taking and allowed banks to claim insurance trust accounts were capitalized with money that had been explicitly deemed off-limits for claims-paying purposes, HUD investigators alleged.

In one instance, Countrywide captive insurance subsidiary Balboa Reinsurance asked its actuaries to determine how much it would need to set aside to cover insurance losses, according to documents obtained by HUD investigators.

"We believe that a reserve of $0 would provide adequate provision for all of Balboa's outstanding loss and loss adjustment expense liabilities," the actuaries wrote in an undated analysis. The deal was structured in such a way that the actuaries believed Balboa would never need to pay claims.

The terms were so favorable to Balboa that it actually proved troublesome, documents from Countrywide's insurance subsidiary show. The company did not want to disclose in accounting statements that its captive insurance subsidiary was getting paid for taking no risk. Setting aside assets to cover claims would give the deals a patina of legitimacy, but it did not "conform to statutory accounting guidelines" for insurance, according to the company's own analysis.

Faced with the prospect of either tacitly admitting that it was not taking on actual risk or filing financial statement that did not conform to accounting guidelines, Balboa was rescued by Vermont insurance officials.

"Balboa has received approval from its Vermont regulators to establish such a reserve as permitted practice," the company's analysis concluded.

David Provost, deputy commissioner of Vermont's captive insurance division, said he disagreed with the HUD investigators' contention that there hadn't been an adequate transfer of risk to the captive reinsurers. State insurance officials have discretion in approving accounting decisions, and actuarial opinions can be subjective, he added.

"I think we have placed reasonable reliance on the opinions of the actuaries that opined on the transactions," he told *American Banker*. "It sure seems that HUD or others could have looked at a few contracts or hired an actuary to determine if this was suitable in their eyes, rather than waiting twenty-plus years to conduct a very expensive investigation."

## BANK PAYBACK

The collapse of housing prices did what corporate executives, lawyer and regulators failed to accomplish — it shut down captive mortgage reinsurance business.

As the residential bust unfolded mortgage insurers got hammered. Triad Guaranty was ordered by state regulators to cease writing new business. Other firms lost more than 90% of their market value.

How banks ultimately fared on the deals isn't entirely clear. Plaintiffs attorneys launched a second round of class action suits in 2007 alleging that Wells Fargo and Bank of America (which acquired Countrywide in 2008) reinsurance subsidiaries paid no claims whatsoever between 2000 and 2006.

Given mortgage insurers' devastating losses in the years since, the banks' subsidiaries have had to pay some claims. Data provided by Vermont's insurance regulator shows that between 2008 and 2009 the banks' captive reinsurers paid enough claims to create an outflow of more than $1.5 billion. But the deals were back to being net profitable by 2010, and how much the bust has cost banks is not public.

Such information was redacted from class action filings in the U.S. District Court for the Eastern District of Pennsylvania, where both Wells and B of A have been sued for allegedly receiving mortgage reinsurance kickbacks. Both companies are now in the process of settling those cases. Bank of America did not respond to a request for comment on the overall profitability of its captive reinsurance deals, and Wells Fargo declined to address that matter. Both banks have maintained that the reinsurance deals were legitimate.

There is reason to believe the banks were net winners on the reinsurance deals, however. According to MGIC's investor relations head Zimmerman, his company has passed on more in net premiums to reinsurers than it has recovered from them to cover claims.

An even larger issue than kickbacks and risk-sharing is at issue, industry observers say. Given the timeframe in which the excess-of-loss policies were rolled out, the arrangements may have helped undermine lenders' underwriting standards. Originally, risk-sharing among mortgage insurers and banks was supposed to ensure that both had an interest in minimizing claims. By adopting excess-of-loss structures that sheltered the banks from substantive losses, banks created an incentive to underwrite riskier mortgages.

These days the mortgage insurers' losses are coming back to bite the banks. With their capital decimated and little to lose, the insurers are now aggressively seeking to make the banks share the pain. In the second quarter of this year alone, Radian denied or rescinded coverage on $193 million in claims due to what it says are underwriting practices that render some policies ineligible for coverage. Radian intends to deny at least $650 million more in future claims. Other insurers are making similar moves. Early this year, PMI Group Inc. told investors it aims to recoup $1.3 billion by denying claims.

"What this all led to is the mortgage insurers becoming not insurers but [insurance policy] rescission companies," says Graham Fisher's Rosner.

As banks have learned in other parts of the housing market, when the entire system gets into trouble all bets on transferring risk are off.

---



© 2011 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

# EXHIBIT B

Banks Took $6B in Reinsurance Kickbacks, Investigators Say - American Banker Article

# AMERICAN BANKER.

## Banks Took $6B in Reinsurance Kickbacks, Investigators Say

**By** Jeff Horwitz
SEP 6, 2011 4:55pm ET

**Many of the country's largest banks received $6 billion in kickbacks from mortgage insurers over the course of a decade, according to a previously undisclosed investigation by the Inspector General of the Department of Housing and Urban Development.**

The allegations, since referred to the Department of Justice, stem from lenders' demand that insurers cut them in on the lucrative business of insuring the mortgages they produced during the housing boom.

In exchange for their business, companies such as Citigroup Inc, Wells Fargo & Co, SunTrust Banks Inc. and Countrywide allegedly required reinsurance partnerships on generous terms that violated the Real Estate Settlement Procedures Act, a 1974 law prohibiting abusive home sales practices.

During a two-day presentation in the summer of 2009, HUD's team presented DOJ attorneys with a thick binder of evidence that major banks had engineered a decade-long kickback scheme, people familiar with the investigation say.

Documents from the investigation show that the inspector general's staff concluded that banks and insurance companies had created elaborate financial structures that had the appearance of reinsurance but failed to transfer significant amounts of risk to their bank underwriters.

Some of the deals were designed to return a 400% profit on a bank's investment during good years and remain profitable even in the event of a real estate collapse.

Making matters worse, banks allegedly forced unknowing consumers to buy more insurance than they needed and failed to properly disclose the reinsurance agreements, another RESPA violation.

HUD's acting inspector general, Michael Stephens, worked on the case before being appointed to head the inspector general's office last year. He acknowledged the investigation's existence and expressed frustration that the case had not yet produced a settlement or prosecution.

While Stephens said he was still "hopeful" that prosecutors would bring a case, "this thing has been going on for too damn long."

## PUNISHING INSURERS

Market observers, analysts and ratings agencies long questioned the reinsurance deals, but banks and insurers publicly maintained they met the standard for arms-length transactions set out in a 1997 policy letter circulated by HUD. The deals, they said, were not the result of coercion.

What those companies may have believed in private is another matter.

Wells Fargo and Bank of America Corp. have settled class action cases alleging the same sort of misconduct flagged by HUD, and internal documents show that banks and insurers viewed the arrangements as a thinly veiled pay-to-play scheme. Even as insurers complained they couldn't afford the escalating cost of the reinsurance payments, banks threatened or punished companies that balked at providing them, documents obtained by *American Banker* show.

Wells Fargo & Co told one insurer that it should consider giving Wells such deals if it wanted business referrals. After insurer MGIC Investment Corp. announced plans to cut back on banks' share of premiums in 2003, Countrywide executives complained to an MGIC executive and told him that they were shifting Countrywide's business to MGIC's competitors.

"I think we should continue to decrease there [sic] share again," former Countrywide business operations executive Mitch Turley wrote in an email to colleagues that was later obtained by investigators and reviewed by *American Banker*. (B of A bought Countrywide in 2008, after the alleged wrongdoing occurred; Turley no longer works for B of A and did not respond to an interview request from *American Banker*.)

Noting that the mortgage industry was in dire shape when investigators handed their case to prosecutors, the inspector general's office proposed that much of the penalty should be stayed. Even still, the proposed settlement would be the most aggressive action ever pursued under RESPA, requiring banks to pay hundreds of millions of dollars in fines and restitution.

Although HUD's investigation was referred to the Justice Department last year, people familiar with the case say that prosecutors have done little to advance it. Contacted by *American Banker*, a spokeswoman declined to discuss the case.

Prosecutors had agreed the case was well worth taking when it was first referred to them, said former HUD Inspector General Ken Donohue and others.

"I'm bewildered by why this wasn't pursued on an aggressive basis," Donohue said.

## "NO BONA FIDE PURPOSE"

HUD's case began far from its Washington headquarters. Around 2007, Special Agent Julien Kubesh of the inspector general's Minneapolis field office teamed up with the Minnesota

Department of Commerce in a review of the insurance on home loans, people familiar with the investigation say.

Mortgage insurance, often required for borrowers without sizable down payments, is a substitute for equity that serves to protect a loan's owner in the event of a borrower default. Banks typically choose the insurance carrier, but borrowers pay for the coverage in the form of higher net mortgage payments. In the industry's early years, there were no financial ties between banks and the insurers.

But Kubesh, a former IRS agent, found that the insurers had taken out reinsurance from subsidiaries of the banks that had produced the loans. Virtually all major lenders had established such ventures, which supposedly shared insurers' risk in exchange for a portion of the insurance premiums.

Kubesh was skeptical of the captive reinsurance agreements, which were entrenched in the mortgage insurance market but at best grudgingly tolerated by HUD in other areas. In a May 2007 settlement, for example, HUD slapped Beazer Homes for using a captive subsidiary to share in the proceeds of title insurance. "There is almost never any bona fide need or business purpose" for captive title reinsurance, HUD noted at the time, adding that the deals' outsized profitability was "strong evidence there is a sham arrangement" to circumvent RESPA.

Banks' captive mortgage reinsurance ventures were little different, Kubesh and his colleagues came to believe.

While designed to look like reinsurance, the deals weren't built to perform like it. The problem was how they split up the risks and rewards of insuring homeowners' mortgages.

When it comes to insurance, "if I get 50% of the profits, I have to take 50% of the risks," said Herman Thordsen, a California attorney who defends companies accused of RESPA violations. "If they're not doing that, then there's likely a violation. And disclosure has to be there, absolutely."

Banks fell far short of both those standards with their captive reinsurance schemes, investigators and the companies' own records suggest. Over the course of two years, Kubesh and other investigators concluded that captive mortgage reinsurance had devolved into a way to hide illegal business referral fees.

THE $0 RESERVE

For a reinsurance agreement to be legitimate, it has to transfer risk from an insurer to a reinsurer. One simple way to do that would be for the insurer and the reinsurer to each collect a portion of the insurance premiums and each pay a similar portion of the insurance claims. In reinsurance, this is called a "quota share" structure.

A different way to split the risk is what's called an "excess of loss" arrangement, in which the insurer has to pay all claims up to a certain point, when the reinsurer steps in. Figuring out how to divide the premiums is now harder, because in the event of a loss the insurer and the reinsurer will no longer bear the load evenly — if the losses are modest, the reinsurer might not have to

pay anything at all.

Still, so long as both the insurer and reinsurer hire actuaries and bargain for their own interests, the resulting agreement should make the reinsurer's reward proportionate to its risk.

Banks started demanding the excess-of-loss reinsurance deals in the mid-1990s. Unlike in the example above, however, the two parties didn't have equal leverage.

The mortgage insurers' entire business depended on keeping the banks happy, and HUD investigators concluded that they gave banks reinsurance deals that would be profitable in virtually every circumstance.

This was partly because the initial terms of the deals were generous — the reinsurance vehicles collected 40% of the premiums, but were responsible for a maximum of 10% of the losses — but also partly because insurers let banks tweak the terms of deals in their favor.

According to investigators, the contracts gave banks a large cushion before they would have to start paying claims. The partnerships excluded high-risk loans from the reinsurance coverage. And the deals were "self-capitalizing," meaning that a bank could fund its stake with incoming premiums. If the deal went bad, the bank could walk away and leave the insurer to cover its losses.

Conceptually, such arrangements are analogous to letting a gambler with $10 in casino chips place a $100 bet at a blackjack table on the assumption that he'll win. A 2003 Standard & Poor's analysis modeled the most popular type of deal and found that in the event of high claims, the reinsurance vehicle's funds wouldn't be enough to cover the losses it was supposed to take on.

"The captive is unable to pay its full contractual exposure," S&P wrote.

The deals had yet another unusual sweetener, investigators alleged.

Each of a bank's reinsurance vehicles was legally separate not only from the bank's main reinsurance subsidiary but also from all the other funds. If a reinsurance deal didn't have enough money to pay its obligations, the bank could abandon it and leave the mortgage insurer with the unpaid bill.

To carry on the casino analogy above, it would be as if the gambler with $10 in chips were allowed to make that same $100 bet at ten different blackjack tables, collecting on the winning bets and renouncing the losers.

Documents reviewed by *American Banker* suggest banks may have agreed they were not taking on significant risk.

At one point, Countrywide's Balboa Insurance division crunched the numbers to determine how much it should reserve for potential losses from the deal. The answer, the actuaries concluded, was "$0," according to a reserve analysis obtained by investigators and cited in a report to the Department of Justice.

All the same, banks persuaded state insurance regulators to sign off on the structures. To judge

whether the reinsurance agreements were fair, state officials relied in part on actuarial analyses submitted by the banks and insurers.

"Review of these opinions has found them to frequently contain significant defects and omissions which render them inapplicable to the actual reinsurance agreements executed," HUD investigators later concluded.

"DEEP CEDE"

With state regulators blessing the deals, the captive mortgage reinsurance business was off to the races. Not everyone involved was thrilled about it.

Mortgage insurers, which had initially used reinsurance deals as a marketing tool, were unpleasantly surprised to find that banks demanded an ever-increasing share of the premiums.

Banks considered the insurers to be interchangeable, and companies like Wells Fargo made it clear as early as 2000 that they wanted "deep cede" deals in which their captives would receive as much as 40% of the insurance premiums in return for providing reinsurance.

In letters to insurer Triad Guaranty from the beginning of the last decade, Wells demanded that Triad "demonstrate a willingness to discuss a captive reinsurance structure with a 40% net ceded premium" in order to receive Wells' future business, according to a HUD investigators' report submitted to the Department of Justice. Further clarifying its demands, the company wrote that "consideration will be given to enhancement of our returns."

Triad is now in liquidation.

Wells Fargo said in a written statement to *American Banker* that risk was split equitably under its contracts with mortgage insurers. It further denied that its captive mortgage reinsurance arrangements had ever been under HUD investigation.

"It is simply not true that Wells Fargo has ever been the subject of a HUD investigation involving either our captive reinsurance programs or our relationships with any private mortgage insurance company," the statement says.

"FEEDING THE BEAST"

Over time, the insurers came to realize that offering banks a taste of their profits only increased their demands for further financial concessions.

The aggressive revenue sharing was ruining insurers' profitability and emboldening lenders to demand even more outlandish deals in a cycle GE Capital Mortgage Insurance called "feeding the beast," a dour 1999 presentation to CitiMortgage noted.

The insurer — which eventually split from General Electric to become Genworth — was pressing Citi to restrain its demands. Ratings agencies and analysts were already flagging reinsurance deals as legally dubious, the insurer warned in a PowerPoint presentation obtained by HUD investigators, and "the MI industry and lenders won't be able to defend/sustain these structures."

Banks Took $6B in Reinsurance Kickbacks, Investigators Say - American Banker Article

Genworth declined to discuss the presentation.

"Captive reinsurance and excess of loss reinsurance structures have been a feature of the insurance industry for decades," a Genworth spokesman said in a written statement. "Genworth's arrangements with lender-affiliated reinsurers were structured in compliance with guidance from HUD."

Genworth further argued to *American Banker* that claims paid by the captive reinsurers in the wake of the mortgage industry's collapse proved the legitimacy of the financial structures. The captive reinsurers to which Genworth ceded premiums have covered a total of $850 million in claims, the company said.

But, as HUD's inspector general reported to the DOJ in 2009 — and as one investigator confirmed to *American Banker* recently — the fact that captive reinsurers paid claims does not mean the structures were unprofitable for the banks.

At least some of the deals were so generous that banks would still turn a profit even in the event of catastrophic claims, a Moody's Investors Service analysis cited by investigators found.

Because banks profited from selling their borrowers insurance, they sold it aggressively. In a presentation to the Department of Justice, the inspector general's investigators claimed that banks forced borrowers to buy more expensive policies than they needed.

"Nearly all loan files reviewed show borrowers with excessive coverage placed on their loan," the presentation concluded.

Most of the time, lenders did not tell borrowers in advance that their captives were reinsuring the deals, HUD investigators reported to the DOJ. In some cases, banks allegedly told customers that the charge for the reinsurance was "none."

Banks and insurers that spoke to *American Banker* denied that they had sold unnecessary or improperly disclosed insurance.

"Wells Fargo provided disclosures to consumers regarding its captive reinsurance programs along with the ability to opt out of reinsurance arrangements," a Wells spokeswoman told *American Banker*.

"CitiMortgage provided disclosures to borrowers and they were offered the choice to opt-out, which many did," a spokesman for Citigroup wrote. "This choice has no impact on the premiums charged to the borrower."

SunTrust declined to comment.

PASSING THE BATON

HUD Inspector General Ken Donohue — and his deputy, Mike Stephens, who succeeded him last year — were confident that they had a case. Initially the project of one regional investigator, the captive mortgage reinsurance probe drew the attention of senior officials in the inspector general's office as well as the RESPA enforcement staff elsewhere in HUD.

Banks Took $6B in Reinsurance Kickbacks, Investigators Say - American Banker Article

In the summer of 2009, Kubesh and Minnesota Department of Commerce staff came to Washington to present their findings to the Department of Justice.

The DOJ said it wanted take the matter on, according to Inspector General Stephens and others. Six months later, HUD's attorneys formally referred its case to prosecutors, effectively ending the housing agency's involvement. Investigators believed a speedy settlement in the hundreds of millions of dollars was likely, and HUD's investigators even suggested that the proceeds should be used to pay for mortgage counseling for borrowers who were allegedly victims of kickback schemes.

Major banks deny that their reinsurance agreements were illegal, but they have not been eager to defend them in court. In July, Bank of America spent $34 million to settle a RESPA class action suit accusing Countrywide of taking the same mortgage insurance kickbacks alleged by HUD investigators.

In court filings prior to that settlement, Countrywide's attorneys argued that eventual payouts made by the company's captive reinsurance vehicles demonstrated that they had taken on real risk.

A Bank of America spokesman made the same argument to *American Banker*.

"[W]hen loan default rates are low — there would be limited or no reinsured losses; and in other years — when loan default rates are high — there would be significant reinsured losses and, correspondingly, significant reserves," he wrote.

Court filings show that Countrywide paid zero reinsurance claims between 2000 and 2006. What losses Countrywide might have later sustained from the deals, however, is not in the public record.

Under an agreement between Countrywide and the plaintiffs' attorneys, case files documenting the company's alleged behavior — as well as how much it earned from reinsurance deals — were sealed by Judge Paul Diamond of the Eastern District of Pennsylvania.

Wells Fargo has also reached a preliminary settlement with the same law firm, Kessler Topaz Meltzer & Check LLP, in a case alleging "a secretive conspiracy to circumvent RESPA's prohibition on kickbacks and unearned fees." A Wells spokeswoman said the company's decision to settle the case does not mean that the allegations had any merit.

"GETTING KICKED AROUND"

More than a year and a half after the Department of Justice took over the case, no settlement has been reached and there is serious doubt as to whether the case even remains active.

Bank of America has not received any HUD inquiries on the subject of Countrywide's captive mortgage reinsurance since 2008, according to a company spokesman, and is unaware of any current review of its deals.

People familiar with the case believe it may have stagnated because demonstrating that the

Banks Took $6B in Reinsurance Kickbacks, Investigators Say - American Banker Article

captive reinsurance amounted to kickbacks would require accounting expertise that the
Department does not possess.

HUD staffers who initially put the case together have moved on to new jobs. Just last month,
HUD's authority to enforce RESPA expired, and its responsibilities were transferred to the new
Consumer Financial Protection Bureau.

The bureau declined to address questions from *American Banker* about whether it intends to
pursue the matter.

The agency has hired at least two former enforcement officials from HUD who are familiar with
the case, however. Both referred questions to the CFPB's press office.

"While we continue to build and staff our enforcement program, the CFPB is capable of
exercising its RESPA enforcement authority now," says a CFPB official.

If the Bureau doesn't take the case, there is also the possibility that Minnesota officials or another
state would readopt it, Acting Inspector General Stephens and other people familiar with the case
said.

"This thing is getting kicked around," Stephens said, arguing that a lack of enforcement on such
matters has eroded consumers' faith in the process of buying a home.

"The mortgage companies … are responsible for those people feeling that way," he said.

*Editor's note: This is the first of a two-part series. Next up: How regulators, the government-
sponsored enterprises, mortgage insurers, and trial attorneys allowed banks to collect a decade
of alleged kickbacks, and the deals' effect on lending standards.*



© 2011 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use,
duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly
prohibited.

# EXHIBIT C

**Proposed EITF Issue**

*Title*:   Risk Transfer in Mortgage Reinsurance Captive Arrangements

**References**

- FASB Statement No. 60, *Accounting and Reporting by Insurance Enterprises*
- FASB Statement No. 113, *Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts*
- FASB Staff Implementation Guidance - Accounting for Reinsurance: Questions and Answers about Statement 113
- AICPA Statement of Position 98-7, *Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer Insurance Risk*
- EITF 93-6, *Accounting for Multiple Year Retrospectively Rated Contracts by Ceding and Assuming Enterprises*

**Issues**

Mortgage lenders have established wholly-owned insurance captives for the purpose of reinsuring mortgage insurance underwritten by mortgage insurers on mortgages originated by the lender. The issues are:

1. Whether FAS 113, *Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts*, or another model applies to these reinsurance contracts.
2. If FAS 113 applies, what is a reasonable standard for evaluating risk transfer for these particular contracts?

The issues are relevant to both mortgage insurers and mortgage lenders, many of whom are SEC registrants.

**Background**

1. An issue has been brought to the attention of the AICPA relating to risk transfer on mortgage reinsurance contracts between mortgage insurers (MI) and mortgage reinsurance captives (reinsurer), wholly-owned subsidiaries of mortgage lenders. There is no consistent practice among the MIs or mortgage lenders, or their advisors, as to the model or criteria for evaluating risk transfer on these contracts.  The AICPA has established a Task Force to address the issue.  Task Force members are listed in Appendix B.

2. Mortgage Insurance - The purpose of mortgage insurance is to protect lenders from default-related losses on conventional first mortgages made to home buyers who make a down payment of less than 20 percent of the purchase price.  Private mortgage insurance companies

insure against the losses associated with defaulted loans by guaranteeing payment to the lender of the top 20 to 30 percent of the claim amount. In effect, the mortgage insurance company shares the risk of foreclosure with the lender.

A claim amount filed with the mortgage insurer generally includes principal and delinquent interest due on the loan, legal expenses incurred during foreclosure, the expense of maintaining the home and any advances the lender made to pay taxes or insurance. Generally, after a lender has instituted foreclosure and acquired title to the property, it can submit a claim to the insurance company.

Mortgage insurers operate within a conservative risk-to-capital ratio, with capital guidelines established by state insurance departments.  Insured risk is defined as the percentage of each loan covered by an insurance policy. Private mortgage insurers must operate within 25-to-1 ratio of risk to capital, which means they set aside $1 of capital for every $25 of risk they insure. Generally, the existing captive mortgage reinsurance arrangements require the captive mortgage reinsurer to maintain a risk-to-capital ratio of a minimum of 10-to-1.

3.  Under a captive contract, a MI enters into a reinsurance contract with a wholly-owned subsidiary of a mortgage lender to reinsure a portion of the mortgage insurers' risk. The lender shares in the profits or losses of the MI on the mortgage loans reinsured with the captive.  Mortgage insurance profits in the 1990's have benefited from low mortgage default rates. The policies are typically excess contracts where a loss up to a specified aggregate limit over the MI's retention is assumed by the reinsurer.  While most contracts are excess, a few quota share contracts have been written wherein the reinsurer proportionately shares in all losses with the MI.

4.  The contracts, first written in 1996, have evolved, as have the interpretations of risk transfer considerations.  The vast majority of the contracts have common terms, however, contracts are negotiated and certain variations in terms exist.  Risk transfer considerations on these contracts have received considerable discussion among the public accounting profession and their clients and, at present, significantly different views exist as to whether the FAS 113 model applies and, if the case, what criteria should be used for evaluating contracts under FAS 113.  Accordingly, different parties can use decidedly different criteria in evaluating risk transfer on the same policy.  Different conclusions and accounting may result when the MI is audited by one firm and the captive reinsurer by another.

5.  There are a number of interested parties to these contracts including the lender, MI, insurance and banking regulators, and purchasers of mortgages in the secondary market. Except for regulators, these parties are among those represented on the AICPA Task Force submitting this paper. The Task Force strongly supports the Emerging Issues Task Force providing

guidance as to what model and criteria should be used to determine if there is sufficient risk transfer in these contracts.

6. The dollar amount of mortgage insurance premiums that have been reinsured through these captives and which may ultimately be dividended back to the mortgage lender has grown significantly over the years. Based on an informal review of the 1999 Private Mortgage Insurance Industry data, the most recent year public information is available, captive mortgage insurance arrangements were used on approximately 30% of private mortgage insurance written. It is estimated that this increased during 2000 and will increase again in 2001. During 1999, more than $100 million in reinsurance premiums were ceded under captive mortgage reinsurance arrangements. It is forecasted that this amount doubled during 2000 and will increase again in 2001. During 2000, home mortgage originations approximated $1 trillion of which more than $160 billion was covered by private mortgage insurance. The programs will continue to build as additional years' activity is added to the contracts. Most of the major US mortgage lenders participate in the reinsurance programs through captive insurers.

7. Most of the major US mortgage lenders with reinsurance captives have domiciled the captive in the State of Vermont. Captives domiciled in Vermont must maintain $250,000 in shareholder capital by regulatory mandate. Contract structures addressed in this paper are those typically written by captives domiciled in Vermont.

8. There is a difference in view as to whether mortgage reinsurance is within the scope of FAS 113. FAS 113 applies to all insurance enterprises to which FAS 60 applies. FAS 60 specifically excluded mortgage insurance from its principal accounting guidance.

9. While the contracts have a standard structure, certain aspects of the contracts create significant differences in interpretation as to the application of the risk-sharing model. A contract functions at the book year level and is typically for a 10 year term. For example, 1999 is a book year and all mortgage insurance policies written during 1999 would be considered "book year 1" and reinsurance premium and reinsurance losses related to that book year would be ceded to the captive reinsurer for 10 years. With certain restrictions, the contract is cancelable at any time by either party; otherwise it is automatically renewable in perpetuity and additional book years would be added to the contract with the respective premium ceded to the captive. Under the contract with the MI, the captive establishes a trust fund for the benefit of each MI. Trust funds for all book years for the particular MI cross-collateralize the entire reinsured obligation to the MI. The trust fund balance changes as additional book year activity occurs. The trust fund is monitored to ensure capital is consistent with current exposures. Quarterly, the captive is required to ensure the trust fund is maintained to equal the greater of a percentage (typically 10%-20%) of the current cumulative loss exposure for all book years or 100% of loss reserves, including a contingency reserve. There is no obligation to the MI on the part of the captive beyond the contractual obligation to fund the trust fund. If a reinsurer fails to make a capital deposit or fails to maintain adequate minimum capital requirements, there are typically contractual steps

specified to rectify the situation. Most commonly, there is a timeframe to allow the reinsurer to correct the deficiency (typically 30 days). At the end of 30 days, if no resolution has occurred, the contract is automatically terminated either on a "cut-off" or "run off" basis, depending upon the contract. With "cut-off", premiums cease to be ceded, risks cease to be transferred and the contract obligations revert back to the MI. In a "run-off" situation, only new business stops, the prior business continues under the original terms of the contract. In these situations, the captive may be required to maintain minimum capital in excess of reserves within the trust as specified by the contract. Any trust fund assets will be distributed to the ceding company or to the reinsurer in accordance with the contract.

10. The use of a trust fund structure to maintain capital and required reserves was motivated in large part by the needs of the ceding primary MI. In order to obtain statutory financial statement credit for reinsurance balances due, a ceding MI is generally required by state insurance regulators to secure these amounts via a trust fund arrangement, a letter of credit provided by a qualified financial institution or funds held on deposit. Of these alternatives, only the trust fund mechanism conforms to the MI eligibility requirements adopted by the Federal Home Loan Mortgage Corporation. For this reason and various other reasons, the trust fund has become the vehicle of choice within the MI industry for meeting regulatory requirements. To date, all captive MI reinsurance agreements that have been executed incorporate a trust fund structure due to Vermont regulatory and other requirements. The trust fund functions as a mechanism for the Vermont regulators to ensure minimum capital is maintained.

11. The trust fund is designed to provide the ceding MI with security in (at least) two fundamental ways. First, the structure effectively forces the captive to collateralize reinsured risk exposures at levels consistent with or exceeding standard MI industry reserve requirements. Second, the structure serves to create a protective "firewall" for the ceding MI to the extent that the exposure of the trust fund assets is solely limited to losses associated with loans reinsured on the ceding MI's behalf. In this respect, the trust fund assets are restricted for the sole use and benefit of the ceding MI. These assets cannot be drawn down to cover losses associated with loans reinsured on behalf of other MIs. In theory, the collateralization and firewall security features will enable the ceding MI to obtain optimal regulatory capital relief from state insurance regulators and optimal risk-based capital relief from Wall Street credit rating agencies.

12. At the same time, however, as discussed above, the trust fund structure also imposes limitations on the ability of the ceding MI to recover losses. Under standard industry practices, the reinsurance agreement restricts the amount of losses recoverable by the ceding MI to the amount of assets maintained in its particular trust fund. The ceding MI cannot attach other assets maintained by the captive in order to recover losses. Trusts established for the benefit of MI's within the captive structure are not cross-collateralized. In addition, subject to the requirements of certain captive regulators, including those in Vermont, the ceding MI cannot attach the core regulatory capital that was used to initially fund the captive. Therefore, the use of the trust fund has the practical effect of limiting the loss exposure of the

captive.  Moreover, the captive is protected from potential insolvency since its core regulatory capital is not exposed to reinsurer risk of loss.

13. The Task Force has considered whether EITF 93-6, *Accounting for Multiple Year Retrospectively Rated Contracts by Ceding and Assuming Enterprises*, is applicable to these contracts and has concluded it is not.  Either party may terminate the mortgage reinsurance contract at any time (with 90 days notice) and there is no additional obligation for either party related to adjustable contract features.  Per EITF 93-6, "a retrospectively rated contract that could be canceled by either party without further obligation is not covered by this Issue."

14. The Task Force has concluded the contract is a series of individual book year contracts, renewable indefinitely.  The basis for this conclusion is the contract may be terminated by either party at any time with minimal notice and the number of book years that ultimately will be included in the contract is unknown.

15. The Task Force has also considered whether these are short or long-duration contracts under FAS 60 and has concluded that the accounting model for short-duration contracts seems more applicable to risk exposures under mortgage guaranty insurance and reinsurance.

16. Different interpretations exist regarding whether the trust fund functions (a) as an aggregate limit of coverage that is changing annually with the addition of a new book year or (b) as collateral to the ceding company and serves to maintain adequate capital commensurate with risk exposures. Depending upon this decision, the contract would be viewed either as (a) a contract evaluated annually on a prospective basis as new book activity occurs or (b) a "series of single book years" each evaluated separately.

17. Under the "series of single book years" scenario there is a difference in view as to (a) whether the trust fund limitations should be considered in a FAS 113 cash flow analysis and (b) whether external capital must be deposited in the trust fund for each book year or whether retained earning of previous book years can be considered capital for subsequent book years without the need to deposit additional external capital.

18. If adequate risk transfer is not present, SOP 98-7, *Deposit Accounting: Accounting for Insurance and Reinsurance Contracts that Do Not Transfer Insurance Risks*, would be applied. According to paragraph 9 of SOP 98-7, "fees to be retained by the insurer or reinsurer, irrespective of the experience of the contract" would be excluded from a deposit liability or asset. Because all premiums paid pursuant to the mortgage reinsurance contract are non-refundable, recognition of a deposit liability by the reinsurer would not be appropriate, i.e., there is no obligation for the reinsurer to return any portion of the premium to the ceding company, except in the form of losses paid. Instead, such fees would be earned over the life of the contract similar to premium recognition under FAS 60. The Task Force agreed the recognition of revenues would be the same whether or not a contract is assessed to have adequate risk transfer. However, under a deposit method, revenue would likely be classified as something other than premiums and losses under the contract would be reflected

as other expenses. Recognition of the revenue as something other than premiums would be an indication to regulators that legal requirements may not be met and the consequences would be significant both from a regulatory and legal perspective (see following point).

19. When entering into the contracts, the lenders must comply with Section 8 of the Real Estate Settlement Procedures Act (RESPA). The US Department of Housing and Urban Development, in providing guidance on RESPA, has stated the position that "arrangements are permissible under RESPA if payments to the reinsurer: (1) are for reinsurance services actually furnished or for services performed and (2) are bona fide compensation that does not exceed the value of such services." Premiums must be commensurate with the risk assumed and "there must be a real transfer of risk". RESPA does not include a reference to authoritative literature for evaluating risk transfer. The legal community, in part, has looked to accounting literature and accounting and actuarial conclusions for guidance. Considerations affecting permissibility of contracts under RESPA are not within the scope of this paper.

**Example of Standard Contract Terms**

*Term*
Reinsurance under a contract is established by "book year" and is typically for a 10-year term. For example, in a 1999 contract, all MI policies written during 1999 would be considered "book year 1" and premiums would be ceded for a 10-year run-off term. Additional "book years" (2000, 2001, etc.) could also be added to this contract. With certain restrictions, the contract is cancelable at any time, but otherwise is automatically renewable in perpetuity. The reinsurer would typically have contracts with several MI's.

*Reinsured Losses*
The MI will cede to the reinsurer losses in excess of an established aggregate "first loss percentage amount of the original risk insured" for each book year. Any loss in excess of the first loss percentage amount will be assumed by the reinsurer up to a specified limit (i.e. the reinsurer's risk is capped). The MI retains risk in excess of the reinsurer's layer. For example, a contract may be structured as a 5/5/25, which means the MI keeps losses up to the first 5% of risk, the reinsurer assumes the next 5%; the MI cedes 25% of premium to the reinsurer. Layers of coverage and premium ceding percentages vary by contract.

*Ceding Commissions*
Certain contracts stipulate a ceding commission will be paid to the MI to reimburse the MI for acquisition costs. The majority of the excess contracts are written without a ceding commission.

*Trust Fund*
A trust fund is established by the Reinsurer for each MI, the assets of which are used to pay reinsured losses.

- *General concept:*  The trust fund is cross-collateralized for all book years for the respective MI. Reinsurer exposure is limited to the amount in the trust fund.
- *Additions to the trust:*  Capital contributions made by the reinsurer; premiums paid by the MI to the reinsurer over the 10-year term of the book year; interest income earned on the monies in the trust.
- *Reductions from the trust:*  Reimbursements for administrative expenses and premium/state/federal income taxes paid to reinsurer; reinsured losses paid to the MI; distributions paid to the reinsurer in excess of minimum capital requirements as permitted by the contract.

*Capital Contributions*
Quarterly, the captive is required to ensure the trust fund is maintained to equal the greater of a percentage (typically 10%-20%) of the current cumulative loss exposure for all book years or 100%-102% of loss reserves, including a contingency reserve.

*Termination Provisions*
*Run-off:* Either party may put the contract into run-off, at any time, by providing notice to the other party.  During run-off, no new policies can become subject to the contract, however, all other terms and conditions shall continue to apply with respect to current book years.

*Cut-off:* If, at any time, (a) the funds in the trust are insufficient to pay amounts due or (b) the ceding company is unable to obtain funds from the trust, then the agreement terminates. Upon termination, there is no further legal obligation to the captive as obligations revert back to the MI.

*Distributions*
Generally, when the trust fund meets an established dollar criteria, distributions can be made from the trust to the reinsurer.  These amounts could then be paid as a dividend to the mortgage lender with insurance department approval.

**Differing Views**

As previously mentioned, there is diversity as to the model and criteria for evaluating risk transfer on these contracts. Different views, presented as questions, follow. A decision tree is attached as Appendix A.

Question 1
*Must a FAS 113 risk transfer analysis be performed to support risk transfer?*

    *Yes*. While FAS 60 specifically excludes mortgage insurance from the principal insurance guidelines, FAS 113 does not specifically exclude mortgage insurance. MIs consider FAS 113 to be relevant guidance for direct business.

    *No*. Mortgage reinsurance is not within the scope of FAS 113 as FAS 113 applies to all insurance enterprises to which FAS 60 applies. Paragraph 6 of FAS 60 specifically excludes mortgage guaranty insurers from its principal insurance guidance. Accordingly, mortgage guaranty reinsurance should not be considered within the purview of FAS 113. Additionally, even if one were to use FAS 113 by analogy, risk transfer analyses are generally not performed on contracts with non-refundable premiums as revenue and expense recognition would generally be the same whether or not deposit accounting were applied, i.e., revenue would be earned over the life of the contract.

    To support the proper reflection of premiums by the reinsurer, the contracts must ensure adherence to regulatory requirements. Since the main concern of regulators is whether premiums charged are commensurate with the loss exposure assumed by the reinsurer, an actuary should be used to render an opinion as to whether premiums represent a reasonable charge for the potential exposures covered under the contract.

Question 2
*Should the limitations of the trust fund structure be considered in a FAS 113 cash flow analysis and, if so, how would it affect the analysis?*

    *Yes.* The trust fund is a significant element of the contract that must be modeled. It is assumed the captive will not fund the trust upon notification the fund balance is below minimum capital requirements and, as such, the trust fund effectively functions as a cap on losses at any given point in time.

    In general, it is expected that the external capital plus new premiums and interest income will be more than adequate to maintain the minimum capital. In the event that an adverse loss scenario were to occur, the contract provides an option to the captive of not funding the trust and allowing the contract to terminate. There is no legal recourse on the part of the ceding company beyond terminating the contract in the event that the captive fails to meet the minimum capital requirements. Given that there is limited unrestricted capital in the captive to provide additional funding to the trust and there is no legal obligation on the part of the

captive's parent to provide funding, it is reasonable to expect that the captive will elect the option built into the contract to not provide additional funding. Based on the facts outlined above it is appropriate to perform the cash flow analysis assuming that no additional capital will be contributed by the captive to the trust fund. In this manner, it is determined if and when a contract's cash flows revert to either a cut-off or run-off scenario, consistent with Q&A 18 to FAS 113.

*No.* Effectively, the trust fund limitation is akin to a capital limitation as opposed to a coverage limitation. The contract specifically requires the captive to ensure the trust is adequately funded on a quarterly basis. Therefore, at the inception of the contract, one would expect the captive to comply with this contractual requirement. Thus, the trust should not be considered a cap on losses within a FAS 113 cash flow analysis but is similar to any practical capital limitation whereby the ceding company is obligated to pay claims, as a contingent obligor, when the reinsurer is either unable to or chooses not to pay a claim. Capital limitations are not considered in FAS 113 risk transfer analyses. The trust fund functions as collateral to the ceding company to ensure the collectibility of reinsured losses and is necessary for the ceding company to recognize reinsurance recoverables as admitted assets within their statutory financial statements. Additionally, from the insurance regulator's perspective, the trust fund acts as a means for the captive to maintain adequate capital that is commensurate with its risk exposures.

As evidence that the trust fund functions more like a capital rather than a coverage limitation, the trust fund is reassessed quarterly to ensure adequate capital is maintained to fund current loss exposures. Distributions cannot be made from the trust fund unless balances exceed the minimum requirements. If the reinsurer incurs losses in a given quarter whereby trust assets fall below minimum capital requirements as stipulated in the reinsurance agreement, most contracts require the reinsurer to replenish the trust but provide a remedy of run-off or cut-off if they fail to do so. Therefore, the only circumstance by which the trust serves to limit losses would occur when the captive fails to fund the trust, as is stipulated in the contract. Such a situation is analogous to a reinsurer depleting its surplus and failing to obtain additional capital to meet its obligations. This potential issue is a matter of capital adequacy to the reinsurer and collectibility of reinsurance recoverables to the mortgage insurer.

A view has been put forth if the captive has no intention of funding the trust in periods of adverse loss, the situation could raise accounting issues. This view represents that, in performing a FAS 113 risk transfer analysis, it is unlikely that the 9a test of FAS 113 (the reinsurer assumes significant insurance risk under the reinsured portions of the underlying contracts) could be met if it is expected that the reinsurer will not participate in losses within the stated coverage limits. For example, the 5% excess 5% coverage in the contract may effectively be limited to 2% excess 5% and thus the reinsurer is not sharing the ceding company's losses above 7%. As such, if the 9a test cannot be met, there is no reason to perform a 9b (reasonable possibility of a significant loss) test. Others believe that if it can be demonstrated that there is a reasonable possibility of a significant loss satisfying the 9b requirement, implicitly 9a is satisfied. It is not necessary for the entire loss layer to be at risk

to achieve risk transfer under FAS 113.  Only sufficient capital needs to be at risk.
Depending upon the pattern of loss development, losses for a particular book year may, in
fact, utilize the entire 5% x 5% layer.

Question 3
*Does the change in trust fund balances give rise to a significant contract amendment at the
beginning of each new book year?*

*Yes.* The trust fund functions as an aggregate contract coverage limit that changes
significantly at the beginning of each book year.  The trust fund balance defines the loss limit
of the contract.  Accordingly, it functions as a significant amendment to the contract that
requires a new risk transfer analysis be performed at the beginning of each book year using
cash flows of the current book year and prior year's run-off on a prospective basis.  The
assumption is that a significant modification; as contemplated by paragraph 33 in FAS 113
and further clarified in EITF, Appendix D, topic D-34, question 6, has been made to the
initial contract (thus requiring re-analysis).  The parties have (a) agreed to continue the
contract and (b) a new policy year is being added with additional exposures and new loss
limits.

*No.* The contractual terms of the trust fund are not changed from book year to book year and,
therefore, should not be viewed as an effective change in the contract requiring a new cash
flow analysis at the beginning of each book year.

Question 4
*Must external capital be deposited in the trust fund for each book year?*

*Yes.* The FAS 113 risk transfer analysis is performed on a book year basis and, accordingly,
external capital from the reinsurer's parent must be deposited in the trust fund for each book
year. This approach is consistent with viewing the contract as a series of individual book year
contracts.  Retained earnings from previous book years are not considered capital to support
other book years, consistent with treating each book year separately. It is also consistent with
viewing the trust fund as established to maintain capital adequacy and collateral for book year
exposures assumed. If capital is not deposited for each book year, the amount of capital at
risk relative to reinsurance exposures becomes significantly smaller as additional book years
are added since premiums and retained earnings are not considered capital for the FAS 113
risk transfer analysis.

In a contract where external capital is deposited for each book year, the contract is evaluated
in its entirety at inception and is not re-analyzed unless there are amendments to the contract,
or the underlying assumptions in the analysis are materially different than actual experience.

*No.* Capital is required to be deposited for the first book year.  For subsequent book years,
capital is required to be maintained at a specified level in order to continue to reinsure new
business.  Retained earnings are considered as capital in each subsequent book year in the

risk transfer analysis. Since the trust fund balance supports all book years, claim activity may require the deposit of external capital to the trust to satisfy minimum capital requirements.

The cross-collateralization of the trust fund and the modeling of retained earnings as capital in support of all book years requires a re-evaluation of cash flows supporting FAS 113. Practice varies in that certain professionals model each book year cash flows for FAS 113 while others model the initial book year of a contract for FAS 113 and reanalyze the contract only if trust fund activity significantly affects available capital levels.

Question 5
*Should all trust fund cash flows be considered in the risk transfer analysis?*

*Yes.* The trust fund is a secured interest to the MI and functions as the collecting point for funds supporting reinsurer exposures to the MI. The only funds that can be used to pay claim losses are those that flow through the trust. Accordingly, the trust is considered the point for evaluating cashflows and risk transfer. Risk transfer is evaluated as the present value of cash flows between the reinsurer and the trust relative to the present value of the premium stream. The cash flows include the capital contribution from the reinsurer and the disbursements to the reinsurer. These disbursements contemplate the ceded premiums and trust investment income less claims losses, expenses and taxes. Anything that represents a diminution of the trust balance has to be contractually permitted by the MI and, accordingly, taxes and expenses are viewed as cash flows in evaluating risk transfer. Additionally, the trust fund balance would be modeled to determine if and when the contract is terminated due to depleted assets and to determine assets available to be disbursed. If the risk transfer analysis is not performed at the trust level, satisfactory risk transfer on a book year would be demonstrated without any external capital being at risk. This does not seem reasonable.

*No.* The trust fund is viewed as belonging to the reinsurer and the traditional FAS 113 approach is applied. Risk transfer is considered to be a function of cash flows solely between the ceding company and the reinsurer. Investment income, expenses, taxes, would not be considered in evaluating risk transfer. Paragraph 10 of FAS 113 states the risk transfer consideration "shall be based on the present value of all cash flows between the ceding and assuming enterprises". Question 16 of the FAS 113 question and answers makes it clear taxes and other operating expenses are not to be considered in the calculation. However, the trust fund balance would be modeled to determine: (a) if and when the contract is terminated due to depleted assets, (b) the level of capital available to support book year exposures, and (c) available assets for distribution.

**Application of FAS 113 Risk Transfer Analysis
to Mortgage Reinsurance Decision Tree**          Appendix A



Is EITF 93-6 Applicable?

**NO**, contracts are cancelable
by either party at anytime.

Must a FAS 113 Cash Flow Analysis be
prepared to support Risk Transfer?

**NO**, however, need to ensure regulatory
requirements are met to recognize

**YES**

Do you consider the trust fund
structure in the FAS 113 Cash Flow

**YES**, consider trust fund as a cap
on losses.

**NO**, it is a capital mechanism. Model
each book year separately and do not
consider trust fund as a cap on losses.

Does the change in trust fund balances give
rise to a significant contract amendment at
the beginning of each new book year?

**YES**, model cash flows of current book year
together with run-off of prior book years.

**NO**, model cash flows for each
book year separately.

Must new capital be infused at the beginning of
each book year to support risk transfer?

**YES**

**NO**, model the trust fund as a limit on
losses within the analysis.

Do you model all trust cash flows as opposed to only
those between the ceding and assuming companies?

**YES**

**NO**

04/06/10

**Appendix B**

**AICPA Accounting Standards**
**Mortgage Captive Reinsurance Task Force**
**Correspondence Distribution List 2000-2001**

| Name | Telephone/Fax/E-mail |
|------|----------------------|
| <u>Name</u> | <u>Telephone/Fax/E-mail</u> |

William J. Bawden, Chair
PricewaterhouseCoopers LLP
Royal Trust Tower TD Centre, Suite 3000
Toronto, Ontario M5K 1G8

CANADA

416-947-8970
Fax: 416-947-8956
bill.bawden@ca.pwcglobal.com

Edward F. Bader
Arthur Andersen LLP
One Financial Plaza
Hartford, CT  06103

860-280-0601
Fax: 860-280-0888
edward.f.bader@us.arthurandersen.com

James A. Betts
Ernst & Young LLP
3200 Beechleaf Court, Suite 700
Raleigh, NC 27604

919-981-2904
Fax:  919-981-2997
andy.betts@ey.com

Jay Matalon
Ernst & Young LLP
1285 Avenue of the Americas, 8th floor
New York, NY 10019-6018

212-773-2468
Fax: 212-773-1203
jay.matalon@ey.com

Ken Bjurstrom
Milliman & Robertson, Inc.
15800 Bluemond Road, Suite 400
Brookfield, WI

ken.bjurstrom@milliman.com

Richard G. Browne
Deloitte & Touche LLP
1700 Market Street
Philadelphia, PA 19103-3984

215-246-2519
Fax: 215-448-2255
rbrowne@deloitte.com

Paul S. Davenport, Jr.
Corporate Services Group Manager
Republic Mortgage Insurance Company
190 Oak Plaza Boulevard
Winston-Salem, NC  27105

336-661-4244
Fax: 336-744-8960
Paul_Davenport@rmic.com

Gary J. Egnasko
PricewaterhouseCoopers LLP
161 Parker Road
Framingham MA  01702

508-370-9645
Fax: 508-405-1710
gary.j.egnasko@us.pwcglobal.com

John Gaines, FCAS, MAAA
AVP - Structured Products
United Guaranty Corporation
230 N. Elm St.
Greensboro, NC 27401

336-333-0276
Fax:  336-412-0929
jgaines@ugcorp.com

**Appendix B**

| <u>Name</u> | <u>Telephone/Fax/E-mail</u> |
|---|---|

Joseph P. Gencarella
KMPG LLP
600 Fleet Center
Providence, RI  02903

401-528-2642
Fax:  401-421-6870
j.gencarella@kpmg.com


Ron D. Kessinger,  Exec. VP & CFO
Triad Guaranty Insurance
101 South Stratford Road, Suite 500
Winston-Salem, NC  27104

336-723-1282
Fax: 336-917-2648
rkessinger@tgic.com


Deborah Lambert
Johnson Lambert & Co.
7500 Old Georgetown Road
Bethesda, MD  20814

301-656-0040
Fax: 301-656-0518

dlambert@ilco.com


Patrick Sinks, Sr. VP and Controller
Mortgage Guaranty Insurance
   Corporation
MGIC Plaza, P.O. Box 488
Milwaukee, WI 53201

414-347-6809
Fax: 414-347-6382

Patrick_Sinks@mgic.com


Charlton Wilder, Vice President
Chase Insurance Group
380 Madison Avenue, 13th Floor
New York, NY 10017

212-622-3536
Fax: 212 622-3966
Charlton.Wilder@chase.com


*STAFF LIAISON:*
Kimberly K. Hekker, Technical Manager
AICPA – Accounting Standards
1211 Avenue of the Americas, 6th Flr.

New York, NY  10036

212-596-6160
Fax: 212-596-6064
khekker@aicpa.org


*********************

*********************

Craig C. Anderson
Arthur Andersen LLP
One Financial Plaza
Hartford, CT  06103

860-280-0525
Fax: 860-280-0888
craig.c.anderson@us.arthurandersen.com


Sherri L. Schickert
PricewaterhouseCoopers LLP
100 East Wisconsin Avenue, Suite 1500
Milwaukee, WI 53202

414-212-1647
Fax: 414-212-1880
Sherri.l.schickert@us.pwcglobal.com


Michael C. Schmitz
Milliman & Robertson, Inc.
15800 Bluemond Road, Suite 400
Brookfield, WI 53005-6069

262-784-2250

Fax: 262-784-6388

mike.schmitz@milliman.com

# EXHIBIT D

# JPMorgan Chase & Co.

**Corporate headquarters**
270 Park Avenue
New York, NY 10017-2070
Telephone: 212-270-6000
jpmorganchase.com

**Principal subsidiaries**
JPMorgan Chase Bank,
   National Association
Chase Bank USA,
   National Association
J.P. Morgan Securities LLC

**Annual Report on Form 10-K**
The Annual Report on Form 10-K of
JPMorgan Chase & Co. as filed with the
U.S. Securities and Exchange Commission
will be made available without charge
upon request to:

Office of the Secretary
JPMorgan Chase & Co.
270 Park Avenue
New York, NY 10017-2070

**Stock listing**
New York Stock Exchange
London Stock Exchange
Tokyo Stock Exchange

The New York Stock Exchange ticker
symbol for the common stock of
JPMorgan Chase & Co. is JPM.

Financial information about JPMorgan
Chase & Co. can be accessed by visiting
the Investor Relations web site at
jpmorganchase.com. Additional
questions should be addressed to:

Investor Relations
JPMorgan Chase & Co.
270 Park Avenue
New York, NY 10017-2070
Telephone: 212-270-6000

**Directors**
To contact any of the Board members or
committee chairs, the Presiding Director
or the non-management directors as a
group, please mail correspondence to:

JPMorgan Chase & Co.
Attention (Board member(s))
Office of the Secretary
270 Park Avenue
New York, NY 10017-2070

The Corporate Governance Principles
of the Board, the charters of the principal
Board committees, the Code of Conduct,
the Code of Ethics for Finance Professionals
and other governance information can
be accessed by visiting our web site at
jpmorganchase.com and clicking on
"Governance" under the "About us" tab.

**Transfer agent and registrar**
BNY Mellon
480 Washington Boulevard
Jersey City, NJ 07310-1900
Telephone: 800-758-4651
bnymellon.com/shareowner/equityaccess

**Investor Services Program**
JPMorgan Chase & Co.'s Investor Services
Program offers a variety of convenient,
low-cost services to make it easier
to reinvest dividends and buy and
sell shares of JPMorgan Chase & Co.
common stock. A brochure and enroll-
ment materials may be obtained by
contacting the Program Administrator,
BNY Mellon, by calling 800-758-4651,
by writing to the address indicated
above or by visiting its web site at
bnymellon.com/shareowner/equityaccess.

**Direct deposit of dividends**
For information about direct deposit of
dividends, please contact BNY Mellon.

**Stockholder inquiries**
Contact BNY Mellon:

*By telephone:*
Within the United States, Canada and
   Puerto Rico: 800-758-4651
   (toll free)
From all other locations:
   201-680-6889 (collect)

   TDD service for the hearing impaired
   within the United States, Canada and
   Puerto Rico: 800-231-5469 (toll free)

   All other locations:
   201-680-6610 (collect)

*By mail:*
BNY Mellon
480 Washington Boulevard
Jersey City, NJ 07310-1900

**Duplicate mailings**
If you receive duplicate mailings because
you have more than one account listing
and you wish to consolidate your accounts,
please write to BNY Mellon at the
address above.

**Independent registered public
accounting firm**
PricewaterhouseCoopers LLP
300 Madison Avenue
New York, NY 10017-6204

As of the beginning of 2009, JPMorgan Chase & Co.
has distributed shareholder information under the
U.S. Securities and Exchange Commission "Notice and
Access" rule. As a result, the firm prints 700,000
fewer Annual Reports and Proxy Statements, which
saves on an annual basis approximately 6,400 trees
and 800 metric tons of $CO_2$ emissions.

This Annual Report is printed on paper made from
well-managed forests and other controlled sources.
The paper is independently certified by BVQI to the
Forest Stewardship Council (FSC) standards. The
paper contains a minimum of 20% post-consumer
waste recycled fibers.



**FSC**
**Mixed Sources**
Product group from well-managed
forests, controlled sources and
recycled wood or fiber

Cert no. SW-COC-002082
www.fsc.org
© 1996 Forest Stewardship Council

©2011 JPMorgan Chase & Co. All rights reserved.
Printed in the U.S.A.

# EXHIBIT E

EX-21.1 4 y86143exv21w1.htm EX-21.1

**Exhibit 21.1**

JPMorgan Chase & Co.
List of subsidiaries

| Name | Organized under the laws of |
|---|---|
| Banc One Building Management Corporation | Wisconsin |
| Banc One Capital Holdings LLC | Delaware |
| BOCP Holdings Corporation | Ohio |
| Banc One Capital Partners IV, Ltd. | Ohio |
| BOCF, LLC | Delaware |
| JPM Mezzanine Capital, LLC | Delaware |
| Chase Investment Services Corp. | Delaware |
| Banc One Financial LLC | Delaware |
| JPMorgan Capital Corporation | Delaware |
| First Chicago Capital Corporation | Delaware |
| JPMorgan Capital (Canada) Corp. | Canada |
| One Mortgage Partners Corp. | Vermont |
| First Chicago Equity Corporation | Illinois |
| First Chicago Leasing Corporation | Delaware |
| First Chicago Lease Holdings, Inc. | Delaware |
| Palo Verde Leasing Corporation | Delaware |
| First Chicago Lease Investments Two, Inc. | Delaware |
| First Chicago Lease Investments, Inc. | Delaware |
| GHML Holdings I, Inc. | Delaware |
| GHML Holdings II, Inc. | Delaware |
| GTC Fund III Holdings, Inc. | Delaware |
| GTC Fund IV Holdings, Inc. | Delaware |
| GTC Fund V Holdings, Inc. | Delaware |
| JPMC Housing Partnership V L.P. | United States |
| Lenox Court Associates, Ltd | Florida |
| JPMorgan Housing Corporation | Delaware |
| Cooper Project, L.L.C. | Delaware |
| J.P. Morgan Mansart Investments | France |
| NLTC Fund Holdings I, Inc. | Delaware |
| OX FCL Two, Inc. | Delaware |
| SAHP130 Holdings, Inc. | Delaware |
| OEP Holding Corporation | Delaware |
| Chase Travel Investment I, LLC | Delaware |
| OEP Parent LLC | Delaware |
| Banc One Equity Capital Fund II, L.L.C. | Delaware |
| Banc One Equity Capital II, L.L.C. | Delaware |
| Bank One Investment LLC | Delaware |
| One Equity Partners Europe GmbH | Germany |
| One Equity Partners II, L.P. | Cayman Islands |
| One Equity Partners III, L.P. | Cayman Islands |
| One Equity Partners IV, L.P. | Cayman Islands |
| One Equity Partners LLC | Delaware |
| Banc One Neighborhood Development Corporation | Ohio |
| Bear Stearns Irish Holdings Inc. | Delaware |
| Bear Stearns International Funding I S.à r.l. | Luxembourg |
| J.P. Morgan Dublin Financial Holdings Limited | Ireland |
| J.P. Morgan Bank Dublin plc | Ireland |
| Bear Stearns International Funding II S.à r.l. | Luxembourg |
| Bear Stearns Ireland Limited | Ireland |
| CCC Holding Inc. | Delaware |
| Chase Commercial Corporation | Delaware |
| Chase Capital Holding Corporation | Delaware |
| Chase Capital Corporation | Delaware |
| Chase Capital Credit Corporation | Delaware |
| Chase Lincoln First Commercial Corporation | Delaware |
| Chase Manhattan Realty Leasing Corporation | New York |
| Palo Verde 1-PNM August 50 Corporation | Delaware |

322

| Name | Organized under the laws of |
|---|---|
| Palo Verde 1-PNM December 75 Corporation | Delaware |
| PV2-APS 150 Corporation | Delaware |
| Chatham Ventures, Inc. | New York |
| J.P. Morgan Partners (BHCA), L.P. | California |
| CVCA, LLC | Delaware |
| Chemical Investments, Inc. | Delaware |
| Clintstone Properties Inc. | New York |
| Custodial Trust Company | New Jersey |
| Hambrecht & Quist California | California |
| H&Q Holdings Inc. | Delaware |
| Hatherley Insurance Ltd. | Bermuda |
| Homesales, Inc. | Delaware |
| J.P. Morgan Broker-Dealer Holdings Inc. | Delaware |
| J.P. Morgan Securities LLC | Delaware |
| J.P. Morgan Clearing Corp. | Delaware |
| J.P. Morgan Capital Financing Limited | England |
| J.P. Morgan Chase International Financing Limited | England |
| Robert Fleming Holdings Limited | England |
| Copthall Overseas Limited | England |
| J.P. Morgan Management (Jersey) Limited | Jersey |
| J.P. Morgan Chase Community Development Corporation | Delaware |
| J.P. Morgan Chase National Corporate Services, Inc. | New York |
| J.P. Morgan Corporate Services Limited | England |
| Robert Fleming Holdings Inc. | Delaware |
| J.P. Morgan Equity Holdings, Inc. | Delaware |
| CMC Holding Delaware Inc. | Delaware |
| Chase Bank USA, National Association | United States |
| Chase BankCard Services, Inc. | Delaware |
| Chase BankCard LLC | Delaware |
| Chase Credit Card Master Trust | United States |
| Chase Issuance Trust | United States |
| First USA Credit Card Master Trust | United States |
| J.P. Morgan Investor Services Co. | Delaware |
| Washington Mutual Master Trust | Delaware |
| Ixe Tarjetas, S.A. de C.V., Sociedad Financiera de Objeto Multiple, Entidad Regulada | Mexico |
| J.P. Morgan Trust Company of Delaware | Delaware |
| JPMorgan Bank and Trust Company, National Association | United States |
| JPM Capital Corporation | Delaware |
| JPM Heartland Wind I, LLC | Delaware |
| JPMC Wind Assignor Corporation | Delaware |
| JPMC Wind Investment LLC | Delaware |
| J.P. Morgan Finance Holdings (Japan) LLC | Delaware |
| J.P. Morgan Finance Japan YK | Japan |
| J.P. Morgan Futures Inc. | Delaware |
| J.P. Morgan GT Corporation | Delaware |
| J.P. Morgan Insurance Holdings, L.L.C. | Arizona |
| Banc One Insurance Company | Vermont |
| Chase Insurance Agency, Inc. | Wisconsin |
| J.P. Morgan International Holdings LLC | Delaware |
| J.P. Morgan Trust Company (Bahamas) Limited | Bahamas, The |
| J.P. Morgan Trust Company (Cayman) Limited | Cayman Islands |
| JPMAC Holdings Inc. | Delaware |
| J.P. Morgan Invest Holdings LLC | Delaware |
| J.P. Morgan Retirement Plan Services LLC | Delaware |
| J.P. Morgan Partners (23A Manager), LLC | Delaware |
| J.P. Morgan Private Investments Inc. | Delaware |
| J.P. Morgan Services Asia Holdings, Inc. | Delaware |
| J.P. Morgan Services Asia Holdings Limited | Mauritius |
| J.P. Morgan Services India Private Limited | India |
| J.P. Morgan Services Inc. | Delaware |
| JPM International Consumer Holding Inc. | Delaware |
| Brysam Mexico II, LLC | Delaware |

323

| Name | Organized under the laws of |
|---|---|
| JPMorgan Asset Management Holdings Inc. | Delaware |
| Constellation Venture Capital III (EF), LP | Delaware |
| HCM Participacoes Brasil Ltda. | Brazil |
| HCM Participacoes No. 2 Brasil Ltda. | Brazil |
| Highbridge Capital Management, LLC | Delaware |
| Highbridge Capital Administrators, LLC | Delaware |
| Highbridge Capital Management (Hong Kong), Limited | Hong Kong |
| Highbridge Capital Management (UK), Ltd. | England |
| Highbridge Principal Strategies, LLC | Delaware |
| Highbridge Principal Strategies Mezzanine Partners Offshore GP, L.P. | Cayman Islands |
| J.P. Morgan Alternative Asset Management, Inc. | Delaware |
| J.P. Morgan Fund Investor LLC | Delaware |
| J.P. Morgan Investment Management Inc. | Delaware |
| J.P. Morgan Direct Investors L.P. | Delaware |
| DVCMM LLC | Delaware |
| JPMorgan Global Absolute Return Strategies Fund LLC | Delaware |
| JP Morgan URPF Master Holding, LP | Delaware |
| JPMorgan Asset Management (Asia) Inc. | Delaware |
| JF Asset Management Limited | Hong Kong |
| JPMorgan Asset Management (Japan) Limited | Japan |
| JPMorgan Asset Management (Korea) Company Limited | Korea, South |
| JPMorgan Asset Management (Singapore) Limited | Singapore |
| JPMorgan Asset Management (Taiwan) Limited | Taiwan |
| JPMorgan Asset Management Real Assets (Asia) Limited | Hong Kong |
| JPMorgan Funds (Asia) Limited | Hong Kong |
| JPMorgan Funds (Taiwan) Limited | Taiwan |
| JPMorgan Asset Management (Canada) Inc. | Canada |
| JPMorgan Asset Management International Limited | England |
| JPMorgan Asset Management Holdings (UK) Limited | England |
| JPMorgan Asset Management (UK) Limited | England |
| JPMorgan Asset Management Holdings (Luxembourg) S.à r.l. | Luxembourg |
| JPMorgan Asset Management (Europe) S.à r.l. | Luxembourg |
| JPMorgan European Property Fund Management Company S.A. | Luxembourg |
| JPMorgan Asset Management Luxembourg S.A. | Luxembourg |
| JPMorgan Asset Management Marketing Limited | England |
| J.P. Morgan Trustee & Administration Services Limited | England |
| JPMorgan Funds Limited | Scotland |
| JPMorgan Investments Limited | England |
| JPMorgan Life Limited | England |
| JPMorgan LDHES LLC | Delaware |
| Security Capital Research & Management Incorporated | Delaware |
| JPMorgan Chase Bank, Dearborn | Michigan |
| JPMorgan Chase Bank, National Association | United States |
| Banc One Arizona Leasing Corporation | Arizona |
| Banc One Building Corporation | Illinois |
| Banc One Community Development Corporation | Delaware |
| Protech Tax Credit Fund III, LLC | United States |
| Banc One Equipment Finance, Inc. | Indiana |
| Banc One Kentucky Leasing Corporation | Kentucky |
| Banc One Real Estate Investment Corp. | Delaware |
| Bear Stearns Mortgage Capital Corporation | Delaware |
| Bear, Stearns Funding, Inc. | Delaware |
| Blue Box Holdings Inc. | Delaware |
| BONA Capital I, LLC | Delaware |
| BONA Capital II, LLC | Delaware |
| California Reconveyance Company | California |
| Chase Access Services Corporation | Delaware |
| Chase Auto Finance Corp. | Delaware |
| Chase Community Development Corporation | Delaware |
| Chase Community Equity, LLC | Delaware |
| Chase Education Loan Trust 2007A | Delaware |
| Chase Equipment Finance, Inc. | Ohio |

324

| Name | Organized under the laws of |
|---|---|
| Chase Funding Corporation | Delaware |
|   Chase Home Finance Inc. | Delaware |
|     Chase Home Finance LLC | Delaware |
|   Chase Mortgage Holdings, Inc. | Delaware |
|   Chase New Markets Corporation | Delaware |
|   Chase NMTC Crown Heights, LLC | Delaware |
|   Chase NMTC SA St. Joseph Investment Fund, LLC | Delaware |
|   Chase Preferred Capital Corporation | Delaware |
|     CPCC Delaware Statutory Trust | Delaware |
|       CPCC Texas Limited Partnership | Texas |
|     CPCC Massachusetts Business Trust | Massachusetts |
|   Chase Ventures Holdings, Inc. | New Jersey |
|   Chem Network Processing Services, Inc. | New Jersey |
| Collegiate Funding Services, L.L.C. | Virginia |
|   Chase Student Loans, Inc. | Delaware |
|   Collegiate Funding of Delaware, L.L.C. | Delaware |
|     Collegiate Funding Services Education Loan Trust 2003A | Delaware |
|     Collegiate Funding Services Education Loan Trust 2003B | Delaware |
|     Collegiate Funding Services Education Loan Trust 2004A | Delaware |
|     Collegiate Funding Services Education Loan Trust 2005A | Delaware |
|     Collegiate Funding Services Education Loan Trust 2005B | Delaware |
| Commercial Loan Partners L.P. | Nevada |
| Cross Country Insurance Company | Vermont |
| CSL Leasing, Inc. | Delaware |
| DNT Asset Trust | Delaware |
|   Ventures Business Trust | Maryland |
| En Pertignus Holding Corp. | Delaware |
| FA Out-of-State Holdings, Inc. | California |
|   Ahmanson Land Company | California |
|   Ahmanson Marketing, Inc. | California |
|   CRP Properties, Inc. | California |
|     HMP Properties, Inc. | Utah |
|   FA California Aircraft Holding Corp. | California |
|     Pacific Centre Associates LLC | California |
|       WMRP Delaware Holdings LLC | Delaware |
|         WMICC Delaware Holdings LLC | Delaware |
|   Irvine Corporate Center, Inc. | California |
|   Rivergrade Investment Corp. | California |
|   Savings of America, Inc. | California |
|   WaMu Insurance Services, Inc. | California |
|   Washington Mutual Community Development, Inc. | California |
| FC Energy Finance I, Inc. | Delaware |
| FDC Offer Corporation | Delaware |
|   Chase Merchant Services, L.L.C. | Delaware |
|     Chase Paymentech Solutions, LLC | Delaware |
|       Paymentech, LLC | Delaware |
|   Paymentech, Inc. | Delaware |
|     Paymentech Management Resources, Inc. | Delaware |
| FNBC Leasing Corporation | Delaware |
|   ICIB Fund I Holdings, Inc. | Delaware |
| Georgetown/Chase Phase I LLC | Delaware |
| Georgetown/Chase Phase II LLC | Delaware |
| Harvest Opportunity Holdings Corp. | New York |
| HCP Properties, Inc. | California |
| J.P. Morgan Commercial Mortgage Inc. | New York |
| J.P. Morgan Electronic Financial Services, Inc. | New York |
| J.P. Morgan International Inc. | United States |
|   Bank One International Holdings Corporation | United States |
|     Bank One Europe Limited | England |
|     J.P. Morgan International Finance Limited | United States |
|       Banco J.P. Morgan S.A. | Brazil |
|         J.P. Morgan Corretora de Cambio e Valores Mobiliarios S.A. | Brazil |

325

| Name | Organized under the laws of |
|---|---|
| J.P. Morgan S.A. Distribuidora de Titulos e Valores Mobiliarios | Brazil |
| Bear Stearns Singapore Management Pte. Ltd. (In Liquidation) | Singapore |
| BOL Canada II Sub, Inc. | Delaware |
| BOL Canada II Trust | Delaware |
| BO Leasing II ULC | Canada |
| BOL Canada I, Inc. | Delaware |
| BOL Canada I Sub, Inc. | Delaware |
| BOL Canada III, Inc. | Delaware |
| BOL Canada III Sub, Inc. | Delaware |
| BO Leasing III ULC | Canada |
| Brysam Lux (Colombia), S.a.r.l. | Luxembourg |
| Cazenove Group Limited | Jersey |
| Cazenove IP Limited | England |
| CB "J.P. Morgan Bank International" (LLC) | Russia |
| Chase Manhattan Holdings Limitada | Brazil |
| Crosby Sterling (Holdings) Limited | England |
| Dearborn Merchant Services, Inc | Ontario |
| Chase Paymentech Solutions | Canada |
| First Data/Paymentech Canada Partner ULC | British Columbia |
| Inversiones J.P. Morgan Limitada | Chile |
| J.P. Morgan Corredores de Bolsa SpA | Chile |
| J.P. Morgan (Suisse) SA | Switzerland |
| J.P. Morgan Bank (Ireland) plc | Ireland |
| J.P. Morgan Administration Services (Ireland) Limited | Ireland |
| J.P. Morgan Bank Canada | Canada |
| J.P. Morgan Bank Luxembourg S.A. | Luxembourg |
| J.P. Morgan Beteiligungs- und Verwaltungsgesellschaft mbH | Germany |
| J.P. Morgan AG | Germany |
| J.P. Morgan Capital Holdings Limited | England |
| J.P. Morgan Chase (UK) Holdings Limited | England |
| J.P. Morgan Chase International Holdings | England |
| J.P. Morgan Courtage SAS | France |
| J.P. Morgan EU Holdings Limited | England |
| J.P. Morgan (SC) Limited | England |
| J.P. Morgan Equities Limited | South Africa |
| J.P. Morgan Europe Limited | England |
| J.P. Morgan Services LLP | England |
| J.P. Morgan Chase Finance Limited | England |
| JPMorgan Cazenove Holdings | England |
| J.P. Morgan Cazenove Limited | England |
| J.P. Morgan Securities Ltd. | England |
| Morgan Property Development Company Limited | England |
| Robert Fleming (Overseas) Number 2 Limited | England |
| J.P. Morgan plc | England |
| J.P. Morgan Holdings B.V. | Netherlands |
| J.P. Morgan Chase Bank Berhad | Malaysia |
| J.P. Morgan Chile Limitada | Chile |
| J.P. Morgan Funding South East Asia Private Limited | Singapore |
| J.P. Morgan (S.E.A.) Limited | Singapore |
| J.P. Morgan Grupo Financiero S.A. De C.V. | Mexico |
| Banco J.P. Morgan S.A., Institucion de Banca Multiple, J.P. Morgan Grupo Financiero | Mexico |
| Fideicomiso Socio Liquidador de Posición de Terceros F00265 | Mexico |
| J.P. Morgan Casa de Bolsa, S.A. de C.V., J.P. Morgan Grupo Financiero | Mexico |
| J.P. Morgan Holdings (Hong Kong) Limited | Hong Kong |
| Copthall Mauritius Investment Limited | Mauritius |
| J.P. Morgan Securities (Far East) Limited | Hong Kong |
| J.P. Morgan Broking (Hong Kong) Limited | Hong Kong |
| J.P. Morgan Futures Co., Limited | China, Peoples Republic of |
| J.P. Morgan International Derivatives Ltd. | Jersey |
| J.P. Morgan International Holdings Limited | Cayman Islands |
| J.P. Morgan India Securities Holdings Limited | Mauritius |
| J.P. Morgan India Private Limited | India |

| Name | Organized under the laws of |
|---|---|
| J.P. Morgan Indonesia Holdings (B.V.I.) Limited | British Virgin Islands |
| J.P. Morgan Securities Singapore Private Limited | Singapore |
| J.P. Morgan Securities Thailand Holdings Limited | British Virgin Islands |
| PGW Limited | Thailand |
| JPMorgan Securities (Thailand) Limited | Thailand |
| Jadeling Malaysia Holdings Limited | British Virgin Islands |
| J.P. Morgan Services (Malaysia) Sdn. Bhd. | Malaysia |
| JPMorgan Securities (Malaysia) Sdn. Bhd. | Malaysia |
| J.P. Morgan Investimentos e Financas Ltda. | Brazil |
| J.P. Morgan Luxembourg International S.à r.l. | Luxembourg |
| J.P. Morgan Malaysia Ltd. | Malaysia |
| J.P. Morgan Overseas Capital Corporation | Delaware |
| J.P. Morgan Australia Group Pty Limited | Australia |
| J.P. Morgan Operations Australia Limited | Australia |
| J.P. Morgan Administrative Services Australia Limited | Australia |
| J.P. Morgan Australia Limited | Australia |
| J.P. Morgan Nominees Australia Limited | Australia |
| J.P. Morgan Portfolio Services Limited | Australia |
| J.P. Morgan Securities Australia Limited | Australia |
| JPMorgan Investments Australia Limited | Australia |
| J.P. Morgan Markets Australia Pty Limited | Australia |
| J.P. Morgan Espana S.A. | Spain |
| JPMorgan Servicios Auxiliares, S.A. | Spain |
| J.P. Morgan International Bank Limited | England |
| J.P. Morgan Securities Canada Inc. | Canada |
| J.P. Morgan Whitefriars Inc. | Delaware |
| J.P. Morgan Whitefriars (UK) | England |
| JPMorgan Corporacion Financiera S.A. | Colombia |
| PT J.P. Morgan Securities Indonesia | Indonesia |
| J.P. Morgan Pakistan (Pvt.) Limited | Pakistan |
| J.P. Morgan Partners (CMB Reg K GP), Inc. | Delaware |
| J.P. Morgan Saudi Arabia Limited | Saudi Arabia |
| J.P. Morgan Securities (C.I.) Limited | Jersey |
| J.P. Morgan Securities (Taiwan) Limited | Taiwan |
| J.P. Morgan Securities Asia Private Limited | Singapore |
| J.P. Morgan Securities Holdings (Hong Kong) Limited | Hong Kong |
| J.P. Morgan Securities (Asia Pacific) Limited | Hong Kong |
| J.P. Morgan Securities Holdings (Caymans) Limited | Cayman Islands |
| J.P. Morgan Securities India Private Limited | India |
| J.P. Morgan Securities Philippines, Inc. | Philippines |
| J.P. Morgan Securities South Africa (Proprietary) Limited | South Africa |
| JPMorgan Administration Services (Proprietary) Limited | South Africa |
| J.P. Morgan Structured Products B.V. | Netherlands |
| J.P. Morgan Trust Company (Jersey) Limited | Jersey |
| JPM Administration Services (Bermuda) Limited | Bermuda |
| JPMorgan Hedge Fund Services (Bermuda) Limited | Bermuda |
| JPMorgan Hedge Fund Services (Ireland) Limited | Ireland |
| JPMorgan Holdings (Japan) LLC | Delaware |
| JPMorgan Securities Japan Co., Ltd. | Japan |
| Norchem Holdings e Negocios S.A. | Brazil |
| NorChem Participacoes e Consultoria S.A. | Brazil |
| Paymentech Salem Services, LLC | Delaware |
| Chase Paymentech Europe Limited | Ireland |
| Sibelius Corporation | Delaware |
| Vastera Bermuda Limited Partnership | Bermuda |
| Vastera Netherlands B.V. | Netherlands |
| J.P. Morgan Mortgage Acquisition Corp. | Delaware |
| J.P. Morgan Treasury Technologies Corporation | Delaware |
| JPMN II Inc. | Nevada |
| JPMN Inc. | Nevada |
| JPMorgan Chase Bank (China) Company Limited | China, Peoples Republic of |
| JPMorgan Chase Vastera Inc. | Delaware |
| JP Morgan Chase Vastera Professional Services Inc. | Delaware |

| Name | Organized under the laws of |
|---|---|
| JPMorgan Xign Corporation | Delaware |
| Labrusca Holding Corp. | Delaware |
| Manufacturers Hanover Leasing International Corp. | Delaware |
| Meliora Holding Corp. | Delaware |
| Providian Bancorp Services | California |
| SCORE TRUST | Canada |
| Second and Union, LLC | Delaware |
| So Wehren Holding Corp. | Delaware |
| South Cutler Corporation | Delaware |
| Stockton Plaza, Incorporated | Florida |
| WaMu Asset Acceptance Corp. | Delaware |
| WaMu Capital Corp. | Washington |
| Washington Mutual Mortgage Securities Corp. | Delaware |
| We Uterque Holding Corp. | Delaware |
| We Valoroso Holding Corp. | Delaware |
| WM Asset Holdings Corp. | Delaware |
| WM Marion Holdings, LLC | Delaware |
|    JPMC Mortgage Funding LLC | Delaware |
|       WaMu 2007 MF-1 Trust | United States |
|       WaMu 2008 SFR- 2 | United States |
|    JPMC Real Estate Investment Trust | Maryland |
|       Washington Mutual Preferred Funding LLC | Delaware |
|       Wamu 2006-OA1 | Delaware |
|       Wamu 2007-Flex 1 | United States |
|       Washington Mutual Home Equity Trust | Delaware |
|    JPMC Specialty Mortgage LLC | Delaware |
|    WMB Baker LLC | Nevada |
| JPMorgan Chase Funding Inc. | Delaware |
|    J.P. Morgan Indies SRL | Barbados |
|    J.P. Morgan Ventures Energy Corporation | Delaware |
|       BE Investment Holding Inc. | Delaware |
|       Arroyo Energy Investors LLC | Delaware |
|          Argonaut Power LP | Delaware |
|          Arroyo DP Holding LP | Delaware |
|          Arroyo Power GP Holdings LLC | Delaware |
|             Jackson Preferred Holdings LP | Delaware |
|          Central Power Holdings LP | Delaware |
|          Okwari CB Holdings LP | Delaware |
|          Okwari UCF LP | Delaware |
|       Carbon Acquisition Company Limited | Jersey |
|          ECOSECURITIES GROUP PLC | Ireland |
|       J.P. Morgan China Commodities Corporation | China, Peoples Republic of |
|       J.P. Morgan Commodities Canada Corporation | Canada |
|       J.P. Morgan Commodities Singapore Pte. Ltd. | Singapore |
|       J.P. Morgan Energy Europe Espana, S.L.U. | Spain |
|       J.P. Morgan Energy Hungary Kereskedelmi Korlatolt Felelossegu Tarsasag | Hungary |
|       J.P. Morgan Energy Trading Holdings Sarl | Switzerland |
|          J.P. Morgan Commodities Sarl | Switzerland |
|          TTMI Sarl | Switzerland |
|       J.P. Morgan Metals & Concentrates LLC | Delaware |
|       J.P. Morgan Metals Group Limited | England |
|          Henry Bath & Son Limited | England |
|             Henry Bath BV | Netherlands |
|             Henry Bath LLC | Delaware |
|             Henry Bath Singapore Pte Ltd | Singapore |
|       J.P. Morgan Energy Trading Holdings Ltd. | England |
|          J.P. Morgan Energy Europe Ltd. | United Kingdom |
|             J.P. Morgan Energy Europe s.r.o. | Czech Republic |
|       J.P. Morgan Metals Limited | England |
|       JPMorgan Ventures Energy (Asia) Pte Ltd | Singapore |
|       Trading & Transportation Management LLC | Delaware |
|    PropPartners Master Fund L.P. | Cayman Islands |
| JPMorgan Distribution Services, Inc. | Delaware |

328

| Name | Organized under the laws of |
|---|---|
| JPMorgan Funds Management, Inc. | Delaware |
| JPMorgan Private Capital Asia Corp. | Delaware |
| JPMorgan Private Capital Asia General Partner, L.P. | Cayman Islands |
| JPMorgan Private Capital Asia Fund I, L.P. | Cayman Islands |
| JPMorgan PCA Holdings (Mauritius) I Limited | Mauritius |
| JPMorgan Securities Holdings LLC | Delaware |
| J.P. Morgan Commercial Mortgage Investment Corp. | Delaware |
| J.P. Morgan Institutional Investments Inc. | Delaware |
| Neovest, Inc. | Utah |
| JPMorgan Special Situations Asia Corporation | Delaware |
| J.P. Morgan Special Opportunities (Delaware) Corporation | Delaware |
| JPMorgan Global Special Situations I LLC | Delaware |
| J.P. Morgan (China) Venture Capital Investment Company Limited | China, Peoples Republic of |
| Harbour Formosa Investment Holdings Limited | Mauritius |
| Harbour Victoria Investment Holdings Limited | Mauritius |
| Indocean Financial Holding Limited | Mauritius |
| JPMorgan Mauritius Holdings II Limited | Mauritius |
| JPMorgan Mauritius Holdings IV Limited | Mauritius |
| JPMorgan Mauritius Holdings Limited | Mauritius |
| JPMorgan Mauritius Holdings VII Limited | Mauritius |
| Mountain Orchard Limited | Mauritius |
| JPMorgan Special Situations (Mauritius) Limited | Mauritius |
| J.P. Morgan Advisors India Private Limited | India |
| Silver Summit (Delaware) Corporation | Delaware |
| Magenta Magic Limited | British Virgin Islands |
| JPMP Capital Corp. | New York |
| J.P. Morgan Partners, LLC | Delaware |
| JPMP Capital, LLC | Delaware |
| J.P. Morgan Capital, L.P. | Delaware |
| JPMCC Belgium (SCA) | Belgium |
| J.P. Morgan Partnership Capital Corporation | Delaware |
| Peabody Real Estate Partnership Corporation | Delaware |
| The Peabody Fund Consultants, Inc. | Delaware |
| JPMREP Holding Corporation | Delaware |
| JPMorgan Real Estate Partners, L.P. | Delaware |
| JPMorgan Real Estate Partners, LP, BofA Plaza LLC | Delaware |
| St. Louis BOA Plaza, LLC | Delaware |
| PIM 1212 Flower LLC | Delaware |
| PIM/KR 1212 Flower LLC | Delaware |
| PIM Commons, LLC | Delaware |
| Asian Commons, LLC | Delaware |
| PIM Continental LLC | Delaware |
| Patriot-JPM Conti Charlotte Holdings, LLC | Delaware |
| PIM Portland Hotel, LLC | Delaware |
| PIM/Waterton Portland Hotel, LLC | Delaware |
| PIM SP4 Office Holdings, LLC | Delaware |
| PIM Winchester, LLC | Delaware |
| PIM/Bluecap Winchester, LLC | Delaware |
| SPG Lodi, LLC | Delaware |
| Westcore Vine, LP | Delaware |
| SPG Portland Hotel Lender, LLC | Delaware |
| SPG/Waterton PH Lender, LLC | Delaware |
| LabMorgan Corporation | Delaware |
| J.P. Morgan Financial Investments Limited | England |
| LabMorgan Investment Corporation | Delaware |
| LabMorgan Investment LLC | Delaware |
| Max Recovery Australia Pty Limited | Australia |
| MorServ, Inc. | Delaware |
| NBD Community Development Corporation | Michigan |
| Park Assurance Company | Vermont |
| SCG Equities I Holding Corp. | Delaware |
| Special Situations Investing Inc. | Delaware |
| The Bear Stearns Companies LLC | Delaware |

329

| Name | Organized under the laws of |
|---|---|
| Aldermanbury Investments Limited | England |
|    Principal Real Estate Funding Corporation Limited | England |
| Bear Growth Capital Partners, LP | Delaware |
| Bear Hunter Holdings LLC | Delaware |
| Bear Stearns Access Fund VII, L.P. | Delaware |
| Bear Stearns Asset Management Inc. | New York |
|    BSAM Private Equity Solutions, Inc. | New York |
|    Bear Stearns Capital Markets Inc. | Delaware |
|    Bear Stearns Alternative Assets II Inc. | Delaware |
|    Bear Stearns Alternative Assets III Inc. | Delaware |
|      Bear Stearns Alternative Assets International Limited | Cayman Islands |
| Bear Stearns International Funding I, Inc. | Delaware |
|    Bear Stearns International Funding (Bermuda) Limited | Bermuda |
|     Bear Stearns Overseas Funding Unlimited | England |
| Bear Stearns International Funding II, Inc. | Delaware |
| Bear Stearns Investment Products Inc. | New York |
|    Strategic Mortgage Opportunities REIT Inc. | Delaware |
| Bear Stearns MB 1998-1999 Pre-Fund, LLC | Delaware |
| Bear Stearns Residential Mortgage Corporation (d/b/a Bear Stearns Mortgage Company) | Delaware |
| Bear Stearns UK Holdings Limited | England |
|    Bear Stearns Holdings Limited | England |
|     Bear Stearns International Trading Limited | England |
|    J.P. Morgan Markets Limited | England |
| Bear Strategic Investments Corp. | Delaware |
|    Bear Stearns Singapore Holdings Pte Ltd | Singapore |
|    Rooftop Holdings Limited | England |
|     Rooftop Funding Limited | England |
|     Rooftop Mortgages Limited | England |
| Bear, Stearns International Holdings Inc. | New York |
|    BSG Insurance Holdings Limited | England |
|     Minster Insurance Company Limited | England |
| Bear, Stearns Realty Investors, Inc. | Delaware |
| CL II Holdings LLC | Delaware |
|    Commercial Lending II LLC | Delaware |
| Commercial Lending III LLC | Delaware |
| Community Capital Markets LLC | Delaware |
|    Commercial Lending LLC | Delaware |
| eCAST Settlement Corporation | Delaware |
| EMC Mortgage Corporation | Delaware |
|    EMC Mortgage SFJV 2005, LLC | Delaware |
|     SFJV 2005, LLC | Delaware |
| Gregory/Madison Avenue LLC | Delaware |
| Indiana Four Holdings LLC | Delaware |
|    Indiana Four LLC | Delaware |
| Madison Insurance Company | New York |
| Madison Vanderbilt Management, LLC | Delaware |
| MAX Recovery Inc. | Delaware |
|    MAX Flow Corp. | Delaware |
| Max Recovery Limited | England |
| MLP Investment Holdings, Inc. | Delaware |
| Plymouth Park Tax Services, LLC | Delaware |
|    Madison Tax Capital, LLC | Delaware |
| PricingDirect Inc. | Delaware |
| Vandelay Recoveries Inc. | Delaware |
|    Max Recovery Canada Company | Nova Scotia |

330

# EXHIBIT F



**Comptroller of the Currency**
**Administrator of National Banks**

Washington, DC 20219

January 22, 1997

**Corporate Decision #97-06**
**January 1997**

William H. McDavid, Esquire
General Counsel
The Chase Manhattan Corporation
270 Park Avenue, 8th Floor
New York, NY 10017

Re:   Notification by Chase Manhattan Bank USA, NA, Wilmington, Delaware, of its intent
      to establish an operating subsidiary to reinsure mortgage insurance
      Application Control Number: 96-WO-08-0009

Dear Mr. McDavid:

This responds to the notification filed by Chase Manhattan Bank USA, NA, Wilmington,
Delaware (the "Bank"),[1] of the Bank's intent to establish an operating subsidiary (the
"Subsidiary") to reinsure a portion of the mortgage insurance on loans originated or
purchased by the Bank or the Bank's lending affiliates.[2]  The Subsidiary will be named Cross

---

[1] The notice was originally filed by Chemical Bank, NA, Jericho, New York.  As a result of
the merger between The Chase Manhattan Corporation and Chemical Banking Corporation,
the name of Chemical Bank, NA, Jericho, New York, was changed to Chase Manhattan Bank
USA, NA, Jericho, New York.  Chase Manhattan Bank USA, NA, Jericho, New York,
subsequently merged with and into Chase Manhattan Bank USA, NA, Wilmington, Delaware.

[2] The Bank's notice, filed pursuant to 12 C.F.R. § 5.34, was filed prior to recently adopted
revisions to this regulation.  Section 5.34 was amended, effective December 31, 1996, but
none of the revisions change the relevant approval criteria for this notice.  As discussed in the
"Analysis" section of this letter, the OCC concluded in Interpretive Letter 743 (October 17,
1996), that reinsuring a portion of the mortgage insurance on loans originated or purchased by
the parent bank of an operating subsidiary, or by affiliates of that bank, is generally
permissible under the National Bank Act as part of, or incidental to, the business of banking.

- 2 -

Country Insurance Company.[3]  Based on the representations made by the Bank, we have no objection to the Bank's plan to establish the Subsidiary to engage in the proposed activity.

## BACKGROUND

### A.     Mortgage Insurance Generally

Mortgage insurance, also known as private mortgage insurance, protects an investor holding a mortgage loan against default by the mortgagor.  Banks and mortgage lenders generally require that borrowers obtain mortgage insurance from third-party mortgage insurers on low down payment loans.[4]

Mortgage insurance has played a vital role in helping low and moderate-income families become homeowners by allowing families to buy homes with less cash.  Mortgage insurance also has expanded the secondary market for low down payment mortgages and the funding available for these loans.  Government sponsored enterprises such as the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation, and most other purchasers in the secondary market, typically will not consider purchasing low down payment conventional loans unless the loans have mortgage insurance.  Secondary market purchases of low down payment loans with mortgage insurance helped fuel the expansion in home construction and sales during the 1970s and 1980s, aiding many first-time and other home buyers.  See Mortgage Insurance Companies of America 1995-1996 Fact Book.

---

[3]The OCC has previously approved reinsurance activities by other operating subsidiaries of the Bank in connection with loans made by the Bank and its affiliates.  In a letter to the Bank dated March 31, 1995, the OCC authorized the Bank to acquire directly as operating subsidiaries, Chemical Financial Services Corporation, Ltd., and Chemical Financial Management Corporation, and indirectly, the subsidiaries of Chemical Financial Management Corporation, including Sun States Life Insurance Company and Great Lakes Insurance Company.  In the OCC's March 31, 1995 letter, the OCC approved the Bank's request to reinsure, through these operating subsidiaries, credit unemployment, credit life, and disability insurance on the loans of the Bank and its affiliates.

[4]For purposes of this letter, "low down payment loans" are those loans with down payments of less than 20 percent of the property's value, or loans with loan-to-value ratios in excess of 80 percent.

- 3 -

**B.    The Proposed Reinsurance Activities**

**1.    The Reinsurance Relationship Generally**

Under the Bank's proposal, the Subsidiary will enter into a reinsurance contract with one or more mortgage insurers to reinsure[5] part of the mortgage insurance on mortgage loans originated or purchased by the Bank or the Bank's mortgage lending affiliates.[6]  Under the Bank's proposal, therefore, the Subsidiary is agreeing to accept from a mortgage insurer a portion of the risk of default associated with certain mortgage loans made or purchased by the Bank and the Bank's mortgage lending affiliates.  In return for accepting risk of default, the Subsidiary will receive a share of premiums paid under the reinsurance contract between the Subsidiary and the primary mortgage insurer.

**2.    Terms of the Reinsurance Agreement**

Under the reinsurance contract, the Subsidiary will become liable to the extent provided in the reinsurance contract to the primary mortgage insurer when a loan insured by the primary insurer goes into default (i.e., the borrower does not make a scheduled payment of principal and/or interest by the stated due date or within the stated grace period).  The Bank represents that under the terms of the reinsurance agreement between the Subsidiary and the primary mortgage insurer, the Subsidiary's maximum contractual exposure will be limited to an exact percentage of the mortgage insurance risk on each loan or on a pool of loans.  Additionally, the Bank represents that its potential liability for the Subsidiary's reinsurance obligation will not exceed the Bank's investment in the Subsidiary.[7]

**3.    Capitalization and Reserve Requirements**

The capitalization of the Subsidiary will be subject to both initial and ongoing requirements, which may vary depending on its size and expected book of business, and other factors.  The Subsidiary will maintain a statutory contingency reserve as required by state insurance authorities.  This reserve is essentially a "reservation of capital" that restricts dividend

---

[5]Reinsurance is a process whereby an original insurer reduces its underwriting risk by passing it on to another insurance company.  The first underwriter may retain only a portion of the risk and reinsure the balance with a second company that then owns the cash flow and assumes that portion of the risk.  See 13A John Alan Appleman & Jean Appleman, Insurance Law and Practice § 7681 (1976).

[6]The Bank, either directly, or through its wholly-owned subsidiaries, will originate or purchase the majority of residential mortgage loans covered by mortgage insurance that the Subsidiary will reinsure.

[7]See footnote 10, infra.

- 4 -

payments. The Bank represents that in most states, the contingency reserve is accumulated by retaining 50 percent of earned premiums each year.[8] In most states, the Subsidiary may make withdrawals from the contingency reserves to the extent that losses exceed 35 percent of earned premiums in any year.

Also, the OCC requires that national banks hold capital commensurate with the level and nature of all the risks of their business, including the operation of operating subsidiaries. If the OCC determines that the Bank's capital levels do not adequately protect the Bank from any risks of the reinsurance business of its Subsidiary, the OCC may use its authority under 12 C.F.R. Part 3 to require the bank to maintain additional capital.[9] The Bank has made a commitment to evaluate the risks presented by the Subsidiary's reinsurance activities and maintain appropriate levels of capital for the Bank and for the Subsidiary.[10] The Bank represents that it will have in place management information systems that will enable the Bank, and the OCC as part of its supervision of the Bank, to monitor, on a quarterly basis, the amount of the Bank's risk based capital and the amount of reinsurance risk in force at the Subsidiary to verify that the level of Bank capital is sufficient to support the risk. Moreover, the Bank represents that the Subsidiary has made a commitment to establish and maintain adequate contingency and specific case basis reserves as required under the reinsurance agreement with the account balance supported by an analysis of the appropriate factors.

The Bank represents that under standard insurance accounting practices and the applicable reinsurance agreement, the reinsurer or the primary insurer is required to establish the following types of reserves for reinsurance risks: an unearned premium ("UEP") reserve, a

---

[8]The Subsidiary will invest its assets only in investment-grade debt securities that are permissible investments for national banks as required by law.

[9]Section 3.10 specifically authorizes the OCC to require higher capital ratios for an individual bank in view of its circumstances. For example, higher capital ratios may be required for "a bank with significant exposure due to the risks from concentrations of credit, certain risks arising from nontraditional activities, or management's overall inability to monitor and control financial and operating risks presented by concentrations of credit and nontraditional activities." 12 C.F.R. 3.10(d).

[10]The OCC will treat the Subsidiary's reinsurance obligation as recourse with respect to loans that the Bank originates or acquires, and subsequently sells, and will apply a capital requirement for the obligation equivalent to the Bank's maximum contractual obligation, which, in this case will be limited to its investment in the Subsidiary. To the extent that the Bank believes and can demonstrate to the satisfaction of the OCC that its actual risk is less than this amount, the OCC will consider whether a different approach to determining the Bank's capital requirement would be more appropriate.

- 5 -

loss reserve, and an incurred but not reported ("IBNR") loss reserve. The UEP reserve represents the unearned portion of premiums assumed. The loss reserve represents estimated future loss payments for loans that are delinquent but for which an insurance claim has not yet been perfected and paid. The IBNR loss reserve is a liability for future estimated losses and loss adjustment expenses for loans which are delinquent, but not yet reported as such to the primary mortgage insurer.

####       4.       Consumer Provisions

The Bank has relationships with various mortgage insurance companies and purchases mortgage insurance directly from an insurer. The borrower is charged for the cost of the insurance. Charges for mortgage insurance are included in the monthly payments and annual percentage rates disclosed by banks to customers who are shopping for a low down payment mortgage. Mortgage insurance fees thus are a component of the costs customers consider when comparing competitive loan products. The Bank has represented that, in the highly competitive market for residential mortgage loans, the Bank and its mortgage lending affiliates have an overriding incentive to arrange for reasonably priced mortgage insurance fees in order to offer competitively priced loans. The Bank has also represented that mortgage insurers are regulated under state laws that include requirements for rate filings and approval.

####       5.       Safety and Soundness Considerations

The Bank's proposal includes safeguards to limit its mortgage reinsurance risk. The Subsidiary will be a state-chartered monoline company (that is, its business will be restricted to the reinsurance of mortgage insurance) and will reinsure mortgage insurance only on loans originated or purchased by the Bank or one of its affiliates. The Subsidiary will not reinsure other mortgage loans, and it will not underwrite mortgage insurance as a primary insurer.

The Bank's own credit standards and credit underwriting experience will provide valuable tools to manage risk since the Subsidiary will only accept home mortgage loan credit risks consistent with the Bank's underwriting standards. At present, the Bank and its mortgage lending affiliates purchase mortgage insurance from seven different underwriters. All seven mortgage insurance underwriters have accepted the mortgage lending standards of the Bank and the Bank's mortgage lending affiliates[11] as a sufficient basis for determining if they will issue mortgage insurance coverage. Under this process, commonly referred to as "delegated underwriting," the mortgage insurance companies rely on the same underwriting standards and the same personnel used by the Bank and the Bank's mortgage lending affiliates in determining whether to approve a particular mortgage loan in the first instance. Thus, the approval of mortgage loans by the Bank and the Bank's mortgage lending affiliates is

---

[11]The Bank has represented that its affiliates use underwriting standards comparable to the Bank's for their mortgage loans.

- 6 -

accepted by the primary mortgage insurance companies as the basis upon which to issue mortgage insurance coverage.

The Subsidiary will also be subject to regulation and oversight by regulatory authorities. As a state-chartered reinsurer, the Subsidiary will be subject to regulation by the state insurance authority of the state of its domicile and state law requirements including licensing, capital and reserve requirements. The Bank also represents that under the reinsurance agreements between the Subsidiary and the mortgage insurers, the Subsidiary will comply with the reinsurance regulatory requirements of the primary mortgage insurer's state of domicile.

In return for accepting the limited credit risk associated with the proposed reinsurance arrangement, the Subsidiary will receive reinsurance premiums, as well as investment income from its cash flow, providing a potentially important source of revenue for the Bank and the Subsidiary.

## ANALYSIS

### A.    "Business of Banking" Analysis

The OCC previously has determined that reinsuring a portion of the mortgage insurance on loans originated or purchased by the parent bank of an operating subsidiary, or by the parent bank's lending affiliates, is generally permissible under the National Bank Act because this activity is part of, or incidental to, the business of banking. See Interpretive Letter No. 743 (October 17, 1996) ("IL 743"). In IL 743, the OCC concluded that, in general, this kind of reinsurance activity is part of the business of banking because the activity (1) is functionally equivalent to or a logical outgrowth of a recognized banking activity; (2) responds to customer needs or otherwise benefits the bank or its customers; and (3) involves risks similar in nature to those already assumed by banks. The OCC also concluded in IL 743 that, even if the activity were not part of the business of banking, it would be permissible as an activity incidental to banking, particularly to a national bank's express power to make loans, because it optimized the use of the bank's credit underwriting capacities.

In determining whether this activity is permissible in the Bank's particular case, we will discuss each of the "business of banking" factors analyzed in IL 743, and apply them to the specific facts of the Bank's proposal.

#### 1.    Functionally Equivalent to or a Logical Outgrowth of Recognized Banking Functions

The Bank's reinsurance, through its Subsidiary, of mortgage loans made or purchased by the Bank or its affiliates, is functionally equivalent to, or a logical outgrowth of, the Bank's business of underwriting mortgage loans. National banks are expressly authorized to make loans under 12 U.S.C. § 24(Seventh) and to underwrite mortgages under 12 U.S.C. § 371.

- 7 -

The proposed reinsurance arrangements are comparable to the extension of low down payment mortgage loans without mortgage insurance, but with higher interest rates to cover the risk of nonpayment. Through the reinsurance vehicle, the Bank is engaged in credit judgments and assumes credit risks comparable to those involved in making these mortgage loans without mortgage reinsurance. With both arrangements, the Bank's decision to accept those credit risks are determined by the Bank's underwriting standards, which are derived from the Bank's lending experience and expertise.[12] Moreover, the risks assumed by the Bank are credit risks rather than actuarial risks. Unlike many traditional forms of insurance, which relate to casualties, death, disability, etc., the Subsidiary's reinsurance would relate to the ability of the mortgage borrower to pay the underlying mortgage obligation. Thus, when reinsuring a mortgage insurance risk, the Subsidiary essentially assumes credit rather than actuarial risk.

The Subsidiary's proposed reinsurance activities also are functionally equivalent to a partial repurchase of a national bank's own loans, a traditional banking activity. It is well established that banks may originate, purchase and sell mortgage and other loans. See 12 U.S.C. § 371(a); OCC Letter No. 418, reprinted in Fed. Banking L. Rep. (CCH) [1988-89 Transfer Binder] ¶ 85,642, at 78,011 (Feb. 17, 1988) (referring to origination, making, purchase and sale of real estate loans as "centrally traditional banking activities"); OCC, Mortgage Banking: Comptroller's Handbook 1-3, 9-10 (March 1996). Under the proposed reinsurance arrangements, the Subsidiary will accept from a primary mortgage insurer part of the credit risk from loans originated or purchased by the Bank or its affiliates. Both the proposed mortgage reinsurance and the purchase of participations in the Bank's loans thus would involve credit decisions based on the same underwriting criteria and comparable credit risks. Both involve the receipt of income for assuming those credit risks and the assumption of losses when the borrower defaults for any reason. The proposed reinsurance activities thus are functionally equivalent to established bank lending activities.

The process of reinsuring mortgage insurance in the manner proposed by the Bank is "functionally interchangeable" with the process of lending and is essentially a new way of conducting an aspect of the very old business of banking. See M&M Leasing Corp. v. Seattle

---

[12]As discussed previously, all of the mortgage insurers through which the Bank currently purchases mortgage insurance practice "delegated underwriting." Specifically, those insurers rely on the Bank's (or the Bank's affiliates') mortgage lending standards as a sufficient basis for determining if they will issue mortgage insurance. The approval of mortgage loans by the Bank and the Bank's mortgage lending affiliates is accepted by the mortgage insurance companies as the basis upon which to issue mortgage insurance coverage. Accordingly, when the Subsidiary engages in the proposed reinsurance activity, the Subsidiary will be relying on the same credit analysis and underwriting standards used by the Bank or the Bank's mortgage lending affiliates in determining whether to approve a mortgage loan in the first instance. Thus, the proposed reinsurance activity is functionally comparable to a lender's role, based on the same credit analysis and standards used by the lender.

- 8 -

First National Bank, 563 F.2d 1377, 1382 - 1383 (9th Cir. 1977).  In the M&M Leasing Corp. decision, the court affirmed the opinion of the Comptroller, holding that personal property leasing was a permissible activity for national banks.  The court concluded that leasing, when the transaction constitutes a loan secured by leased property, is essentially the lending of money on personal security, an express power under the National Bank Act.  Id. at 1382.  In its analysis, the court discussed how financial leasing is similar to lending on personal security, serves the same purpose as lending, and is "functionally interchangeable" with lending.  The court stressed that this "functional interchangeability" was the touchstone of its decision.  Id. at 1383.  Similarly, in American Insurance Association v. Clarke, 865 F.2d 278 (D.C. Cir. 1988), the court also considered whether a new activity was "functionally equivalent" to a recognized banking power.  There, the court affirmed the Comptroller's opinion that the use of standby credits to insure municipal bonds was functionally equivalent to the issuance of a standby letter of credit, a device long recognized as within the business of banking.  The Bank's proposal to reinsure loans through its Subsidiary is clearly consistent with this line of analysis and represents an alternative way for the Bank to extend mortgage loans.

The Bank's proposal is also consistent with other bank activities related to banks' lending powers.  Under 12 C.F.R. § 7.1013 a national bank may offer debt cancellation contracts for the death or disability of a borrower.[13]  The Bank's credit position, as reinsurer of mortgage loans through its Subsidiary, would resemble the position assumed by lenders in issuing debt cancellation contracts.  In both of these activities, the initial credit decision also provides the basis for assuming the additional role involving the loan.  Moreover, in both cases the risk assumed is closely related to the risk of default that is inherent in banks' lending functions.[14]  The fact that the Subsidiary's reinsurance activities will include reinsuring mortgage insurance on certain mortgage loans that are not originated or purchased by the Bank, i.e., mortgage loans that are originated or purchased by the Bank's mortgage lending affiliates, does not affect the permissibility of the Bank's proposal.  Under the Bank's proposed reinsurance arrangement, a portion of the risk of default associated with a loan held by a mortgage lending affiliate would simply be transferred to the Subsidiary.  According to the Bank, the Subsidiary will only reinsure those loans that meet the Bank's credit standards.  In

---

[13]See also Interpretive Letter No. 277, December 21, 1983, reprinted in [1983-1984 Transfer Binder] Fed. Banking L. Rep. (CCH) ¶ 85,441 (permitting national banks to underwrite credit life insurance); Interpretive Ruling 7.1016 (permitting national banks to issue and honor independent undertakings).

[14]Debt cancellation contracts provide for the cancellation of specified loan amounts upon the occurrence of a specific event (e.g., the borrower's death), whereas private mortgage insurance covers mortgage loan defaults for any reason where there is insufficient mortgage loan collateral.  Thus, the risks assumed when a bank reinsures mortgage loans is more analogous to a bank's lending than the risks assumed when a bank issues debt cancellation contracts.