# EXHIBIT B

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
**(Cite as: 2013 WL 593963 (D.Md.))**

H
Only the Westlaw citation is currently available.

United States District Court,
D. Maryland.
Denise MINTER et al.
v.
WELLS FARGO BANK, N.A. et al.
Bradley Petry et al.
v.
Prosperity Mortgage Co. et al.

Civil Action Nos. WMN–07–3442,
WMN–08–1642.
Feb. 14, 2013.

Cyril Vincent Smith, III, William K. Meyer, Zuckerman Spaeder LLP, Baltimore, MD, Richard S. Gordon, Benjamin Howard Carney, Thomas Macy McCray-Worrall, Gordon and Wolf Chtd, Towson, MD, for Denise Minter, Jason Alborough, Rachel Alborough, Lizbeth T. Binks.

Gregory Todd Lawrence, Eric Daniel Massof, Conti Fenn and Lawrence LLC, Baltimore, MD, Glenn Russell Donaldson, Law Offices Of G. Russell Donaldson PC, Crofton, MD, for Mehdi Nafisi, Forough Iranpour, Kenneth Pfeifer, Angela Pfeifer, Frank Larocca, Catherine Larocca.

John Augustine Bourgeois, Kramon and Graham PA, Baltimore, MD, Brian M. Forbes, David D. Christensen, Irene Claire Freidel, K and L Gates LLP, Boston, MA, David T. Case, K and L Gates LLP, Washington, DC, for Wells Fargo Bank, N.A., Wells Fargo Ventures, LLC.

Jay N. Varon, Jennifer M. Keas, Melinda F. Levitt, Jennifer Nadege Toussaint, Foley and Lardner LLP, Washington, DC, for Long & Foster Real Estate, Inc., Walker Jackson Mortgage Corporation.

Thomas M. Hefferon, Barbara E. Rutkowski, David L. Permut, Sabrina Marie Rose-Smith, Sirisha Venkata Kalicheti, Goodwin Procter LLP, Washington, DC, for Prosperity Mortgage Company.

*MEMORANDUM*
WILLIAM M. NICKERSON, Senior District Judge.

*1 Numerous motions are pending in these two related cases. In *Minter v. Wells Fargo,* Civ. No. WMN–07–3442 (*Minter*), the following motions are pending and ripe: Plaintiffs' Motion for Partial Summary Judgment Regarding Defendants' Non–Compliant ABA Disclosures, ECF No. 415; Defendants' Motion for Summary Judgment on the Claim for Equitable Tolling by Plaintiff Ms. Binks and the Tolling Class Members' Claims, ECF No. 418; Defendants' Joint Motion for Summary Judgment on Plaintiffs' Individual and Class RESPA Section 8(c)(4) Claims, ECF No. 419; and Defendants' Motion for Summary Judgment on Plaintiffs' Individual and Class Conspiracy to Violate RESPA Claims, ECF No. 444. In *Petry v. Prosperity Mortgage Co.,* Civ. No. WMN–08–1642 (*Petry*), the following motions are pending and ripe: Defendants' Motion for Summary Judgment on Plaintiffs' Individual and Class Claims, ECF No. 297; and Defendants' Motion to Certify Questions to the Court of Appeals of Maryland and to Supplement Summary Judgment Record, ECF No. 337.[FN1]

Upon review of the papers submitted and the relevant case law, the Court determines that the summary judgment motions filed by Defendants will be denied, except those portions of the motions that relate to the conspiracy claims. Those claims will be dismissed. The Court will also deny Defendants' motion for certification to the Maryland Court of Appeals. Plaintiffs' motion for partial summary judgment will be held *sub curia.*

**I. FACTUAL AND PROCEDURAL BACKGROUND**
The factual allegations underlying Plaintiffs' claims and Defendants' defenses have been laid out by this Court in numerous prior decisions and will

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
**(Cite as: 2013 WL 593963 (D.Md.))**

not be repeated here in any detail. Briefly stated, however, Plaintiffs allege that in 1993, Wells Fargo Bank, N.A. (Wells Fargo), which was then known as Norwest Mortgage, entered into a joint venture with an affiliate of Long & Foster Real Estate, Inc. (Long & Foster), the Walker Jackson Mortgage Company, which was then known as Prosperity Mortgage Corporation. The new entity formed was called the Prosperity Mortgage Company (hereinafter, Prosperity).

Although the precise nature of their claims have evolved somewhat over time, Plaintiffs have always alleged that Prosperity was a sham entity created to provide a pipeline of mortgage referrals from Long & Foster to Wells Fargo and a means for Wells Fargo to funnel kickbacks to Long & Foster for those referrals. Although Prosperity charged and was paid substantial fees by borrowers for services, Plaintiffs assert it actually performed little or no work in connection with the mortgage transactions. Plaintiffs further allege that Wells Fargo was the actual lender in the mortgages at issue. Plaintiffs contend the mortgages were "table-funded," *i.e.,* the loans were "funded by a contemporaneous advance of loan funds [by Wells Fargo] and an assignment of the loan to the person advancing the funds [*i.e.,* Wells Fargo]." *See* 24 C.F.R. § 3400.2 (defining table funding).

*2 Defendants counter that Prosperity is a legitimate correspondent lender and, while contracting out some underwriting and other functions to Wells Fargo, nonetheless performed itself most of the functions of a lender. Prosperity represents that the mortgages at issue were funded by a "warehouse line of credit" extended to Prosperity by Wells Fargo and then sold on the secondary market, predominately to Wells Fargo. Defendants also proffer that many of Prosperity's mortgages are referred by real estate companies other than Long & Foster and that only 90 percent of its loans are sold to Wells Fargo.

In addition to the factual background for Plaintiffs' claims and Defendants' defenses, much of the legal framework for those claims and defenses has been set out in this Court's previous opinions and, for that reason, that legal framework will not be repeated here in significant detail. In *Minter,* the undersigned has issued three substantive opinions that are relevant to issues raised in the pending motions. In ruling on Defendants' first motion for summary judgment, a motion filed very early in this litigation, the Court noted that the parties agreed that the viability of most of Plaintiffs' claim turned on whether Prosperity was a "bona fide mortgage lender that performs all of the core services necessary to make and fund mortgage loans." 593 F.Supp.2d 788, 794 (D.Md.2009). Furthermore, the Court held that, in order to determine whether Prosperity is a true provider of settlement services, the Court "looks to a 10–factor test outlined by the United States Department of Housing and Urban Development (HUD) in its 1996–2 Statement of Policy regarding affiliated business arrangements." *Id.*[FN2]

In its May 3, 2011, decision certifying class actions in *Minter* and *Petry,* 274 F.R.D. 525 (D.Md.2011), the Court further clarified the requisites of a claim under Section 8(c)(4) of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2607(c)(4), the claim for which a class was ultimately certified in *Minter.* The Court explained that, while RESPA generally outlaws what might otherwise be considered "kickbacks" for referrals, Congress carved out in Section 8(c)(4) an exemption for certain Affiliated Business Arrangements (ABAs). Section 8(c)(4) provides that,

> Nothing in [Section 8 of RESPA] shall be construed as prohibiting ... (4) affiliated business arrangements so long as (A) a disclosure is made of the existence of such an arrangement to the person being referred and, in connection with such referral, such person is provided a written estimate of the charge or range of charges generally made by the provider to which the person is referred ..., (B) such person is not required to use any particular provider of settlement services,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
**(Cite as: 2013 WL 593963 (D.Md.))**

and (C) the only thing of value that is received from the arrangement, other than the payments permitted under this subsection, is a return on the ownership interest or franchise relationship.

**\*3** 12 U.S.C. § 2607(c)(4). While acknowledging that there is some ambiguity in the language employed in this statute and the regulation implementing this section,[FN3] the Court concluded that the language "strongly impl[ies] that ABAs not in compliance with the three conditions of Section 8(c)(4) are *per se* violations [of RESPA]." 274 F.R.D. at 538. The Court found further support for this conclusion in the legislative history of RESPA, which the Court examined at length. *Id.* at 538–541.

Thus, the Court concluded, "to pass muster under RESPA, an alleged ABA must: (1) involve a bona fide provider of settlement services; and (2) conform to all three conditions set forth in Section 8(c)(4)." *Id.* at 542. As to that first condition—being a bona fide provider of settlement services—the Court looks to HUD's 10–factor test. Those factors are to be considered "in their totality and balanced appropriately in light of specific facts of the business arrangement under review." *Id.* at 544. "If, upon consideration of all applicable factors, the entity under review is not a bona fide provider of settlement services, then the arrangement does not meet the definition of an ABA. And if it does not qualify as an ABA, then it cannot qualify for the ABA exemption, even if it otherwise conforms to the conditions set forth in Section 8(c)(4)." *Id.* at 542.

When considering class certification based upon alleged violations of Section 8(c)(4), the Court bifurcated the proposed class definition to create two classes: a "Timely Class" for those class members whose claims fell within RESPA's one-year statute of limitations and a "Tolling Class" for those whose claims fell outside that limitations period. *Id.* at 548. In allowing the possibility of a "Tolling Class," the undersigned adopted a conclusion previously reached by Magistrate Judge Susan Gauvey in a discovery ruling. Judge Gauvey concluded that equitable tolling is *available* for claims brought under RESPA. 675 F.Supp.2d 591, 595 (D.Md.2009). Nonetheless, because no Named Plaintiff had a claim that arose in the tolling period and thus could satisfy the typicality requirement for the Tolling Class, the Court declined to certify a class as such but opined that Plaintiffs could move to amend their complaint to identify and designate a proper class representative. 274 F.R.D. at 549.

In the May 3, 2011, class certification opinion, the Court declined to certify a class for Plaintiffs' Section 8(a) kickback claim.[FN4] The Court reasoned that this claim only pertains to clients who transacted with Prosperity after being referred there by Long & Foster and that certifying this subclass would "unnecessarily complicate and obscure the larger question" of the case regarding the legitimacy or illegitimacy of Prosperity. 274 F.R.D. at 549. In contrast, the Court held that the claim under Section 8(c)(4) is not limited to those referred by Long & Foster. *Id.* at 548–49.

**\*4** In response to the Court's certification decision, Plaintiffs moved to amend the complaint to include a new Named Plaintiff, Lizbeth Binks, whose claim fell outside of the limitations period and then moved to certify a Tolling Class. On January 5, 2012, the Court granted Plaintiffs' motion and certified a Tolling Class. 279 F.R.D. 320 (D.Md.2012). In certifying a Tolling Class, the Court specifically noted that it was not reaching the merits of whether Binks' claim could be equitably tolled. *Id.* at 325 n. 6 & n. 7.

In opposing the motion to certify, Defendants suggested that Binks was not an adequate representative because she would not be able to successfully toll her own claim because Prosperity's relationship with Wells Fargo was disclosed to her and she did not inquire further. Because all class members received similar materials in connection with the settlement, the Court concluded that "Binks stands in the same position as other tolling class members with respect to whether the disclosures provided during a standard transaction should have put

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
**(Cite as: 2013 WL 593963 (D.Md.))**

claimants on notice that the disclosures were inadequate and that Prosperity was a sham entity; if Ms. Binks should have known, then all class members should have known, so she is an adequate and typical representative." *Id.* at 330. As to her due diligence, the Court observed that her choice "not to dig deeply into the propriety of the closing costs because she just wanted to buy the house and had no reason to suspect that Prosperity was actually a sham ..." was "the same as the false sense of security alleged by class members." *Id.*

While the Court granted the motion to certify a Tolling Class, the Court noted that, "if, as the parties begin to delve deeply into the arguments regarding equitable tolling, manageability becomes a significant problem and overwhelms the advantages of certification, the Court has discretion to decertify the class. *Id.* at n. 11 (citing *Central Wesleyan College v. W.R. Grace & Co.,* 6 F.3d 177, 189–90 (4th Cir.1993)).

Turning to *Petry,* the Court has rendered two decisions that provide the legal framework for Plaintiffs' claims in this second action. Where, in *Minter,* Plaintiffs focused primarily on federal RESPA claims, Plaintiffs in *Petry* relied upon many of the same factual allegations to assert claims under Maryland statutes and common law, most notably, Maryland's Finder's Fee Act (FFA), Md.Code Ann., Com. Law § 12–801 *et seq.* The particular subsection of the FFA on which Plaintiffs' claims rest, § 12–804(e), provides that "a mortgage broker may not charge a finder's fee in any transaction in which ... an owner ... of the mortgage broker is the lender." Because Wells Fargo is a part-owner of Prosperity and Plaintiffs contend that Prosperity functioned as a mortgage broker for loans funded by Wells Fargo, Plaintiffs contend that any fees charged by Prosperity were unlawful finder's fees.

*5 In ruling on the motion to dismiss, the Court held that the plain language of the FFA "clearly contemplates a situation where a mortgage broker acts as a mortgage lender," rejecting Defendants' argument that the FFA "excludes from its definition of 'mortgage broker' a person who is 'named as a lender in the agreement, note, deed of trust, or other evidence of indebtedness.' " 597 F.Supp.2d 558, 562 (D.Md.2009). The Court reached that conclusion following the reasoning of several unpublished decisions of the Circuit Court of Baltimore City which, while not binding, the Court found persuasive. *Id.* at 562–63, n. 4 & n. 5. Specifically, the Court relied upon *Jones v. Nationscredit Financial Services Corporation,* No. 24–C–02–572 (Feb. 3, 2003), which held, a " 'plain reading of the statute indicates that the dual role is recognized and the legislature is interested in heavily regulating these transactions to protect consumers from ... redundant and excessive fees.' " 597 F.Supp.2d at 563 (quoting *Jones* at *7).

The Court also rejected Defendants' argument that Prosperity did not act as a mortgage broker. That argument, the Court noted, turned on one of the same factual findings at issue in *Minter, i.e .,* whether Plaintiffs' loans were table-funded or bona fide secondary market transactions. *Id.* In response to Defendants' argument that Prosperity did not charge Plaintiffs a "finder's fee" because the fees paid to Prosperity were for work actually performed, the Court found that the issue of whether Prosperity actually performed any services was a factual dispute requiring full discovery. *Id.* at 564.

Finally, in that same opinion, the Court held that Defendants' assertion that Plaintiffs' state law FFA claim was preempted by Section 501(a)(1) of the federal Depository Institutions Deregulation and Monetary Control Act (DIDMCA), 12 U.S.C. § 1735f–7a, also involved a factual inquiry requiring discovery. Following the Maryland Court of Appeals decision in *Sweeney v. Savings First Mortgage, LLC,* 388 Md. 319, 879 A.2d 1037 (Md.2005) , this Court concluded that DIDMCA only preempts claims against "creditors" not "brokers." 597 F.Supp.2d at 564 n. 6. "Whether Prosperity is a creditor or broker is a question of fact." *Id.*

In the opinion certifying the "Timely Class" in *Minter,* the Court also certified a class in *Petry* with

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
(Cite as: 2013 WL 593963 (D.Md.))

a class definition that includes, *inter alia,* claims under the FFA. 274 F.R.D. at 551–556. In certifying that class, the Court further explained the scope of an FFA claim. The Court noted that, like the certified RESPA claim in *Minter,* Plaintiffs' FFA claim turned on "Prosperity's status as a sham-controlled entity or independent provider of settlement services as defined by RESPA and HUD." *Id* . at 552. That distinction under RESPA, however, "is not dispositive under the FFA ... but it does inform the FFA analysis." *Id.* While the *Minter* Plaintiffs can prevail on their RESPA claim by merely proving that Prosperity is a front brokerage for Wells Fargo loans, to prevail on a FFA claim, Plaintiffs must also prove that Prosperity charged and received an unlawful "finder's fee." *Id.* at 552, n. 32.

*6 In certifying the *Petry* class, the Court observed that, unfortunately, the scope of fees and charges considered improper "finder's fees" under the FFA is "somewhat ambiguous." *Id.* at 552. The definitional section of the statute defines a "finder's fee" as "any compensation or commission directly or indirectly imposed by a broker and paid by or on behalf of the borrower for the broker's services in procuring, arranging, or otherwise assisting a borrower in obtaining a loan or advance of money." Md.Code Ann., Com. Law § 12–801(d). The Court opined that, "[f]acially, the definition is broad and would seem to encompass any fees charged to a borrower by a broker in the course of brokering a loan." 274 F.R.D. at 552.

Subsection (b) of § 12–804, however, provides that, "[i]n addition to a finder's fee, a mortgage broker may charge a borrower for the actual cost of ... [a]ny appraisal [or] credit report" or of certain other services. Thus, the FFA would seem to carve out from the definition of "finder's fees," fees for certain goods and services that would have appeared to be within the definition of § 12–801(d). There, observed the Court, "lies the ambiguity." 274 F.R.D. at 552. The Court also observed that the parties presented very little by way of briefing as to scope of fees proscribed by the FFA. *Id.* at 553.

Notwithstanding that ambiguity, the Court found that the distinction between impermissible finder's fees and permissible fees for certain services under § 12–804(b) was probably not determinative of Plaintiffs' FFA claims. The evidence before the Court at that time suggested that each Prosperity loan "generated myriad fees both permissible and impermissible in nature. Given the broad scope of fees made impermissible by the FFA, most if not all transactions with Prosperity will have involved an FFA violation, provided of course Prosperity was acting as both broker and nominal lender as Plaintiffs allege." *Id.* at 555. In addition, because the FFA provides for fixed liquidated damages,[FN5] "Plaintiffs need only establish that Prosperity charged one impermissible finder's fee." *Id.*

Again, following reasoning offered by Magistrate Judge Gauvey in resolving the scope of discovery, the Court also held that the FFA was subject to Maryland's 12–year statute of limitations for "specialty" claims, Md.Code Ann., Cts. & Jud. Proc. § 5–102(a) (6). 274 F.R.D. at 553–54 (citing 675 F.Supp.2d 591, 595 n. 4). Although the Court held that equitable tolling might also be available for Plaintiff's FFA claims, the Court did not certify a separate tolling class in *Petry.* Where the one-year limitations period conveniently coincided with a change in Prosperity's organization and management, the much longer limitations period for the FFA claim did not. In the absence of such a coincidental convenience, the Court exercised its discretion and declined to certify a separate tolling class. *Id.* at 554.

*7 As the briefing of the pending summary judgment motions approached, Plaintiffs in both *Minter* and *Petry* elected to dismiss various claims and to proceed to trial on just some of the claims that survived the Court's rulings on dispositive motions. By letter dated August 21, 2012, Plaintiffs stated that they did "not intend to pursue any claims at the two trials of these matters, other than those based on the Finder's Fee Act and RESPA. To be

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
**(Cite as: 2013 WL 593963 (D.Md.))**

clear, this means that trial would be limited to Count I in *Minter* (the certified claims under RESPA § 8), and Counts I and II in *Petry* (Finder's Fee Act and conspiracy)." *Minter,* ECF No. 396. While there remained some confusion as to whether Plaintiffs in *Minter* had abandoned a claim for "conspiracy to violate RESPA," the Court, without ruling on the viability of such a claim, concluded that Plaintiffs had adequately expressed their intent to continue to pursue this claim. *See* ECF No. 433. With the claims still at issue significantly narrowed, the parties filed the above referenced motions for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party must demonstrate through the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that a reasonable jury would be unable to reach a verdict for the non-moving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When this burden is met, the non-moving party then bears the burden of demonstrating that there are disputes of material fact and that the matter should proceed to trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Further, the court must construe the facts in the light most favorable to the party opposing the motion. *See United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *In re Apex Express Corp.,* 190 F.3d 624, 633 (4th Cir.1999).

## III. DISCUSSION

In several of their summary judgment motions, Defendants, in essence, ask the Court to reconsider its prior decisions regarding the scope of the claims brought against them. The Court is not going to re-hash decisions already made. The Court will discuss those legal issues for which there is either purported new authority (the motions related to the Section 8(c)(4) claim to the FFA conspiracy claim) or where an issue is raised for the first time in this litigation (the motion related to conspiracy to violate RESPA).

### A. Motions in Minter

#### 1. Defendants' Joint Motion for Summary Judgment on Section 8(c)(4) claims (ECF No. 419)

*8 In this motion, Defendants suggest that the Court should reconsider its conclusion that Section 8(c)(4) of RESPA is independently actionable based on "new authority," specifically: a recent decision of the Supreme Court, *Freeman v. Quicken Loans, Inc.,* --- U.S. ----, 132 S.Ct. 2034, 182 L.Ed.2d 955 (May 24, 2012); a recent district court decision from the Northern District of California, *Washington v. National City Mortgage Co.,* Case No. 10-5042, 2011 WL 1842836 (N.D.Cal. May 16, 2011); and a brief filed by HUD in a case pending in the Sixth Circuit, *Carter v. Welles-Bowen Realty, Inc.,* No. 10-3922. The Court finds nothing in this new authority to warrant a different conclusion than it previously reached regarding violations of Section 8(c)(4).

Defendants posit that "[t]he *Freeman* decision is unambiguous: the actionable provisions of Section 8 are found in Sections 8(a) and 8(b)." ECF No. 419-1 at 26.[FN6] The Supreme Court in *Freeman* was addressing the scope of RESPA's prohibition against fee-splitting found in Section 8(b).[FN7]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
**(Cite as: 2013 WL 593963 (D.Md.))**

Section 8(c) was nowhere mentioned in *Freeman.* The Court did discuss the scope of Section 8(a), but only in response to the petitioners' argument that, unless the Court adopted the petitioners' proffered construction of Section 8(b), Section 8(b) would be rendered "largely surplusage" in light of the prohibitions of Section 8(a). 132 S.Ct. at 2043. Just because the Court had reasons to discuss Section 8(a) in discerning the reach of Section 8(b) does not imply that those two sections are the only actionable provisions of Section 8. *Freeman* is simply silent as to Section 8(c) and no inference can be drawn from that silence.

Defendants also argue that a principle of statutory construction applied in *Freeman, noscitur a sociis,* should be applied by this Court to deem Section 8(c)(4) an exemption to liability and not an independent basis for liability. This principle "counsels that a word is given more precise content by the neighboring words with which it is associated." *Id.* at 2042. The *Freeman* Court applied it for the unremarkable observation that the words "portion" and "percentage" must imply some splitting of a fee because they are found in RESPA in the phrase "portion, split, and percentage." While there is perhaps some merit to the contention that, because Section 8(c)(4) is found in a subsection containing exemptions, it must also be viewed as simply another exemption, this Court has, after an exhaustive review of RESPA's language and legislative history and HUD's rule-making, reached a different conclusion. Nothing in *Freeman* compels a different conclusion.

Similarly, the fact that one additional district court has reached a conclusion different from this Court does not alter this Court's conclusion. This Court previously acknowledged the split in authority on this issue and also notes that the most recent reported decision addressing the issue, *Bolinger v. First Multiple Listing Service, Inc.,* 838 F.Supp.2d 1340 (N.D.Ga.2012), followed the reasoning of this Court. It is not surprising that courts might come to different conclusions as to the meaning of a statute that this Court has acknowledged is not the model of clarity.

**\*9** Nor does the Court find HUD's brief in *Carter* to be compelling new authority for a conclusion different than that previously reached by this Court. In *Carter,* the district court held that HUD's 1996–2 Policy Statement was unconstitutionally vague. Filing its brief as intervener in the appeal of that decision, HUD did argue, as Defendants note, that the Policy Statement was "not intended to function as a legislative rule that imposes bright-line binding requirements." ECF No. 421–8 at 27. Instead, the Policy Statement was issued to provide guidance as to what factors should be considered and weighed "in order to distinguish bona fide settlement service providers from sham entities created to evade RESPA's prohibition of kickbacks and unearned fees." *Id.* at 23. But, this is how this Court has always viewed the Policy Statement, not as a bright-line checklist of ten factors that must be present, but as factors to be considered "in their totality and balanced appropriately in light of specific facts of the business arrangement under review." 274 F.R.D. at 544. In fact, HUD cited this Court's decision in this case in its brief as an example of appropriate reliance on the 1996–2 Policy Statement. ECF No. 421–8 at 35.

Turning to the factual issue of whether Defendants are entitled to summary judgment on the Section 8(c)(4) claim as that claim has been framed by the Court, the Court concludes that there are disputes of material fact as to multiple issues precluding the entry of summary judgment.

Defendants moved for summary judgment focusing on the arrangement between Long & Foster and Prosperity, contending that, as to that ABA, the three requirements of Section 8(c)(4) are met. Defendants maintain that Long & Foster made RESPA-compliant disclosures to all class members referred to Prosperity. Defendants also maintain that Long & Foster does not require its customers to use Prosperity and, on that issue, there is actually no dispute. Finally, Defendants maintain that the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
(Cite as: 2013 WL 593963 (D.Md.))

only "thing of value" Long & Foster received for its referrals was a return on its ownership interest, which is permitted under Section 8(c)(4). In addition, Defendants argue that Prosperity satisfies all ten of the factors outlined in HUD's 1996–2 Policy Statement.

In opposing the motion, Plaintiffs focus on the relationship between Prosperity and Wells Fargo FN8 more than that between Long & Foster and Prosperity. Plaintiffs contend that while Long & Foster may adequately disclose its relationship with Prosperity, Prosperity does not provide compliant ABA disclosures regarding its relationship with Wells Fargo. Furthermore, Plaintiffs maintain that Long & Foster receives more from the arrangement than a simple return on investment. Specifically, Plaintiffs focus on a significant subsidy given to Prosperity for the services Wells Fargo performs for Prosperity. This subsidy arises out of the "Home Office Allocation" (HOA) paid to Wells Fargo by Prosperity. Since 2006, Prosperity has paid a flat monthly fee for these services *that* Plaintiffs contend is significantly less than the true cost for those services. *See* ECF No. 447 at 25–26.

*10 The sufficiency of Prosperity's ABA disclosures turns, in large part, on whether the Prosperity loans are funded through a "warehouse line of credit" and then sold in the secondary market, as Defendants claim, or simply "table-funded," as Plaintiffs claim. If those loans are made by Prosperity and transferred to Wells Fargo on the secondary market, those transfers would be outside the reach of RESPA. *See* 24 C.F.R. § 3500.5(b)(7) ("A bona fide transfer of a loan obligation in the secondary market is not covered by RESPA"). If table-funded, however, Prosperity is functioning as a mortgage broker referring loans to Wells Fargo and that reality must be disclosed. *See id.* ("In determining what constitutes a bona fide transfer, HUD will consider the real source of the funding and the real interest of the funding lender. Mortgage broker transactions that are table-funded are not secondary market transactions.").

The Court finds that the warehouse line of credit versus table-funding issue cannot be resolved on summary judgment. In support of their claim that the loans are not table-funded, Defendants proffer evidence that Prosperity holds the loans for at least a day, that Prosperity pays interest on the amounts borrowed from Wells Fargo, and that approximately 10% of Prosperity's loans are sold to investors other than Wells Fargo. Defendants offer the report of their expert, James Paneptino, in which he states that the pertinent documents governing the arrangement between Prosperity and Wells Fargo "contain similar terms, conditions, representations and remedies customarily found in warehouse lending agreements used by mortgage banking firms in the industry and the governing documents establish a warehouse lending credit facility that is to be utilized by Prosperity Mortgage in funding its loans with Wells Fargo Bank performing the roles typically performed by a warehouse lender." ECF No. 421–17 at 18.

Plaintiffs counter that, while there may be a "paper dwell time" of a few days before loans are "assigned" to Wells Fargo, Wells Fargo's automatic and guaranteed purchase of Prosperity's loans result in an actual "dwell time" of zero. As to interest purportedly paid by Prosperity, Plaintiffs suggest that, because the interest Prosperity supposedly pays for borrowing funds from Wells Fargo is balanced out against the interest Prosperity earns for the few days it purportedly holds the loans before assigning them to Wells Fargo, the net interest expense is zero. As to the claim that Wells Fargo only buys 90% of Prosperity's loans, Plaintiffs offer evidence that Wells Fargo has exclusive control over Prosperity's "secondary market" activities and decides to whom the other 10% of loans are sold. ECF No. 447–2 at 75–76 (Stephanie Biggs Dep. at 135–36) (Prosperity loans are "all assigned to Wells Fargo ... [a]nd then Wells Fargo will make a determination at that point if they want to assign it to another investor."). Upon their review of the structure of the Prosperity/Wells Fargo arrangement, Plaintiffs' experts, Thomas FitzGibbon and Jack

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
(Cite as: 2013 WL 593963 (D.Md.))

Pritchard, conclude that the brief or non-existent dwell time, the lack of any risk to Prosperity, the fact that Wells Fargo is the sole and exclusive source of funds, as well as other indicia, all combine to demonstrate that the Prosperity loans are table-funded and not those of a bona fide correspondent lender. *See* ECF No. 447–5 at 61–71 (FitzGibbon Report) and ECF No. 447–5 at 75–77 (Pritchard Report). Furthermore, the Court notes that, while Defendants seek to explain away this testimony, Prosperity's own officers describe the funds used for Prosperity loans as Wells Fargo's funds and the loans as table-funded transactions. *See,* ECF No. 447–3 at 202–03 (Wes Foster Dep. at 99–10); ECF No. 447–3 at 15 (Michael Dunn Dep. at 30–31).

*11 The Court also finds that there are disputes of fact as to the third Section 8(c)(4) requirement, *i.e.,* whether Long & Foster received a "thing of value" beyond a return on its investment. While Defendants assert that the flat monthly HOA payment charged by Wells Fargo since 2006 covered the actual costs of the services rendered, Joe Jackson, a member of Prosperity's Operating Committee, stated in his deposition that payment was "slightly less" than the cost. ECF No. 447–3 at 46 (Jackson Dep. at 260). While Defendants argue that Kelly Anderson, the Wells Fargo Relationship Manager for Prosperity during the relevant time, simply used the wrong word, she calculated what she called a "HOA subsidy" of $2,769,320 in her evaluation of the Wells Fargo/Prosperity arrangement for 2008. ECF No. 447–2 at 34. This evidence, along with other evidence offered by Plaintiffs, gives rise to at least a dispute of fact as to whether Prosperity violates the no "thing of value" requirement.

Defendants observe in their reply that if the flat rate HOA payments are deemed to be a subsidy, that finding would only apply to the period of time beginning in 2006 when the flat rate was implemented. The Court agrees and, should the claims of the Tolling Class go forward along with the claims of the Timely Class, the jury would need to be instructed that the evidence related to the HOA flat monthly payments is only relevant to those claims that arose after 2006.

The Court finds similar disputes of fact as to many of the ten factors in the 1996–2 Policy Statement. Some of those factors involve the same analysis as discussed above. For example, a finding that Prosperity loans are table-funded would impact the fifth factor, *i.e.,* whether Prosperity incurs the risks and receives the rewards of a comparable enterprise operating in the market. *See* ECF No. 447–5 at 64–66 (FitzGibbon Report discussing this factor). Other factors would also seem to weigh in favor of a finding that Prosperity is a sham. As to Factor 2—"Is the new entity staffed with its own employees to perform the services it provides?—Defendants note that Prosperity has more than 300 employees. Many of the core lending functions, however, are performed by employees of Wells Fargo, not those of Prosperity. As to Factor 3—Does the new entity manage its own business affairs?—it appears that most of the management, particularly senior management comes from Wells Fargo.[FN9]

For these reasons, the Court finds that Defendants are not entitled to summary judgment on Plaintiffs' Section 8(c)(4) claims. In their motion, Defendants request that, should the Court deny the motion, that it nonetheless limit some of claims and some of the evidence to be admitted in support of these claims. Specifically, Defendants contend: (1) that claims arising out of transactions that closed prior to HUD issuance of the 1996–2 Policy Statement should be dismissed; (2) that Plaintiffs should be precluded from offering evidence about the initial payment made by Norwest Mortgage (Norwest), Wells Fargo's predecessor, for its share of one half Prosperity, and (3) that Plaintiffs are not entitled to recover "Service Release Premiums" as RESPA statutory damages.

*12 Defendants' argument based on when HUD issued its Policy Statement simply misses the mark.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
**(Cite as: 2013 WL 593963 (D.Md.))**

The Policy Statement did not create a new rule or requirement; it simply clarified an existing law. Sham ABAs were already prohibited, the Policy Statement simply provided a tool to evaluate whether a particular ABA was a sham.

As to the second issue, Defendants first argue that the question as to whether Norwest overpaid for its one half share of Prosperity is relevant, if at all, only to Plaintiffs' Section 8(a) claims, which were not class certified and, thus, are not part of the upcoming trial. While perhaps more relevant to a Section 8(a) "kickback" claim, the Court finds this issue potentially relevant to Plaintiffs' Section 8(c) claim as well. Plaintiffs' sham ABA theory is premised on the theory that Prosperity was created simply as a vehicle to funnel benefits to Long & Foster in exchange for referral of loans to Wells Fargo. What Wells Fargo's predecessor did to set up that vehicle is relevant to that theory.

Defendants also argue that Plaintiffs cannot prove that Norwest overpaid for its share of Prosperity. Defendants cite the deposition testimony of one of Plaintiffs' experts, Neil Demchick, in which he stated that he had not seen enough data to show that the valuation on which Norwest's payment was based was unreasonable. ECF No. 419–1 at 73 (citing Demchick Dep. at 190). Plaintiffs counter that there is evidence that establishes the actual assets of the entity purchased to become Prosperity were worth only $150,000. In his expert report, Demchick opined that the $3.5 million dollar purchase price that Norwest paid for one half of those assets "represented payment for the expectation of future referrals from Long & Foster to Prosperity that would benefit Norwest." ECF No. 447–5 at 17 (Demchick Report at 6). That Wells Fargo paid for "good will" based upon future referrals would be relevant to Plaintiffs' Section 8(c)(4) claims.

Turning to the issue of "Service Release Premiums" (SRPs), Plaintiffs and Defendants note that the terms "Service Release Premiums" or "Servicing Release Premiums," are often confused with or used interchangeably with a related term, "Yield Spread Premiums" (YSP). The term YSP is more typically used in the broker context, where the term SRP is more typically used in the correspondent lender context. Both are fees received for delivering a loan: a YSP in the case of a loan delivered to a lender from a broker; a SRP in the case of a loan delivered to an investor from a correspondent lender. As noted above, if Prosperity is truly a correspondent lender assigning loans to Wells Fargo in the secondary market, then the fee received would not be subject to RESPA. If, however, Prosperity is a sham lender functioning as a broker, the fee is subject to RESPA.

In asking the Court to hold as a matter of law that Plaintiffs are not entitled to recover any statutory damages related to SRPs, Defendants' primary argument is that "Prosperity did not receive yield spread premiums in connection with the [Plaintiffs'] loans because it did not act as a mortgage broker for such loans." ECF No. 419–1 at 76; *see also* ECF No. 455 at 37 ("Prosperity did not act as a broker and therefore had no reason to receive broker compensation.") The question of whether Prosperity functioned as a broker, of course, is at the heart of these actions and is highly disputed.

*13 Defendants' second argument related to SRPs is that courts have consistently held that damages related to SRPs are not subject to class treatment. Because damages based on YSPs require comparison between the services rendered and the compensation received for those services, each individual transaction must be analyzed separately. *See Howland v. First Am. Title Ins. Co.,* 672 F.3d 525, 531 (7th Cir.2012). While Plaintiffs did not address this issue in the briefing of this motion, they did address it in other briefing. *See* ECF No. 454 at 17–18, n. 8. Plaintiffs note that the cases requiring a comparison between services rendered and fees paid are cases decided under Section 8(b). *Id.* n. 8. In contrast, if Prosperity is found to have violated Section 8(c)(4) by failing to disclose its ABA relationship with Wells Fargo, Defendants

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

would be liable for three times the amount class members "paid for" the origination of Prosperity loans. Plaintiffs contend that they can prove at trial that what Plaintiffs "paid for" those loans includes YSPs which were capitalized into the cost of the loans. *Id.* at 18. Whether Plaintiffs will be able to so prove is a disputed fact.

### 2. Plaintiffs' Motion for Partial Summary Judgment Regarding Defendants' Non-Compliant ABA Disclosures (ECF No. 415)

Plaintiffs' motion for partial summary judgment is somewhat unusual. Plaintiffs suggest that, *if* it is determined either by (1) a judgment in *Petry* that would have collateral estoppel effect in *Minter*, or (2) a jury verdict in *Minter*, that the loans purportedly originated by Prosperity and assigned to Wells Fargo on the secondary market were actually table-funded, *then* the Court "can and should hold as a matter of law that Defendants violated RESPA because Prosperity failed to disclose that it was referring mortgage loans to Wells Fargo as required by § 8(c)(4)." ECF No. 415–1 at 1, 2. The Court should then, according to Plaintiffs, grant the Timely and Tolling Classes partial summary judgment as to liability. ECF No. 415 at 4. While filing their motion contemporarily with Defendants' motions, Plaintiffs ask that the Court hold their motion *sub curia*.

The Court will grant that last request and hold Plaintiffs' motion *sub curia*. While there is some merit in the logic of Plaintiffs' motion, the scope of any collateral estoppel arising from a hypothetical *Petry* verdict in favor of Plaintiffs is best left until after the *Petry* trial is concluded.[FN10] The implications of a jury finding in *Minter* that Prosperity's loans were table-funded, *vel non*, is a matter for jury instructions in *Minter*.

### 3. Defendants' Joint Motion for Summary Judgment on the Claim for Equitable Tolling by Plaintiff Ms. Binks and the Tolling Class Members' Claims (ECF No. 418)

The Court has held that the equitable tolling of RESPA's statute of limitations is *available*. The question in the pending motion is whether it is *applicable* to Binks and the other members of the Tolling Class. In the Fourth Circuit, a statute of limitations can be equitably tolled only when the plaintiff establishes: (1) the defendant fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence. *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir.1995). The Fourth Circuit has also noted, however, that "any invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir.2000). "The circumstances under which equitable tolling has been permitted are therefore quite narrow." *Chao v. Virginia Dept. of Transp.*, 291 F.3d 276, 283 (4th Cir.2002).

*14 In arguing that there should be no equitable tolling, Defendants suggest that Binks received several disclosures informing her that both Long & Foster and Wells Fargo were affiliated in some fashion with Prosperity. Long & Foster's disclosure stated that Long & Foster had a business relationship with Prosperity and might benefit financially from the referral to Prosperity. Specifically, the disclosure stated, Long & Foster Real Estate, Inc. and Prosperity Mortgage Corporation are owned by a common parent and that "Prosperity Mortgage Corporation owns a one-half interest in a joint venture mortgage banking company, Prosperity Mortgage Company." ECF No. 275–3. While Binks signed the disclosure indicating that she had read and understood it, she testified that, in fact, she had not. ECF No. 275–2 at 14–15 (Binks Dep. at 56–57).

Binks also received an ABA disclosure from Prosperity prior to closing. ECF No. 415–4. That disclosure stated that Prosperity had a business relationship with Wells Fargo, as well as several other entities related to Wells Fargo: Wells Fargo Real

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
(Cite as: 2013 WL 593963 (D.Md.))

Estate Tax Services, LLC; Wells Fargo Escrow Company, LLC; and Wells Fargo Insurance Co. The disclosure stated further that, because of that relationship, referrals to those entities might provide Prosperity with a financial or other benefit. *Id.* Binks was presented with this disclosure a month before closing and again at closing. In this disclosure, as in the Long & Foster disclosure, Binks was informed that "THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES." ECF No. 415–4 at 2 (Wells Fargo ABA Disclosure) (emphasis in original); *see also* ECF No. 275–3 at 2 (Long & Foster ABA Disclosure) (emphasis in original).

At closing, which was held on May 19, 2006, Binks received and executed a "Notice of Assignment, Sale or Transfer of Servicing Rights" which indicated that her loan had been sold or assigned from Prosperity to Wells Fargo, effective that same date.[FN11] ECF No. 275–4 at 2. Binks has also testified that as she approached closing on her loan, she "did not feel certain that everything had been done right" and that she did not know if there were "padded fees" in the closing costs. ECF No. 275–2 at 38 (Binks Dep. at 125). Despite those concerns, Binks testified that "by the time we got to closing, all [she] wanted to do was buy the house, so [she] didn't ask any questions there." *Id.* at 39 (Binks Dep. at 126).

Regarding the first of the requirements necessary for equitable tolling, the Court would agree that a jury could find that Prosperity fraudulently concealed from Binks the nature of her loan. Prosperity repeatedly identified itself as the lender and, if Plaintiffs' table-funding contention is correct, that representation was untrue. That representation goes to the heart of Plaintiffs' claims.

*15 The Court notes its disagreement, however, with Plaintiffs' contention that a RESPA violation is a "self-concealing" wrong. Courts addressing that issue have consistently held that violations of Section 8 of RESPA are not self-concealing. *See, e.g., Egerer v. Woodland Realty, Inc.,* 556 F.3d 415 (6th Cir.2009); *Kay v. Wells Fargo & Co.,* 247 F.R.D. 572, 577 (N.D.Cal.2007). While Plaintiffs contend that these cases can be distinguished because they address claims under Section 8(a), and not Section 8(c)(4), the claims in these actions nonetheless involved the alleged use of a sham entity to commit the violation. In *Egerer,* at the heart of the plaintiffs' claim was the allegation that the defendants operated a title company "as a sham business" to collect unearned fees from settlement services. ECF No. 456–12 at 6 (First Amended Class Action Complaint in *Egerer* at ¶ 21). In *Kay,* the plaintiffs alleged that Wells Fargo entered into "captive reinsurance arrangements" in which insurers are obligated to enter into "sham transactions" with a Wells Fargo affiliate as a means to funnel kickbacks. ECF No. 456–13 at 12–14 (*Kay* Class Action Complaint at ¶¶ 62–73).

While the Court agrees that a jury could find actual fraudulent concealment, the Court has more difficulty in concluding that the jury could find that Binks exercised due diligence. Binks admits she had misgivings about the fees she was being charged and the fact that she was informed at closing that her loan had already been assigned to Wells Fargo perhaps should have pointed her to Wells Fargo for the answer to her misgivings. Accepting, *arguendo,* that it was reasonable for her not to ask questions that might derail her hoped-for settlement, the limitations period still gave her a year to inquire about what she suspected might be padded fees. "Inquiry notice is triggered by evidence of the *possibility* of fraud, not by complete exposure of the alleged scam." *GO Computer, Inc. v. Microsoft Corp.,* 508 F.3d 170, 177–78 (4th Cir.2007) (emphasis added) (internal quotations omitted).

Nevertheless, as Plaintiffs observe, while the Long & Foster disclosure indicated that Long &

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
(Cite as: 2013 WL 593963 (D.Md.))

Foster was a one-half owner of Prosperity, nowhere is Wells Fargo identified as an owner of Prosperity. Furthermore, at Binks' settlement, indications of Wells Fargo's involvement in her loan may have raised fewer flags given that Binks was settling on a second loan at the same time, a loan that she knew to be from Wells Fargo. In addition, there is the question as to how successful any inquiry would have been, given Defendants' consistent efforts to maintain a cloak of confidentiality over the relationships between Prosperity and Wells Fargo. Construing the facts in the light most favorable to Binks, and drawing all permissible inferences in her favor, the Court cannot conclude that Defendants are entitled to summary judgment on the issue of whether the statute of limitations should be tolled as to Binks' claim.

*16 While the Court concludes that summary judgment should be denied as to that issue as to Binks' claim, after delving into the arguments regarding tolling, particularly in light of the narrowness of its applicability, the Court finds it must at least consider the option to which it alluded when certifying the Tolling Class, *i.e.,* exercising its discretion to decertify that class should issues of manageability begin to overwhelm the advantages of certification. 279 F.R.D. at 331 n. 11. The Court will delay that determination, however, until after the completion of the *Petry* trial. Because of the happenstance that the applicable statute of limitation for the FFA claim in *Petry* is twelve years, the Court will have the opportunity to gauge the manageability of claims extending over a period of time roughly equivalent to that of the Tolling Class.

**4. Defendants' Joint Motion for Summary Judgment on Plaintiffs' Individual and Class Conspiracy to Violate RESPA Claims (ECF No. 444)**

Defendants raise three arguments in favor of the Court's granting summary judgment in their favor on Plaintiffs' conspiracy to violate RESPA claims. First, Defendants argue that Plaintiffs failed to allege such a claim in their complaint. Second, Defendants assert that there is no cause of action for conspiracy to violate RESPA under the guiding principles of *Central Bank of Denver v. First Interstate Bank of Denver, P.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Third, Defendants simply argue that, because in their view, the facts do not support an underlying violation of Section 8(c)(4), there can be no conspiracy to violate that provision.

The third argument can be readily dispatched as the Court has found that there is a material dispute of fact as to whether there was an underlying RESPA violation. The first argument has more merit. There is nothing in Plaintiffs' RESPA count, Count I, expressly alleging that Defendants entered into an agreement or understanding to violate RESPA. While Plaintiffs point to language throughout the Second Amended Complaint referencing "co-conspirators" or Defendants "conspiring," that language is more readily connected to the six separate RICO counts and the civil conspiracy counts originally asserted in the Second Amended Complaint, but subsequently dismissed by Plaintiffs. The Court need not reach the issue of whether Plaintiffs asserted such a claim, however, as the Court concludes that there is no conspiracy claim that can be asserted under RESPA.

In *Central Bank of Denver,* the Supreme Court addressed the question as to whether there was secondary aiding and abetting liability under Section 10(b) of the Securities Exchange Act. In holding that there was no such liability, the Court laid out certain important principles as to when secondary liability can be read into federal statutes. The Court held that "the starting point in every case involving construction of a statute" is the statutory language, 511 U.S. at 173, and that courts may not read a cause of action for secondary liability into the language of a federal statute that is silent on the issue, because doing so would "extend liability beyond the scope of conduct prohibited by the statutory text." *Id.* at 177. In refusing to recognize a cause of action for aiding and abetting a violation of Section 10(b), the Court observed that "Congress knew how

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
**(Cite as: 2013 WL 593963 (D.Md.))**

to impose aiding and abetting liability when it chose to do so," and thus if "Congress intended to impose aiding and abetting liability," then "it would have used the words 'aid' and 'abet' in the statutory text." *Id.* at 176–77. The Court held that federal courts are not permitted to "amend the statute to create liability for acts that are not themselves ... within the meaning of the statute." *Id.* at 177–78 ("the issue ... is not whether imposing private civil liability on aiders and abettors is good policy but whether aiding and abetting is covered by the statute").

**\*17** Following *Central Bank of Denver*, federal courts have extended its teaching to reject attempts to assert conspiracy claims where the statute at issue is silent as to conspiracy liability. Courts have consistently rejected efforts to impose conspiracy liability under Section 10(b). *See, Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 841–42 (2d Cir.1998) ((noting that "every court to have addressed the viability of a conspiracy cause of action under § 10(b) and Rule 10b–5 in the wake of *Central Bank* has agreed that *Central Bank* precludes such a cause of action"); *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1098 (N.D.Cal.1994) ("The Court's rationale in *Central Bank of Denver* also forecloses Plaintiffs' conspiracy liability theory. Section 10(b) is silent as to conspiracy liability and there is no provision in the securities statutes authorizing a private cause of action for such conduct."). Courts have also applied the teaching of *Central Bank of Denver* to purported conspiracy claims under other statutes. In *Freeman v. DirecTV, Inc.,* the Ninth Circuit held, after examining the statutory language of the Electronic Communications Privacy Act, that there is no conspiracy liability under the act because there was no language in the act suggesting secondary liability or from which such liability could be implied. 457 F.3d 1001, 1005 (9th Cir.2006) ("When a statute is precise about who ... can be liable courts should not implicitly read secondary liability into the statute.") Similarly, in *Kramer v. Perez,* the Eighth Circuit held that there was no conspiracy liability under an Iowa anti-spam statute. 595 F.3d 825, 830 (8th Cir.2010) ("We refuse to create a private cause of action for civil conspiracy and/or aiding and abetting where [the statute's] text creates no such liability.").

It is worth noting that, in their attempt to urge the Court to recognize conspiracy liability under RESPA, Plaintiffs turn to the text of Section 8(a) and Section (d), and not that of Section 8(c)(4), the provision for which the class has been certified. That was necessary because a cause of action under 8(c)(4) is implied and not expressed. *See* 274 F.R.D. at 538 ("While neither the statute nor Regulation X explicitly say so, the statements emphasized above strongly imply that ABAs not in compliance with the three conditions of Section 8(c)(4) are per se violations."); *id*. at 537 ("the statute is unclear as to the legality of ABAs not in compliance the Section 8(c)(4)"). One of the primary cases relied upon by Plaintiffs recognizes that courts are "reluctant to pile inference upon inference in determining Congressional intent [to create secondary liability]." *Boim v. Quranic Literacy Inst.,* 291 F.3d 1000, 1019 (7th Cir.2002). For that reason alone, this Court finds that the recognition of a claim for conspiracy to violate Section 8(c)(4) is inappropriate.

**\*18** Nonetheless, even the language relied upon by Plaintiffs from other sections of RESPA does not support conspiracy liability. Section 8(a) provides,

> No person *shall give* and no person *shall accept* any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a) (emphasis added). The civil enforcement provision of RESPA, Section 8(d) provides,

Any person or persons *who violate the prohibi-*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
**(Cite as: 2013 WL 593963 (D.Md.))**

*tions or limitations of this section* shall be jointly and severally liable to the person or persons charged for the settlement service involved in the violation in an amount equal to three times the amount of any charge paid for such settlement service.

12 U.S.C. § 2607(d)(2) (emphasis added). Thus, the statute extends liability to those who "violate" the statute's prohibition by "giv[ing]" or "accept[ing]" a kickback.

To broaden liability under the statute, Plaintiffs cite to the language in the text of Section 8(a) that requires the giving and acceptance of the kickback to be "pursuant to any agreement or understanding." The Court observes that this language, however, does not make the mere agreement actionable. From Section 8(d), Plaintiffs argue that Congress expressed the intent to "cast a wide net to capture 'any person or persons' involved in a violation of RESPA." ECF No. 452 at 23. The broad "involved in the violation" language in Section 8(d), however, plainly refers to the settlement services involved in the violation, not any person involved in the violation.

In support of their conspiracy claim, Plaintiffs also rely on several decisions recognizing conspiracy liability, but decided under very different statutes. In a letter to defense counsel sent when the issue of whether this conspiracy claim even remained in the case, Plaintiffs' counsel cited *Cabello v. Fernandes-Larios,* 402 F.3d 1148 (11th Cir.2005), for the proposition that federal common law supports the imposition of conspiracy liability under RESPA. ECF No. 430 at 3 n. 3. Plaintiffs mention that decision in their opposition, ECF No. 452 at 19, but with no discussion. *Cabello* was decided under the Alien Tort Statute, a statute enacted in 1789, and the Torture Victims Protection Act. *Cabello* does not even mention *Central Bank.* Another decision of the Supreme Court, *Sosa v. Alverez-Machain,* noted that the Alien Tort Statute is a jurisdictional statute creating no new causes of action but simply addressing the power of the courts to entertain cases concerned with a certain subject, 542 U.S. 692, 714, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), but that decision was also not mentioned in *Cabello.* This Court finds that the statutes at issue in *Cabello* are much less analogous to RESPA than those statutes addressed in the cases cited above in which no conspiracy liability was found.

**\*19** In their actual opposition to the motion, Plaintiffs rely most heavily on *Boim. Boim* was decided under 18 U.S.C. § 2333, a statute which allows U.S. nationals who have been injured "by reason of an act of international terrorism" to sue therefor and recover treble damages. In recognizing secondary liability and distinguishing the case before it from *Central Bank,* the Seventh Circuit noted that "the statute defining 'international terrorism' includes activities that 'involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State.'" 291 F.3d at 1019 (quoting 18 U.S.C. § 2331(1)). "Involve," observed the court, "is a rather broad word" and thus the words used in the statute are "broad enough to include all kinds of secondary liability." *Id.* at 1020–21. Again, no similar broad language is found in RESPA.[FN12]

The Court finds no support for the conclusion that Congress intended to create a cause of action for conspiracy under RESPA and thus, the Court will granted Defendants' motion for summary judgment as to this claim.

**B. Motions in Petry**

**1. Defendants' Joint Motion for Summary Judgment on Plaintiffs' Individual and Class Claims (ECF No. 297)**

Many of the primary arguments related to Plaintiffs' FFA claims have been already addressed and resolved above. Defendants argue that "[b]ecause Prosperity acts as a lender rather than a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
(Cite as: 2013 WL 593963 (D.Md.))

broker, the Maryland Finder's Fee Act has no application to the class members' transactions and summary judgment should be entered." ECF No. 297–1 at 7. Also, because Defendants assert that Prosperity functioned as a creditor and not a broker, they assert that Plaintiffs' FFA claims are preempted by DIDMCA. *Id.* at 50. That Prosperity was a lender or creditor and not a broker turns on whether the transactions were table-funded, as Plaintiffs claim, or assigned to Wells Fargo in the secondary market, as Defendants claim. On these issues, the Court has determined that there are disputes of fact rendering summary judgment inappropriate.

There are some additional issues, however, that need to be addressed. Most significant is the question as to whether Prosperity charges any finder's fees. In Plaintiffs' view, if Prosperity functioned as both the named lender and a broker in the same transaction, any fee it charged was an impermissible finder's fee.[FN13] Prosperity charged an "Application Fee" of $410, a "Processing Fee" of $490, and an "Underwriting Fee" of $390 in the *Petry* transaction. *See* ECF No. 101. In addition, Plaintiffs note that Prosperity generally collects "service release premiums" (SRPs) which Plaintiffs assert are indirect broker fees paid by the class members through increased interest payments. ECF No. 324 at 18.[FN14]

Defendants also assert that Plaintiffs lack standing to bring a FFA claim on the ground that there is no evidence that Plaintiffs paid any of these fees. The HUD–1 Settlement statement for the Petrys' transaction indicates that the sellers contributed $7,827.05 to the Petrys' transaction and the total settlement costs amounted to only $6,500.47. ECF No. 1–1. On that basis, Defendants conclude that Plaintiffs "suffered no concrete injury traceable to Defendants' conduct" and thus have no standing to bring an FFA claim. Plaintiffs respond that the FFA defines finder's fees as fees " 'paid by *or on behalf of* the borrower.' " ECF No. 324 at 47 (quoting FFA § 12–801(d), emphasis added by Plaintiffs). The fees challenged in this case are identified on the HUD–1 statement as "Paid from the Borrower's Funds at Settlement," and had those fees not been charged, more funds would have been left in the Petrys' pockets.

*20 Defendants argue that Prosperity is entitled to summary judgment as to transactions where Prosperity funded loans with checks drawn on its own bank account. ECF No. 297–1. Although funds were typically transmitted to settlements by wire in Wells Fargo's name, a few of the earlier transactions were funded by Prosperity checks. There is at least a dispute of fact, however, as to whether these funds came from the same account as the wired funds. *See Minter*, ECF No. 40–5 at 3 (Randall Krout Decl. at ¶ 13).

Defendants also argue that Prosperity is entitled to summary judgment as to loans sold to investors other than Wells Fargo. As mentioned above, however, there is a dispute of fact as to whether all loans are first assigned to Wells Fargo and some only later sold to other investors.

Finally, Defendants contend that Long & Foster and Wells Fargo are entitled to summary judgment on the conspiracy to violate the FFA based upon a decision of the Maryland Court of Appeals, *Shenker v. Laureate Education, Inc.*, 411 Md. 317, 983 A.2d 408 (Md.2009), which was decided nine months after this Court's decision on Defendants' motion to dismiss. In *Shenker*, the Court of Appeals answered a question it opined it had not had the occasion to answer previously, *i.e.*, "whether a defendant may be held liable as a civil conspirator where that defendant is legally incapable of committing the underlying tort." 983 A.2d at 428. *Shenker* arose specifically in the context of a claim for civil conspiracy to commit the underlying tort of breach of fiduciary duty and the court held that establishing that claim "would require proof that the defendant, although not committing personally the underlying tort, *was legally capable of committing the underlying tort.*" *Id.* at 429 (emphasis added). Because one of the defendants owed no fiduciary duty to the plaintiffs, the court

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
**(Cite as: 2013 WL 593963 (D.Md.))**

held that this defendant could not be held liable for conspiracy to breach a fiduciary duty and affirmed the dismissal of the conspiracy claim against that defendant. *Id.*

Here, the class of individuals that are legally capable of committing the underlying tort, *i.e.,* the violation of the FFA, is narrow; the FFA " 'applies only to mortgage brokers and the fees they charge borrowers.' " *Fields v. Walpole,* Civ. No. DKC–11–1000, 2011 WL 2669401 at *7 (D.Md. July 6, 2011) (quoting *Sweeney v. Savings First Mortg., LLC,* 388 Md. 319, 879 A.2d 1037, 1048–49 (Md.2005)). Because neither Long & Foster nor Wells Fargo are alleged to function as mortgage brokers in the transactions at issue in this action, Defendants conclude that they are not capable of violating the FFA directly and thus, cannot be liable for conspiracy to violate that statute. The Court agrees.

Plaintiffs' arguments to the contrary are unavailing. First, Plaintiffs argue that lenders can also be held liable under the FFA. As support for this position, Plaintiffs quote the following portion of the statute: " 'A mortgage broker may not charge a finder's fee in any transaction in which the mortgage broker ... *is the lender* ...' " ECF No. 324 at 52 (quoting FFA § 12–804(e), emphasis added by Plaintiffs). That language, however, still requires that a violator of the statute be a "mortgage broker."

*21 Plaintiffs next appear to argue that it does not matter that Long & Foster and Wells Fargo "are not alleged to have [acted as mortgage brokers] in the transactions in this case" as long as "they *could have*" in some transaction. ECF No. 324 at 53 (emphasis in original). That argument misses the point of *Shenker*. While the dismissed defendant in *Shenker* certainly could be in a fiduciary in some other context, what mattered was the fiduciary relationship that was allegedly breached in the action before the court. That Long & Foster or Wells Fargo are hypothetically capable of functioning as mortgage brokers in some other context, does not render them capable of committing the tort that is underlying the conspiracy claims alleged in *Petry.*

Accordingly, summary judgment will be granted in favor of Defendants on the claim of conspiracy to violate the FFA.

## 2. Defendants' Motion to Certify Questions to the Court of Appeals of Maryland and to Supplement Summary Judgment Record (ECF No. 337)

Defendants have moved to have several questions related to the scope of the FFA certified to the Maryland Court of Appeals. They suggest that "plaintiffs' interpretation of the Finder's Fee Law, previously adopted by the Court, fundamentally misconstrues the plain meaning of and the legislative intent behind the statute." ECF No. 337–1 at 1. Whether certification might have been advantageous at some point in this litigation, the Court notes that it reached its particular interpretation of the statute in 2009. Now, after the case has been pending for more than four years and just weeks away from the scheduled trial date, certification would only result in unnecessary delay. As Plaintiffs note, this Court under similar circumstances has concluded that certification "at this stage would cause delay and possibly waste resources." *Antonio v. Security Servs. of Am.,* AW–05–2982, 2010 WL 2858252 at *9 (D.Md. July 19, 2010). The motion to certify will be denied.

## IV. CONCLUSION

For the reasons stated above, Defendants' motions for summary judgment will be denied except those portions of the motions that relate to conspiracy to violate RESPA and conspiracy to violate the FFA. Those claims will be dismissed. The Court will also deny Defendants' motion for certification to the Maryland Court of Appeals. Plaintiffs' motion for partial summary judgment will be held *sub curia.* A separate order will issue.

> FN1. There are also several motions in limine pending in these actions but they are not yet ripe and will be addressed in a separate memorandum.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
(Cite as: 2013 WL 593963 (D.Md.))

FN2. Quoting an earlier decision of this Court in *Benway v. Resource Real Estate Services, LLC*, the Court summarized those ten factors as follows:

(1) does the entity have sufficient initial capital and net worth; (2) is the entity staffed with its own employees; (3) does the entity manage its own business affairs; (4) does the entity have a separate office; (5) are substantial services provided by the entity; (6) does the entity perform substantial services by itself; (7) if the entity contracts out services, are they from an independent company; (8) if the entity contracts out work to another party, is the party performing any contracted services receiving a payment for services or facilities provided that bears a reasonable relationship to the value of the services or goods received; (9) is the new entity actively competing in the marketplace for business; and (10) is the entity sending business exclusively to one of the settlement providers that created it.

239 F.R.D. 419, 424 (D.Md.2006).

FN3. 24 C.F.R. § 3500.15(b) (Regulation X).

FN4. Section 8(a) of RESPA provides:

No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

12 U.S.C. § 2607(a).

FN5. Section 12–807 provides that "[a]ny mortgage broker who violates any provision of this subtitle shall forfeit to the borrower the greater of: (1) Three times the amount of the finder's fee collected; or (2) the sum of $500."

FN6. Because of the presence of several preliminary pages in many of the memoranda, the pagination in the ECF header is often at odds with the pagination found at the bottom of the page. For ease and consistency of reference, the Court will refer to the pagination in the ECF heading. Furthermore, unless otherwise noted, the ECF numbers referenced in the discussion of motions filed in *Minter* will be the ECF numbers from the *Minter* docket and the ECF numbers referenced in the discussion of the *Petry* motions will be those of the *Petry* docket.

FN7. While Plaintiffs were at one time advancing a Section 8(b) claim, that claim has since been abandoned. See *Minter* ECF No. 230 at 22–23.

FN8. Defendants suggest that this is somehow a "new theory" and that Plaintiffs should be prohibited from injecting it into this litigation at this late time. This is not a new theory. While Plaintiffs have certainly elaborated on the details of the Prosperity/ Wells Fargo arrangement, they alleged in the initial complaint that Prosperity was a "sham 'Affiliated Business Arrangement' " and served no purpose in the transactions at issue other than to refer loans from Long & Foster to Wells Fargo. Compl. ¶ 4. In their motion for class certification filed in July 2010, Plaintiffs highlighted the alleged deficiencies in Prosperity's ABA disclosure forms. ECF No. 186 at 19–20.

FN9. The Court does agree with Defendants that Factor 1, relating to the initial capitalization of Prosperity, is not particularly relevant. More significant would be

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)
**(Cite as: 2013 WL 593963 (D.Md.))**

Prosperity capitalization when it became operational and its capitalization going forward.

FN10. The Court is curious what estoppel effect Plaintiffs would concede would arise out of a judgment in favor of Defendants in *Petry*.

FN11. Binks actually settled on two loans in that settlement. She took a second loan directly from Wells Fargo. Binks structured the purchase of her home in this manner because she was planning on paying off this second loan with the proceeds from an anticipated divorce settlement. Only the first loan, which identified Prosperity as the lender, is at issue in this case.

FN12. Plaintiffs also rely on *Halberstam v. Webb*, 705 F.2d 472 (D.C.Cir.1983). *Halberstam* was a diversity action involving a common law wrongful death action, not a federal statute, and thus has no bearing on how to determine the scope of Congressional intent in extending secondary liability under a particular statute.

FN13. Plaintiffs acknowledge that as a broker, Prosperity would be permitted to charge borrowers the "actual cost" of any good or service required to complete the loan application process that was paid to a third party. ECF No. 324 at 17 n. 8. Plaintiffs note, however, that because of the structure of its payment arrangement with Wells Fargo, Prosperity cannot present any identifiable "actual costs" to pass through. *Id.*

FN14. While Plaintiffs cite Prosperity's general practice of collecting SRPs in its transactions, they do not specifically claim that Prosperity collected a SRP in connection with the Petrys' loan. Defendants suggest that there was no such fee paid in connection with that loan. ECF No. 327 at 15. Regardless, as the Court has previously noted, if any of the other fees charged by Prosperity were impermissible, Plaintiffs would be entitled to liquidated damages.

D.Md.,2013.
Minter v. Wells Fargo Bank, N.A.
--- F.Supp.2d ----, 2013 WL 593963 (D.Md.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.